**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| CORNEL WEST AND MELINA ABDULLAH, GERALDINE TUNSTALLE, KATHERINE HOPKINS-BOT, AND CHARLES HIER, | : : : : : | No. 2:24-cv-01349 *(filed electronically)* |
| Plaintiffs, | : : | |
| v. | : : | |
| PENNSYLVANIA DEPARTMENT OF STATE AND AL SCHMIDT, IN HIS CAPACITY AS SECRETARY OF THE COMMONWEALTH, | : : : : : | |
| Defendants. | | |

**PLAINTIFFS' MOTION FOR TEMPORARY RETRAINING ORDER AND**
**PRELIMINARY INJUNCTION**

Plaintiffs Cornel West, Melina Abdullah, Geraldine Tunstalle, Katherine Hopkins-Bot, and Charles Hier respectfully move this Court for a Temporary Restraining Order and a Preliminary Injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure: prohibiting Defendants the Pennsylvania Department of State and Secretary of the Commonwealth, Al Schmidt from enforcing their incorrect interpretation of the Election Code in a manner that violates Plaintiffs' First and Fourteenth Amendment Rights such that Plaintiffs West and Abdullah can be provisionally certified as candidates for President and Vice President of the United States of America. The grounds for this Motion are set forth in the accompanying Memorandum of Law attached hereto.

1

WHEREFORE, Plaintiffs respectfully ask this Court to grant this Motion and enjoin Defendants from enforcing their incorrect interpretation of the Election Code in a manner that violates Plaintiffs' First and Fourteenth Amendment Rights such that Plaintiffs West and Abdullah can be provisionally certified as candidates for President and Vice President of the United States of America.

Respectfully submitted,

Dated: September 25, 2024

/s/ Matthew H. Haverstick
Matthew H. Haverstick (No. 85072)
Shohin H. Vance (No. 323551)
Samantha G. Zimmer (No. 325650)*
KLEINBARD LLC
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
Ph: (215) 568-2000
Fax: (215) 568-0140
Eml: mhaverstick@kleinbard.com
svance@kleinbard.com
szimmer@kleinbard.com

*Pro Hac Vice forthcoming*

/s/ Erik Roberts Anderson
J. Andrew Crompton (No. 69227)*
Erik Roberts Anderson (203007)
Ryan T. Gonder (No. 321027)*
McNEES WALLACE & NURICK LLC
100 Pine Street
Harrisburg, PA 17101
Ph: (717) 232-8000
Eml: dcrompton@mcneeslaw.com
eanderson@mcneeslaw.com
rgonder@mcneeslaw.com

*Pro Hac Vice forthcoming*

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CORNEL WEST AND MELINA ABDULLAH, GERALDINE TUNSTALLE, KATHERINE HOPKINS-BOT, AND CHARLES HIER, | : : : : | No. 2:24-cv-01349 *(filed electronically)* |
| Plaintiffs, | : : : | |
| v. | : : | |
| PENNSYLVANIA DEPARTMENT OF STATE AND AL SCHMIDT, IN HIS CAPACITY AS SECRETARY OF THE COMMONWEALTH, | : : : : : | |
| Defendants. | : | |

**PLAINTIFFS CORNEL WEST AND MELINA ABDULLAH'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR TEMPORARY RETRAINING ORDER AND PRELIMINARY INJUNCTION**

## I.   INTRODUCTION

The primary values protected by the First Amendment to the United States Constitution — "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," — are "served when election campaigns are not monopolized by existing political parties." *Anderson v. Celebrezze*, 460 U.S. 780, 794 (1983) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). Accordingly, minor political parties, known in Pennsylvania as political bodies, are crucial to advancing diversity of thought and ensuring competition in the marketplace of ideas. *See id.*

1

Regardless of the nature of the elected office at issue, severe burdens on a political body's ability access without any discernable governmental interest proffered to justify such a restriction are an affront to the First and Fourteenth Amendment of the United States Constitution. But in the specific context of presidential elections, such burdens must be examined with particular care because of the "uniquely important national interest" that is implicated has "an impact beyond [the state's] own borders." *Id.* at 794-95.

This case presents exactly such a concern because Defendants' interpretation of the Pennsylvania Election Code unfairly burdens and discriminates against political bodies, their candidates, and supporters, without any state interest for doing so. Plaintiffs West and Abdullah (together, Candidates) are current President and Vice-President candidates of the Justice for All political body who seek access to the ballot in Pennsylvania. In furtherance of that goal the Candidates, over a period of several months, obtained signatures from over 13,000 registered and qualified Pennsylvania voters, including Plaintiffs Geraldine Tunstalle, Katherine Hopkins-Bot, and Charles Hier (collectively, Voters). Candidates then timely submitted their nomination papers, together with their own affidavits (the "West/Abdullah Nomination Papers"). Yet, Defendants refused to accept West/Abdullah Nomination Papers, maintaining that, under Section 951 of the Election Code, 25 P.S. § 2911, the Candidates were required to not only list all nineteen of their presidential electors on the nomination papers prior to circulation, but also submit *candidate* affidavits from each of those nineteen individuals. Defendants' interpretation of

2

Section 951 of the Election Code discriminates against Candidates, Voters, and political bodies as a whole, treating them differently from the two major political parties. What is more, Defendants' interpretation does not advance ***any*** state interest and, thus, unconstitutionally infringes on Plaintiffs' First and Fourteenth Amendment rights.

Accordingly, Plaintiffs ask this Court to preliminarily enjoin Defendants from enforcing their unconstitutional interpretation of Section 951 of the Election Code, direct the Secretary to accept the West/Abdullah Nomination Papers, and certify the names of Cornel West and Melina Abdullah as candidates for President and Vice-President of the United States, respectively.

## II.   BACKGROUND

### A.   Nomination of candidates for President and Vice-President of the United States under the Pennsylvania Election Code.

The Pennsylvania Election Code outlines two general avenues through which candidates for President and Vice-President of the United States may have their names printed on the general election ballot: (1) nomination by the "major" political parties; 25 P.S. §§ 2861-2883; or (2) nomination by political bodies and "minor" political parties." 25 P.S. §§ 2911-2914.[1]  To fully understand the constitutional

---

[1] Section 801 defines a "political party," as "[a]ny party or political body, one of whose candidates at the general election next preceding the primary polled in each of at least ten counties of the State not less than two per centum of the largest entire vote cast in each of said counties for any elected candidate, and polled a total vote in the State equal to at least two per centum of the largest entire vote cast in the State for any elected candidate, is hereby declared to be a political party within the State[.]" 25 P.S. § 2831(a). But Section 912.2 further clarifies that any "political party as defined in section 801(a) or (b) whose State-wide registration is less than fifteen per centum of the combined State-wide registration for all State-wide political parties as of the close of the registration period immediately preceding the most recent November election[,]" is defined as a "minor political party." *Id.* at § 2872.2(a). Currently, the Libertarian party is the only minor political

violations associated with Defendants' interpretation of these diverging processes for nomination, a brief discussion of both methods is necessary.

Under the Election Code, the major political parties, which are those political organizations whose share of the registered voters statewide is equal to or greater than fifteen percent and at least one of whose candidates polled above a certain minimum threshold, enjoy certain privileges not available to political bodies and minor parties must follow. *See* 25 P.S. §§ 2831(a); 2872.2. For decades, the Republican and Democratic parties have been the only two major political parties in Pennsylvania.

As relevant here, the major political parties are entitled to choose their nominee for President and Vice-President of the United States at their respective party's national convention. Thereafter, within thirty days of having received the nomination, the respective presidential candidates of each of the major political parties must submit to the Secretary their respective slates of presidential electors. *See* 25 P.S. § 2878. Importantly, the presidential electors of the major political parties do not have to submit affidavits, or pay the associated fees. Indeed, all that is required of the major political parties is some type of communication relaying the

---

party in Pennsylvania. The ballot-access process for political bodies and minor political parties is identical in all respects relevant here, the term "political body," as used here, includes "minor political parties." *See id.* ("Notwithstanding any other provision in this act to the contrary, minor political parties shall nominate all of their candidates for the offices to be filled at the ensuing November election pursuant to section 9031 in accordance with the requirements of section 951, other than subsection (e)(6) and (7) thereof,2 and section 954,3 and shall obtain the required signatures during the same time frame available to political bodies."). Thus, although the term "major political party" does not appear in the Election Code, Plaintiffs use it here as a shorthand to describe the two political parties that are not classified as "minor political parties"—namely, the Republican and Democratic parties.

names and address of the presidential electors. *See id.* ("The names of such nominees, with their residences and post office addresses, shall be certified immediately to the Secretary of the Commonwealth by the nominee for the office of President or Vice-President, as the case may be, making the nominations."). Notably, as well, although the Election Code prescribes a timeframe within which the major political parties must identify their presidential electors, the thirty-day period is hardly a deadline at all, since a major political party's failure to submit the names of its electors is in no way fatal to the candidacy of a political party's presidential candidate, provided that the designation is made "as soon as may be possible after the expiration of thirty days." *Id.*

By contrast, political bodies, which are defined as "independent bod[ies] of electors," 25 P.S. § 2602—as well as minor political parties whose total share of statewide support is below the aforementioned threshold—nominate their candidates for President and Vice-President by filing nomination papers in accordance with certain requirements set forth in Sections 951 through 954 of the Election Code. *See* 25 P.S. §§ 2911-2914.

Section 951 provides that "nomination of candidates for any public office may also be made by nomination papers signed by qualified electors of the State, or of the electoral district for which the nomination is made, and filed in the manner herein provided." *Id.* at § 2911(a). For presidential candidates, the minimum signature requirement is five thousand. *See id.* at § 2911(b).[2] Furthermore, Section

---

[2] Although Section 951(b) imposes a substantially higher signature requirement, *see* 25 P.S. § 2911(b), in *Constitution Party of Pa. v. Cortés*, No. 12-2726, Doc. No. 115 (E.D. Pa. Feb. 1, 2018),

951(e) requires that the nomination papers be accompanied by "an affidavit of each candidate nominated therein[.]" *See id.* at § 2911(e) (emphasis added). In addition, under Section 954, "each candidate nominated by a nomination paper" must submit "[t]he same filing . . . as required in section 913 for the filing of nomination petitions by candidates for nomination to the same office." *Id.* at § 2914 (citing 25 P.S. § 2873). The filing for seeking a "public office to be filled by the electors of the State at large[,]" 25 P.S. § 2873, is $ 200.

In each such affidavit, the candidate must state: (1) the election district in which he resides, (2) the name of the office for which the candidate seeks office, (3) that the candidate is eligible for the office, and (4) the candidate will not knowingly violate any provisions of the Election Code. 25 P.S. § 2911(e). Section 951.1 of the Election Code (the "disaffiliation requirement") further provides that "[a]ny person who is a registered and enrolled member of a party during any period of time beginning with thirty (30) days before the primary and extending through the general or municipal election of that same year shall be ineligible to be the candidate of a political body in a general or municipal election held in that same year." *Id.* at § 2911.1.

---

the United States District Court for the Eastern District of Pennsylvania found the requirement unconstitutional and replaced it with a 5,000 signature minimum for presidential candidates. By its terms, the decision in *Constitution Party of Pa.* only applies to the three political bodies and minor political parties who lodged the complaint. However, the Secretary has recognized that the Court's rationale would likely apply with equal force to all bodies and parties that are required to nominate their candidates by nomination papers and, thus, has announced that the Department would accept nomination papers that comply with the minimum signature requirements interposed by *Constitution Party of Pa.*

**B.     Role of presidential electors**

The role of presidential electors in the electoral process is negligible and entirely ministerial. Once designated, individual presidential electors for President and Vice-President candidates of both political parties and political bodies, remain largely unknown to the general public and have virtually no involvement in the political process until several weeks after the general election. For example, presidential electors are nowhere listed on the ballot or in election materials provided to voters by election officials. For example, a sample ballot for Beaver County in the 2020 election, attached as Exhibit A to the Complaint, lists only candidates for President and Vice-President without listing presidential electors, instructing voters to "[v]ote for the candidates of one party for President and Vice-President, or insert the names of candidates." *Id.* Moreover, as is readily apparent from the sample ballot, voters cannot vote for individual presidential elector, given that the write-in space contains only one blank line.

Similarly, although the Election Code includes extensive notice and publication requirements, it does not require the names of presidential electors to be publicly advertised or listed anywhere. Indeed, as a practical matter, it is exceedingly difficult for voters to ascertain the identities of the presidential electors. To that end, the names of presidential electors do not appear on the Department's "Candidate Database," or its "Unofficial List of Candidates," or in any other portion of the Department's website.

7

### C.     Defendants' application of the Election Code to political bodies

Prior to the 2024 General Election, the Department published its interpretation of these ballot-access provisions under a page titled "Third Party Nomination Paperwork."[3] Inexplicably, the Department took the position that every individual designated as a presidential elector by a political body is a "candidate." Thus, according to the Department, this meant that, in order to access the ballot, a political body would be required to obtain at least five-thousand signatures on nomination papers containing not only the names of its candidates for President and Vice-President of the United States, but also the names of each of its nineteen presidential electors.[4]  What is more, under Defendants' construct, political bodies would also be required to submit the requisite candidate affidavits prescribed by Section 951(e) of the Election Code from each of its presidential electors.[5]  Because of this statutory construct, the Department also took the position that the disaffiliation requirements set forth in Section 951.1 of the Election Code applies to presidential electors.[6]

---

[3] *See* https://www.pa.gov/en/agencies/dos/programs/voting-and-elections/running-for-office/third-party-nomination-paperwork.html#accordion-21c3b2a9ea-item-f2eb7b4ba2 (last visited Sept. 16, 2024).

   [4] *See id.* ("A presidential candidate must nominate 19 individuals to serve as candidates for the office of presidential elector.")

   [5] Specifically, the frequently asked questions portion of the Department's website provides, in relevant part:

   **Do presidential electors need to complete the Candidate's affidavit?**
   Yes, minor political party and political body candidates for the office of presidential elector must file candidates' affidavits by the August 1 deadline. 25 P.S. §§ 2911(e), 2913(a).

*Id.*

   [6] *See id.* ("[A]ny person who is a registered and enrolled member of the Democratic, Republican, or Libertarian party during any period of time beginning thirty (30) days before the primary and extending through the general or municipal election of that same year is ineligible to be

D.    **Candidates' submission of the Nomination Papers and Defendants' refusal to accept them.**

The sever burden associated with the Department's newfangled interpretation of Section 951 became evident when nomination papers came due in August 2024.  On July 11, 2024, Candidates timely filed the West/Abdullah Nomination Papers with Defendants. The West/Abullah Nomination Papers contained over 13,000 signatures, including those of Voters, requesting that West and Abdullah's names be printed on the General Election ballot. In addition, West and Abullah paid the relevant filing fee, and attached their respective candidate affidavits. *See* 25 P.S. § 2911(b)-(e); 25 P.S. § 2914.

Obtaining the affidavits from the nineteen listed presidential electors, however, proved to be more a difficult task because some of the individuals originally listed became unwilling or unable to serve in that role. Despite Candidates' disagreement with Defendants' interpretation of Section 951 of the Election Code, Candidates, their presidential electors, and others worked diligently to obtain the necessary affidavits by assuring the original electors that once the relevant filings were accepted, Justice for All would appoint an updated slate of electors.

These efforts, however, came up short. On August 1, Defendants rejected the West/Abdullah Nomination Papers because candidate affidavits from all nineteen individual presidential electors listed on said nomination papers were not timely

---

a candidate for presidential elector of a political body in a general or municipal election held in that same year. 25 P.S. § 2911(e).").

submitted. The next day, Defendants emailed the rejection notice to Candidates'
campaign.

Thereafter, certain presidential electors and substitute presidential electors
for West and Abdullah filed a mandamus and declaratory relief action in the
Commonwealth Court's original jurisdiction for a writ of mandamus compelling the
Department and Secretary to accept the West/Abdullah Nomination Papers in
accordance with his statutory obligations and, alternatively, for a declaration that
the Department's interpretation of Section 951 of the Election Code was contrary to
the Election Code and the Pennsylvania and Federal Constitutions. *See Williams v.
Pa. Dep't of State*, No. 394 MD 2024 (Pa. Cmwlth.). The Commonwealth Court
dismissed the action filed by West and Abdullah's presidential electors, primarily on
the basis of laches, and the Pennsylvania Supreme Court affirmed by a *per curiam*
order. *See Williams v. Pa. Dep't of State*, No. 394 MD 2024, 2024 WL 3912684 (Pa.
Cmwlth. Aug. 23, 2024), *aff'd*, 25 WAP 2024 (Pa. Sept. 16, 2024).  Notably, while the
case brought by their presidential electors was pending before the Supreme Court,
Candidates sought to intervene.  That request, however, was denied.

As it turns out, Candidates were not the only political body candidates for
President and Vice-President to have their nomination papers rejected or
challenged because of Defendants' interpretation of Section 951 of the Code. *See
Clymer v. Schmidt*, No. 376 MD 2024, 2024 WL 3912661 (Pa. Cmwlth. Aug. 23,
2024), *aff'd*, No. 67 MAP 2024) (Pa. Sept. 13, 2024); *In re: Nomination Papers of
Claudia De la Cruz*, Nos. 379 M.D. 2024 (Pa. Cmwlth. Aug. 20, 2024), *aff'd*, 56 EAP

10

2024 (Pa. Sept. 13, 2024).  In fact, two other political bodies were unable to nominate candidates for President and Vice-President solely because of defects associated with the affidavits of their presidential electors.

## III.   <u>ARGUMENT</u>

Defendants' interpretation of Section 951 is unsustainable under governing constitutional precepts because the combined effect of treating Justice for All's presidential electors as "candidates for public office" creates a severe burden on the association rights of Candidates and Voters. And because the significant barrier to entry erected by Defendants treats upstart political bodies differently than the major political parties, its constitutionality must be viewed with particular skepticism.  Given the significance of the burden imposed on political bodies—and the widely disparate treatment to which they have been subjected—Defendants must show that their interpretive approach is necessary to advance a compelling state interest and is narrowly tailored to do so.  But Defendants can do neither.  In fact, far from advancing a compelling interest, the strictures to which Defendants have subjected political bodies does not advance *any* readily discernable interest whatsoever.

The 2024 General Election is less than two months away and both Candidates and Voters will suffer immediate and irreparable harm if Defendants' unconstitutional interpretation of Section 951, as explained below, is not enjoined. Because Plaintiffs satisfy each of the four relevant basic prerequisites to awarding such relief, they are entitled to an immediate injunction prohibiting Defendants

11

from enforcing Section 951(e)'s affidavit requirement against Justice for All's individual presidential electors. *See BP Chemicals, Ltd. v. Formosa Chemical & Fibre Corp.,* 229 F.3d 254, 263 (3d Cir. 2000) (identifying standard for injunctive relief). *First*, Plaintiffs are likely to succeed on the merits of their claim—namely, that Defendant's treatment of Justice for All's individual presidential electors as "candidates for public office" under Section 951 of the Election Code imposes a severe burden on their constitutionally protected rights under the First and Fourteenth Amendment to the United States Constitution that does not advance any cognizable state interest.  Second, because counties will soon begin printing and transmitting mail-in ballots for the November 5, 2024 General Election the risk of harm to Plaintiffs is both imminent and irreparable.  Third, while the modest delay associated with granting injunctive relief may result in some administrative difficulties, the balance of equities weighs in favor of preventing the unconstitutional disenfranchisement of the Candidates and their supporters. Fourth, and finally, the public interest weighs in favor of conducting the 2024 General Election free of constitutional taint and in accordance with constitutional mandates.

Moreover, the Third Circuit Court of Appeals recently reiterated, if the first two factors—referred to as the "gateway factors"—are established, the "court then determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Amalgamated Transit Union Local 85 v. Port Auth. of Allegheny Cty.*, 39 F.4th 95, 103 (3d Cir. 2022).  Here, even if there

12

is some arguable merit to Defendants' arguments with regard to the additional

burdens attendant in delay, given the substantial strength of Plaintiffs' argument

with regard to the first two factors, balancing all four factors weighs decisively in

favor of granting preliminary injunctive relief.

> **A.** **Plaintiffs are likely to succeed on the merits of their claim that Defendants' decision to preclude them from the ballot violates the Federal Constitution.**

Turning to the first factor, Plaintiffs are likely to succeed on the merits of

both claims—namely, that Defendants' interpretation of Section 951 of the Election

Code violates: (1) the right of freedom of association under the First and Fourteenth

Amendment of the United States Constitution; and (2) the guarantee of equal

protection of laws under the Fourteenth Amendment.  Although they present

distinct causes of action, in the specific context of challenges to ballot-access laws,

both constitutional claims are analyzed pursuant to the same general analytical

framework: the Court must first examine the degree to which the challenged State

action burdens the constitutional right in question and, based on that assessment,

determine whether a sufficiently strong justification has been proffered for

imposing such a burden.  *Patriot Party of Allegheny Cnty. v. Allegheny Cnty. Dep't of

Elections*, 95 F.3d 253, 258 (3d Cir. 1996) (explaining that, under the "general

framework for analyzing constitutional challenges to state election laws[,]" a court

"applies a fact intensive balancing test that weighs the burden that the state

election law places on a political party against the state's asserted justification for

the law").

13

Applying these principles, Plaintiffs' likelihood of success on the merits is evident.  Specifically, as developed in greater detail below, without advancing or protecting any plausible governmental interest, the cumulative effect of Defendants' interpretation of Section 951 has resulted in a significant burden on Plaintiffs' constitutionally protected rights to freedom of association and equal protection of laws.

> 1. **Because Defendants' interpretation of the Election Code burdens Plaintiffs' First Amendment Rights and advances no state interest, Plaintiffs are likely to succeed on their First Amendment claim.**

It is well-settled that the First Amendment's guarantee of freedom of association includes not only "the right of individuals to associate for the advancement of political beliefs[,]"[7] and "select a standard bearer who best represents [their] ideologies and preferences[,]'"[8] but also the right of the chosen candidate to access the ballot.  *See, e.g., Illinois State Bd. of Elections*, 440 U.S. 173, 184 (1979) (explaining that ballot-access restrictions "implicate the right to vote because absent recourse to referendums, voters can assert their preferences only through candidates or parties or both[,]" and  "[b]y limiting the choices available to voters, the State impairs the voters' ability to express their political preferences" (internal citations and quotation marks omitted); *see also The Constitution Party of Pennsylvania v. Cortes*, 116 F.Supp.3d 486, 499 (E.D. Pa. 2015) ("Freedom to

---

[7] *Deibler v. City of Rehoboth Beach*, 790 F.2d 328, 332 (3d Cir. 1986) (quoting *Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979))

[8] *Patriot Party of Allegheny Cnty. v. Allegheny Cnty. Dep't of Elections*, 95 F.3d 253, 259 (3d Cir. 1996) (quoting *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 224 (1989)

14

associate for political ends has little practical value if the [political parties or bodies] cannot place their candidates on the ballot and have an equal opportunity to win votes[.]" (citing *Illinois State Board of Elections*, 440 US. at 184)), *aff'd sub nom. Constitution Party of Pennsylvania v. Cortes*, 824 F.3d 386 (3d Cir. 2016).[9]  In short, therefore, it is beyond peradventure that Defendants' interpretation of Section 951 of the Election Code burdens a fundamental constitutional right.

Of course, because "states must be free to engage in 'substantial regulation of elections' if 'some sort of order, rather than chaos, is to accompany the democratic processes[,]'" *Donald J. Trump for President, Inc. v. Boockvar*, 493 F.Supp.3d 331, 383 (W.D. Pa. 2020) (quoting *Burdick v. Takushi*, 504 U.S. 428, 433 (1992)), "not all restrictions imposed by the States on candidates' eligibility for the ballot impose constitutionally-suspect burdens on voters' rights to associate or to choose among candidates." *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983).  Thus, the fundamental nature of the right at stake does not, in of itself, require strict scrutiny.  Rather, under the *Anderson-Burdick* framework established by the United States Supreme Court, the analysis requires "a weighing process[,]" whereby courts "consider what burden is placed on the rights which plaintiffs seek to assert and then [] balance that burden against the precise interests identified by the state and the extent to which these interests require that plaintiffs" rights be burdened."

---

[9] *See also Anderson v. Celebrezze*, 460 U.S. 780, 786 (1983) ("[T]the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters." (quoting *Bullock v. Carter,* 405 U.S. 134, 143, 92 S.Ct. 849, 856, 31 L.Ed.2d 92 (1972)). **"**Our primary concern is with the tendency of ballot access restrictions "to limit the field of candidates from which voters might choose." Therefore, "[i]n approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters." *Ibid.*

*Rogers v. Corbett*, 468 F.3d 188, 194 (3d Cir. 2006). Accordingly, the Court must "look at the nature of the rights involved here and the burdens imposed by Pennsylvania election law on minor political parties in order to determine if the burden is justified." *Id.* ("Only after weighing these factors can we decide whether the challenged statute is unconstitutional."); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (explaining that the Court balances the character and magnitude of the injury to the constitutional right against "the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff[s'] rights"). If the burden is severe, "the state's interest must be compelling and the law must be narrowly tailored to serve the state's interests." *Reform Party of Allegheny Cnty. v. Allegheny Cnty. Dep't of Elections*, 174 F.3d 305, 310 (3d Cir. 1999); *accord Donald J. Trump for President, Inc. v. Boockvar,* 493 F.Supp.3d 331, 384 (W.D. Pa. 2020) ("If the state imposes a 'severe' burden on the right to vote, strict scrutiny applies—the rule may survive only if it is 'narrowly tailored' and only if the state advances a 'compelling interest.'" (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997))). Conversely, where "the burdens, although not trivial, [a]re not severe[,]" courts apply "an intermediate level of scrutiny, in which the State's asserted regulatory interests need only be sufficiently weighty to justify the limitation imposed on the minor party's rights." *Reform Party of Allegheny Cnty.*, 174 F.3d at 314. Finally, because "[a] burden that falls unequally on new or small political parties or on independent candidates impinges, by its very

16

nature, on associational choices protected by the First Amendment[,]" in ascertaining the proper level of scrutiny courts have been especially skeptical of ballot restrictions that—either in practice or in effect—impose additional barriers to ballot access for upstart candidates. *Patriot Party of Allegheny Cnty.*, 95 F.3d at 262 (quoting *Anderson*, 460 U.S. 793); *accord Reform Party of Allegheny Cnty.*, 174 F.3d at 315.

Against this constitutional backdrop, Defendants' interpretation of Section 951 of the Election Code cannot pass muster. As it pertains to the first step of the analysis, in judging the severity of the burden, the Third Circuit Court of Appeals has cautioned that courts "must look to the actual effect that the restriction will have on the party." *Patriot Party of Allegheny Cnty.*, 95 F.3d at 259. Such a wholistic examination of the relevant circumstances is necessary because "a number of facially valid provisions of election laws may operate in tandem to produce impermissible barriers to constitutional rights." *Storer v. Brown*, 415 U.S. 724, 737 (1974).[10]

---

[10] *See also Constitution Party of Pennsylvania v. Cortes*, 824 F.3d 386, 398 (3d Cir. 2016) (rejecting "the Commonwealth's attempt to separate the two challenged provisions" because "[p]ermitting such a fragmentation of the Aspiring Parties' claims would prevent meaningful review of the real harm caused by the statutory scheme in place here"), *aff'g The Constitution Party of Pennsylvania*, 116 F.Supp.3d at 503 ("It is the **combined effect** of the signature requirement with Section 2937's signature validation procedures which creates the substantial burdens in this case." (emphasis added) (citing *Storer v. Brown*, 415 U.S. at 737 (1974))); *Molinari v. Powers*, 82 F.Supp.2d 57, 71 (E.D.N.Y. 2000) ("The conclusion that the New York ballot access scheme poses an undue burden in its totality invokes the application of the principle 'that a number of facially valid provisions of election laws may operate in tandem to produce impermissible barriers to constitutional rights.'" (quoting *Storer*, 415 U.S. at 737)); *McLaughlin v. N. Carolina Bd. of Elections*, 850 F.Supp. 373, 393–94 (M.D.N.C. 1994) ("[T]he Court must examine whether the 'totality' of North Carolina's statutory scheme violates plaintiffs' constitutional rights. In considering this issue, the Court must determine whether the laws, operating in conjunction, 'freeze' the status quo by preventing all candidates, other than the two major parties, from any realistic access to the ballot."), *aff'd*, 65 F.3d 1215 (4th Cir. 1995).

Accordingly, the inquiry in this regard must center on the practical effect of treating a political body's presidential electors as "candidates for public office" under Section 951 of the Election Code—not whether this interpretive approach, on its face, imposes an undue burden.  Viewed through this lens, the severity of the burden comes into full focus.

As described above, because Defendants have taken the position that each of the nineteen presidential electors are "candidates for public office" they have also insisted that political bodies seeking to nominate candidates for President and Vice-President of the United States must also identify (by name, address, and occupation) all nineteen electors on each sheet of their nomination papers. Accordingly, under Defendants' interpretation, if any one of the nineteen individuals identified as presidential electors become unable or unwilling to serve in that role, every single signature obtained until that point are rendered invalid.  The practical effect of this was that Justice of All was required to identify nineteen individuals before it could begin circulating its nomination papers and when, shortly before August 1, 2024 filing deadline, it discovered some of the nineteen individuals so identified were no longer willing or able to serve as electors, ballot access for West and Abdullah became practically impossible.  That the obstacle to ballot access erected by Defendants' interpretation was nearly insurmountable is illustrated by the only "options" that were available to Justice for All when it learned that some of the individuals originally listed as presidential electors would have to be replaced.

18

Justice for All's first option was to persuade those individuals who were no longer willing to serve as electors to nonetheless file an affidavit or declaration of candidacy (together with a withdrawal form), after which, the committee authorized to fill vacancies would appoint a replacement elector.[11]  Indeed, after the process was explained to them, some of the individuals originally listed as electors agreed to do this.

Alternatively, Justice for All could have stricken out the names of the "original" electors on the already-circulated nomination papers and replaced them with the new lineup of electors.  But under the Election Code, the Secretary is required to reject nomination papers that have been materially altered after circulation.  See 25 P.S. § 2936. And, because the Secretary maintains that presidential electors are "candidates for public office," striking out the names of the original presidential electors to replace them with new ones would undoubtedly constitute a material alteration.  *See e.g.*, *Wilds v. Sec'y of Com. of Pa.* 475 A.2d 847, 850 (Pa. Cmwlth. 1984).  In short, the end result of making such a change after circulation would have been the same:  the West/Abdullah Nomination Papers would have been rejected.

---

[11] Inasmuch as the Department has maintained a political body's chosen presidential electors are "candidates for public office" under Section 951, Justice for All could not have named new presidential electors unless and until it timely filed duly executed affidavit or declaration from the nineteen individuals originally listed as electors on the nomination papers. *See In re Scroggin,* 237 A.3d 1006, 1023 (Pa. 2020) (holding that, because the Green Party had failed to timely submit the necessary affidavits from its original candidates for office, the attempted substitution was "ineffectual" and the candidacy was "ineffectual" (citing *Watson v. Witkin*, 22 A.2d 17, 21 (Pa. 1941) ("The authorized party committee can make substituted nominations only when the duly nominated candidate of the party dies or withdraws as a candidate. Before there can be a 'substituted nomination' there must have been a nomination."))).

19

Faced with these equally unappealing options, the only other avenue for ballot access would have been to discard the original nomination papers—reflecting the will of 13,000 registered voters that West and Abdullah be listed as candidates for President and Vice-President—and begin the process anew. But this too was not a viable option, given that it would have been practically impossible to obtain the necessary signatures in such a short time period.

By any measure, therefore, the ***combined*** practical effect of treating a political body's presidential electors as "candidates for public office" under Section 951 created a substantial burden. Indeed, the experience of other political bodies over the last two months confirms that Defendants' interpretation of Section 951 severely and disproportionately impacts upstart organizations. As noted above, in addition to the West/Abdullah ticket, the Presidential and Vice-Presidential candidates of two other emerging political bodies (Socialism and Liberation and the Constitution Party) have been denied ballot access not because they failed to submit a sufficient number of valid signatures, but rather, because their nineteen presidential electors failed to comply with the candidate affidavit requirement. As a result, aside from the nominees of the major political parties, the only Presidential and Vice-Presidential nominees that are presently set to appear on the ballot are those of the Libertarian Party and the Green Party—neither of which are political organizations that are in their nascent stages. As the Third Circuit Court of Appeals has observed "minor political parties are not the step-children of the American political process." *Patriot Party of Allegheny Cnty.*, 95 F.3d at 261.

20

Rather, that is precisely the role to which they have been relegated by Defendants'
interpretation.  In fact, Defendants' interpretation of Section 951 not only
"***threaten*[*s*]** to reduce diversity and competition in the marketplace of ideas[,]"
*Anderson*, 460 U.S. at 794 (emphasis added), it has a proven track-record of doing
so.

And while the difficulties created by Defendants' interpretations of Section
951 are severe in their own right, the constitutional significance of these burdens
become even more pronounced when they are compared against the ballot-access
procedure prescribed for the presidential and vice-presidential candidates of the
major political parties. *See Anderson*, 460 U.S. at 794 (explaining, that "[a] burden
that falls unequally on new or small political parties or on independent candidates
impinges, by its very nature, on associational choices protected by the First
Amendment" because it "discriminat[es] against both candidates and voters whose
political preferences lie outside the existing political parties"); *Patriot Party of
Allegheny Cnty.*, 95 F.3d at 261-62 (cautioning that "minor political parties are not
the step-children of the American political process" and summarizing the line of
cases in which "the Supreme Court struck down statutes or practices that
unnecessarily burdened the ability of minor political parties to participate in the
political process").

To begin, unlike political bodies, who (as a practical matter) must have their
full slate of presidential electors set in stone before they begin circulating
nomination papers, the major political parties are not required to even identify their

21

slate of presidential electors until thirty days after they have chosen their respective candidate for president. *See* 25 P.S. § 2878. And even then, unlike political bodies and minor political parties, the two major political parties may access the ballot without submitting ***any*** affidavits—not even from their candidates for presidential and vice-presidential candidates. In fact, all that is required of major political bodies is ***some*** type of communication (the nature and formality of which is not prescribed in statute), furnishing the names and addresses of presidential electors. In this connection, because they are entirely excused from submitting any affidavits, the major political parties are also granted ballot access entirely free of charge, whereas Justice for All, under Defendants' approach, was required to pay $4,200 to access the ballot ($200 for West's affidavit, $200 for Abdullah's affidavit, and $200 for each of the nineteen presidential elector affidavits). Moreover, a political party's failure to submit the names of its presidential electors within the allotted time does not even affect that party candidate's right to appear on the ballot. *See generally* 25 P.S. § 2878.

Also of note, the major political parties' presidential electors are not required to even be registered voters in the Commonwealth—let alone registered members of their respective parties. Yet, under Defendants' interpretation of Section 951 of the Election Code, only those who have disaffiliated from the major parties may serve as presidential electors for political bodies. The multitude of hurdles that a presidential candidate faces because of contrived formalities relative to presidential

electors plainly skew the electoral landscape against political participation by
disfavored upstart parties.

Finally, to the extent there is any lingering doubt that the severity of the
burden on Plaintiffs' constitutional rights requires application of strict scrutiny, it is
put to rest by the fact that the restrictions divined by Defendants have national
implications.  As the Supreme Court explained in *Anderson*, "in the context of a
Presidential election, state-imposed restrictions implicate a uniquely important
national interest." *Anderson*, 460 U.S. at 794-95.  Thus, the *Anderson* Court
cautioned, "the State has a ***less*** important interest in regulating Presidential
elections than statewide or local elections, because the outcome of the former will be
largely determined by voters beyond the State's boundaries." *Id.* at 795 ("This
Court, striking down a state statute unduly restricting the choices made by a major
party's Presidential nominating convention, observed that such conventions serve
'the pervasive national interest in the selection of candidates for national office, and
this national interest is greater than any interest of an individual State.'" (quoting
*Cousins v. Wigoda*, 419 U.S. 477, 490 (1975)).  Following *Anderson*, Courts have
routinely recognized that "the national-election implication an important factor" in
ascertaining the level of scrutiny that should be applied. *Nader v. Connor*, 332
F.Supp.2d 982, 988 (W.D. Tex. 2004), *aff'd*, 388 F.3d 137 (5th Cir. 2004); *Council of
Alternative Political Parties v. Hooks*, 179 F.3d 64, 73 (3d Cir. 1999) (finding
*Anderson*'s strict scrutiny analysis inapposite because the challenged statute
"applie[d] to state and local elections, rather than the national presidential election,

23

and therefore the State's interest [was] appreciably greater"); *Cromer v. State of S.C.*, 917 F.2d 819, 827 (4th Cir. 1990) (holding that, under *Anderson*, the fact that "the law is strictly limited to state elections" constitutes "a significant difference").[12] Yet Section 951, as interpreted by Defendants, turns *Anderson* on its head, as it makes the disparity between the ballot-access process far more pronounced in the context of presidential candidates.  In sum, strict scrutiny applies and, thus, Defendants must show that their interpretation of Section 951 of the Election Code is: (1) necessary to advance a compelling State interest; and (2) narrowly tailored to achieve that objective.  Defendants can do neither.

Although Defendants bear the burden of identifying the precise interest that is purportedly at stake,[13] Plaintiffs will take this opportunity to preemptively address some of the arguments that may be offered in this regard.  For example, the Commonwealth undoubtedly has an interest in ensuring that candidates are able to demonstrate some level of perceptible support before accessing the ballot.  *See, e.g.*, *Jenness v. Fortson*, 403 U.S. 431, 442 (1971) ("There is surely an important state interest in requiring some preliminary showing of a significant modicum of support

---

[12] In fact, if all that were required of Justice for All was submission of affidavits from its nineteen presidential electors in conjunction with the filing of the nomination papers, it is highly unlikely that this action would have ever been brough, since West and Abdullah could have easily obtained affidavits from nineteen individuals eager to serve as presidential electors.

[13] *Reform Party of Allegheny Cnty.*, 174 F.3d at 315 ("When we consider constitutional challenges to specific provisions of a State's election laws, we cannot speculate about possible justifications for those provisions. The court must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." (internal citations and quotation marks omitted)).  In fact, this holds true even if an intermediate level of scrutiny were appropriate.  *See id.* (citing *Edenfield v. Fane*, 507 U.S. 761, 768 (1993) (explaining, in the context of intermediate scrutiny, that courts may not "supplant the precise interests put forward by the State with other suppositions").

24

before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election."). Thus, requiring the presidential and vice-presidential candidates to submit at least 5,000 signatures is certainly a sensible measure. But requiring presidential ***electors*** to be listed on those nomination papers does nothing to further that goal, since it is presidential and vice-presidential ***candidates*** that appear on the ballot—not their electors. And any suggestion that those signing the nomination papers do so because they support the presidential electors, rather than the candidates themselves, borders on the absurd. Indeed, absent relief from this Court, a presidential candidate who ***has*** made the "preliminary showing of a significant modicum of support a level of support" required of political bodies by obtaining signatures from over 13,000 supporters will be prevented from participating in the political process. *Jenness*, 403 U.S. at 442.

Similarly, it is well-settled that a state has an interest in "protect[ing] the integrity of its political processes from frivolous or fraudulent candidacies." *Bullock*, 405 U.S. at 145. And if all that Defendants required was that a political body's nomination paper be accompanied by candidate affidavits from nineteen individuals willing and eager to serve as presidential electors, reliance on this well-recognized state interest would be understandable. But again, the combined effect of Defendants' interpretation is far more severe. Viewing the statutory scheme's overall effect, there is no basis for concluding that "integrity of the political process"

25

is protected by denying ballot access merely because some of the individuals who had originally agreed to serve as presidential electors for an upstart political body were no longer willing or able to do so. *Id.* Nor does the fact that some of the original presidential electors may have decided that they can longer act in that capacity suggest that the candidacy of the putative presidential and vice-presidential nominees is "frivolous or fraudulent." *Id.* In short, Plaintiffs have searched in vain to identify any plausible state interest (let alone a compelling one) that is served by treating a political body's presidential electors as "candidates for public office."

In fact, even if the candidate affidavit requirement were examined on its own terms—without regard for the combined effect of treating presidential electors as "candidates for public office"—Defendants' interpretation would still be unable to pass muster in light of the procedure prescribed for the major parties. In this regard, Defendants may suggest that such affidavits are necessary to ensure that the individuals designated to act as a political body's presidential electors have agreed to serve in that role and are not fraudulently named. *See id.* at 1019 ("The requirements of sworn affidavits are to insure the legitimacy of information crucial to the election process." (quoting *Petition of Cianfrani*, 359 A.2d 383, 384 (Pa. 1976)). But despite its facial appeal, this rationale does not withstand scrutiny, as it does not offer any justification for treating the presidential electors of political bodies differently than those of political parties.

26

Similarly, Defendants cannot articulate any interest whatsoever in requiring a political body to identify its presidential electors before it can even circulate nomination papers, while allowing a political party thirty days after it has made its nomination. To the contrary, requiring political bodies to submit such papers before the major political parties has generally been viewed as constitutionally suspect. *See Patriot Party of Allegheny Cnty.*, 95 F.3d at 262 (noting that *Anderson* invalidated a statute that "required independent candidates to file nominating petitions several months before candidates of political parties were required to file their documentation"). Moreover, even if some justification could be offered for affording political parties additional time for identifying their presidential electors, it is impossible to conceive of any legitimate state interest that is served by precluding political bodies from the ballot for failure to comply with the deadline, but not imposing the same requirement on the parties. And finally, there is no plausible reason for exacting a $4,200 fee from political bodies as a precondition to ballot access, while allowing political parties to access the ballot free of charge.

To the extent Defendants suggest that the affidavit is necessary to ensure eligibility, that argument also fails because there are no "facts pertinent to [a presidential elector's] candidacy." *In re Scroggin*, 237 A.3d 1006, 1018 (Pa. 2020). Indeed, the only "qualifications" to hold the "office" (*i.e.*, disaffiliation within the statutorily prescribed 30-day period) is based on circular logic—that is, disaffiliation is a "qualification" only insofar as presidential electors are, as Defendants maintain, candidates for public office subject to Section 951. In fact, requiring disaffiliation in

27

the present context raises independent constitutional concerns in its own right.

Specifically, such provisions are sensible with regard to all other offices, in that they

mirror the provisions of the Election Code requiring candidates in primaries to be

registered members of their respective political parties.  But disaffiliation makes no

sense here because a major party's presidential electors need not be affiliated with

that party.  And finally, requiring each of the nineteen presidential electors of a

political to pay a fee, while imposing no similar mandate on the major political

bodies is also unsupportable.

In closing, it bears emphasis that minor political bodies serve a crucial role in

our elections. Indeed, the primary values protected by the First Amendment to the

United States Constitution — "a profound national commitment to the principle

that debate on public issues should be uninhibited, robust, and wide-open," — are

"served when election campaigns are not monopolized by existing political parties."

*Anderson*, 460 U.S. at 794 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254,

270 (1964)).

> **2.    Because Defendants' interpretation of the Election Code unfairly discriminates against political bodies by imposing extra-statutory requirements without advancing a state interest, Plaintiffs are likely to succeed on their Fourteenth Amendment claim.**

Plaintiffs are likely to succeed on the merits of their claim that Defendants'

interpretation of Section 951 violates the Equal Protections Clause of the

Fourteenth Amendment.  *See* U.S. Const. amend. XIV. As intimated earlier, the

overarching analysis in this regard substantially overlaps with the framework

applied to First Amendment cases in this realm, as it requires a court to balances

28

the character and magnitude of the injury to the constitutional right against "the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff[s'] rights." *Burdick*, 504 U.S. at 434; *Williams v. Rhodes*, 393 U.S. at 23, 30 (1968) ("In determining whether or not a state law violates the Equal Protection Clause, we must consider the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification."); *see also Patriot Party of Allegheny Cnty.*, 95 F.3d at 269 ("[O]ur analysis of the Patriot Party's equal protection claim is similar in many respects to the balancing test that we applied to its free association claim."). The severe burden imposed by Defendants' treatment of political bodies as "the step-children of the American political process," is discussed in great detail above. And largely for the same reasons that the unequal burdens placed on Plaintiffs violate the First Amendment, they also violates the Equal Protection Clause of the Fourteenth Amendment. Specifically*,* they give "established parties a decided advantage over any new parties struggling for existence and thus place substantially unequal burdens on both the right to vote and the right to associate." *Williams*, 393 U.S. at 31.[14]  Indeed, as evidenced by the fact that three political bodies were denied ballot access exclusively because of

---

[14] In this regard, it bears noting that, just as the burden on Plaintiff's First Amendment right must be judged with a view toward the overall practical impact of the challenged regulation, "[i]n order to determine whether election laws violate the Equal Protection Clause, [courts] must measure the totality of the burden that the laws place on the voting and associational rights of political parties and individual voters against the justifications that the State offers to support the law." *Id.*

defects associated with their presidential electors' affidavits, Defendants' interpretation of Section 951 "help[s] to entrench the decided organizational advantage that the major parties hold over new parties struggling for existence. *Patriot Party of Allegheny Cnty.*, 95 F.3d at 269. Plaintiffs will refrain from simply repeating the foregoing arguments.

### B.   Without injunctive relief, Plaintiffs will suffer irreparable harm.

Plaintiffs, and the voters of the Commonwealth, will be irreparably harmed if injunctive relief is not granted. Candidates will be disenfranchised because they are not presently included on the ballot as candidate for President and Vice-President due to Defendants' unconstitutional interpretation of Section 951.

To start, even outside the context of elections, "'[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Kim v. Hanlon*, 99 F.4th 140, 159 (3d Cir. Apr. 17, 2024) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Moreover, according to relevant new sources, Defendants have certified the ballots without Candidates and the county boards of elections stand ready to print and distribute military and mail-in ballots.[15] As such, the harm Plaintiffs will suffer is "immediate[,]" *ECRI v. McGraw-Hill, Inc.*, 8090 F.2d 223, 226 (3d Cir. 1987), and is of the kind that "cannot be redressed by a legal or an equitable remedy following a trial." *Instant Air Freight Co. v. C.F. Air Freight,*

---

[15] https://apnews.com/article/pennsylvania-election-cornel-west-7ce33c1efaead5ccac3dae36d950fee0 (last visited September 17, 2024).

*Inc.*, 882 F.2d 797, 801 (3d Cir. 1989). In other words, a preliminary injunction is "the only way of protecting the plaintiff[s] from harm." *Id.*

Here, the only way to prevent ballots from being finalized pursuant to Defendants' unconstitutional interpretation is through an injunction. Without an injunction, Candidates will not appear on mail-in, absentee, or military ballots that are soon-to-be finalized and distributed. As this Court has recognized, "[t]he election is a single event incapable of repetition, and it is of such paramount importance to both the candidate and his community, that denying a candidate his effective participation in it is … of great, immediate, and irreparable harm[.]" *Loftus v. Twp. of Lawrence Park*, 764 F. Supp. 354, 359 (W.D. Pa. 1991) (internal quotation marks omitted).  The harm that Plaintiffs will suffer is, therefore, both irreparable and immediate.  *See, e.g.*, *Council of Alternative Political Parties v. Hooks*, 121 F.3d 876, 883 (3d Cir. 1997) (holding that the District Court erred in refusing to grant an injunction because "[i]f the plaintiffs lack an adequate opportunity to gain placement on the ballot in this year's election, this infringement on their rights cannot be alleviated after the election"); *Goodall v. Williams*, 324 F.Supp.3d 1184, 1199 (D. Colo. 2018) (finding the irreparable harm prong satisfied because, "unless an injunction issues, [the candidate's] name will not appear on the primary ballot" and "[t]he plaintiffs who signed [the candidate's petitions] will be irreparably harmed by not having their signatures counted and, as a result, will not be able to vote for [the candidate] in the primary election"); *Barr v. Galvin*, 584 F.Supp.2d 316, 321 (D. Mass. 2008) ("The plaintiffs will undoubtedly suffer irreparable harm if

this injunction is denied because the ballots will be printed without the names of the candidates actually chosen to represent the Libertarian Party in the 2008 presidential election. No damages or other legal remedy can compensate for a missed election."); *McInerney v. Wrightson*, 421 F.Supp. 726, 729–30 (D. Del. 1976) ("Thus, the immediate threat to the plaintiff is that his name will not appear on the general election ballot. There is no adequate remedy at law to compensate the plaintiff for this injury should he prevail in the final judgment.  Therefore, the Court concludes that the plaintiff has made the necessary showing of irreparable harm."); *see also Valenti v. Mitchell*, 962 F.2d 288, 299 (3d Cir. 1992) (noting that "the injury to a potential candidate resulting from denial of a place on the primary ballot is great").  For these reasons, Plaintiffs have satisfied their showing of an immediate irreparable harm.

C.    **Plaintiffs will suffer greater injury from the denial of injunctive relief than defendants will suffer if injunctive relief is granted.**

The third consideration, in essence, requires an assessment of whether an injunction would do more harm than good based on a broad examination of all parties' concerns.  *See Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharms. Co.,* 290 F.3d 578, 596–97 (3d Cir. 2002); *McMahon v. Pennsylvania Turnpike Comm'n,* 491 F.Supp.2d 522, 529 (M.D. Pa. 2007). Here, insofar as Defendants will argue that they will suffer a greater harm because an injunction will delay county boards of elections from printing and distributing military ballots. But the relevant provisions of the Election Code permit a blank

32

ballot to be provided without candidates listed in instances where the official ballots are not ready. *See In re Avery,* 275 A.3d 946, 955 n. 5 (Pa. 2022) (J. Brobson, concurring) (citing to 25 P.S. §§ 3146.3(d), 3146.5(a); 25 Pa.C.S. § 3506(d)).

Any delays associated with printing mail-in ballots, while not optimal, also does not tip the balance of equities against an injunction. To begin, the deadline by which the boards of elections must transmit mail-in and absentee ballots is October 22, 2024 (nearly a month from the date of filing). Specifically, although the Election Code contemplates delivery of mail-in ballots "as soon as a ballot is certified and the ballots are available[,]" it further provides that "[w]hile any proceeding is pending in a Federal or State court which would affect the contents of any ballot, the county board of elections may await a resolution of that proceeding but in any event, shall commence to deliver or mail official mail-in ballots not later than the second Tuesday prior to the primary or election." 25 P.S. § 3150.15 (setting forth the mail-in ballot delivery process); *see also id.* at § 3146.5(b)(1) (setting forth the same process as to absentee ballots).

To the extent some county boards of elections have already started printing ballots, it is unclear whether any voters (with the exception of overseas and military voters) have received ballots. The number of ballots transmitted (if any) is likely small.[16] In fact, it appears that at least one of the counties that was set to begin

---

[16] And in any event, courts are well within their power to craft appropriate relief where a change in the lineup of candidates occurs after ballots have already been sent, *see, e.g., In re Gen. Assembly from 158th Dist.*, 108 A.3d 129, 131 (Pa. Cmwlth. 2014); *Shogan v. Commonwealth, Bureau of Commissions, Elections & Legislation*, 938 A.2d 1132, 1136 (Pa. Cmwlth. 2007), or where names of certain candidates are omitted because of a mistake in the printing and mailing process. *See, e.g., Parnell v. Allegheny Cnty. Bd. Of Elections*, No. 2:20-cv-1570 (W.D. Pa. Oct. 26, 2020) (Consent Order).

delivering mail-in ballots this week (Montgomery) is going to be delayed irrespective of any action from this Court.  *Republican National Committee v. Montgomery County Board of Commissioners*, No. 2024-22251 (Mont. Cnty. Ct. Comm. Pls.).  And in any event, as Defendant Department of State has previously acknowledged, "*[i]t is not unusual for the candidate lists to remain 'in flux' beyond the last day* for counties to deliver absentee ballots or special write-in absentee ballots, if necessary, to certain military and overseas civilian voters." Affidavit of Jonathan Marks, Commissioner of the Bureau of Commissions, Elections and Legislation, at ¶ 63, *Corman v. Torres*, Case No. 1:18-cv-00443-CCC-KAJ-JBS (M.D. Pa. Mar. 2, 2018) (emphasis added).[17]  The Marks Affidavit explains that "late changes to the ballot are common[,]" *id*. at ¶ 66, and provides a lengthy list of cases in which such changes were ordered only weeks before an election. Thus, by their own admission, any inconvenience or difficulty that would result from such a delay would be neither significant, nor unprecedented.

Nevertheless, to the extent Defendants intend to argue that the harm associated with any administrative difficulties they may face in complying with an injunction would outweigh the irreparable injury to Plaintiffs (and the13,000+ voters who have petitioned to have the Candidates' names appear on the ballot), Defendants' *ipse dixit* in this regard will not suffice.  Rather, they must present competent evidence detailing the specific injuries that would be caused by an injunction.  *See Council of Alternative Political Parties*, 121 F.3d at 883.

---

[17] Attached hereto as Exhibit A.

Specifically, in *Council of Alternative Political Parties*, the Court reversed the district court's denial of injunctive relief, holding that any finding of countervailing harm to the election process resulting from an injunction must be supported by record evidence. The lower court's conclusion that a preliminary injunction would "inject confusion and disarray into the November ballot[,]" the panel explained, was "clearly erroneous," as it found no "record evidence justifying the district court's finding[.]" *Id.* (cleaned up). Emphasizing the need for an evidentiary record in this regard, the Court further, noted that the Secretary of State had not cited any case "involving a challenge to a ballot access provision in which preliminary relief was denied solely because an election was impending. denied solely because an election was impending." *Id.* In fact, as relayed by that panel, "the authorities are quite to the contrary, as the Supreme Court and the lower federal courts have not been averse to granting preliminary relief close to an election when plaintiffs have demonstrated an entitlement to such relief." *Id.*; *see also id.* at 883 n.7 (collecting cases in support of proposition).

Accordingly, the irreparable harm that Plaintiffs will suffer far outweighs harm that Defendants will suffer as a result of any delay in finalizing the ballots.

**D.    Injunctive relief will not adversely affect the public interest.**

The fourth and final factor also militates in favor of granting an injunction because, "[i]n the absence of legitimate, countervailing concerns, the public interest clearly favors the protection of constitutional rights, including the voting and associational rights of alternative political parties, their candidates, and their

35

potential supporters." *Council of Alternative Political Parties*, 121 F.3d at 883–84; *see also Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005) ("[C]autious protection of the Plaintiffs' franchise-related rights is without question in the public interest."); *Madera v. Detzner*, 325 F.Supp.3d 1269, 1283 (N.D. Fla. 2018) ("The public interest is always served by more equitable, easier access to the ballot."). Most critically, "the right of every citizen to vote is a fundamental right." *Donald J. Trump for President,* 493 F.Supp.3d at 383. And as the United States Supreme Court has repeatedly recognized, voters can assert their preferences only through candidates or parties or both. *See Anderson*, 460 at 787 ("'It is to be expected that a voter hopes to find on the ballot a candidate who comes near to reflecting his policy preferences on contemporary issues.'" (quoting *Lubin v. Panish*, 415 U.S. 709, 716 (1974))). The public's right to vote for Candidates will therefore be "heavily burdened" if they are not included on the ballots. *Id*. at 788. ("The right to vote is heavily burdened if that vote may be cast only for major-party candidates at a time when other parties or other candidates are clamoring for a place on the ballot." (quotations omitted)). In sum, an injunction will therefore preserve the public's ability to cast a ballot for Candidates and any harm to the public caused by a delay in ballot distribution will be firmly outweighed by the preservation of the public's right to cast a ballot for the candidate of their choice.

Moreover, when the right to vote is involved, additional administrative or financial burdens on the government—unless exorbitant—generally do not constitute a sufficiently significant injury to the public interest that would warrant

36

denial of injunctive relief. *See, e.g.*, *United States v. Berks Cnty., Pa.*, 250 F.Supp.2d 525, 541 (E.D. Pa. 2003) (holding that, while an injunction "may result in some administrative expenses for Defendants, such expenses are likely to be minimal and are far outweighed by the fundamental right at issue"); *Johnson v. Halifax Cnty.*, 594 F.Supp. 161, 171 (E.D.N.C. 1984) (acknowledging that "it is clear that the preliminary injunction will place administrative and financial burdens on the defendant[,]" but holding that "[s]uch burdens, however, are not, in the opinion of the court, undue in view of the otherwise irreparable harm to be incurred by plaintiffs").[18]

## IV.   **CONCLUSION**

Because Plaintiffs are likely to succeed on the merits their constitutional claims and the equitable considerations governing the Court's assessment is this context weigh in their favor, Defendants should be immediately enjoined from enforcing their incorrect interpretation of Section 951 of the Election Code in a manner that is unconstitutional under the First and Fourteenth Amendments to the United States Constitution.

---

[18] It also bears noting that courts have, at times, granted relief that would require reprinting ballot materials contingent on candidates bearing the additional costs. *See, e.g.*, *United Citizens Party of S.C. v. S.C. State Election Comm'n*, 319 F.Supp. 784, 790 (D.S.C. 1970); *see also In re Gen. Assembly from 158th Dist.*, 108 A.3d 129, 131 (Pa. Cmwlth. 2014)

Respectfully submitted,

Dated: September 25, 2024 /s/ Matthew H. Haverstick
          Matthew H. Haverstick (No. 85072)
          Shohin H. Vance (No. 323551)
          Samantha G. Zimmer (No. 325650)*
          KLEINBARD LLC
          Three Logan Square
          1717 Arch Street, 5th Floor
          Philadelphia, PA 19103
          Ph: (215) 568-2000
          Fax: (215) 568-0140
          Eml: mhaverstick@kleinbard.com
          svance@kleinbard.com
          szimmer@kleinbard.com

*Pro Hac Vice forthcoming

/s/ Erik Roberts Anderson
J. Andrew Crompton (No. 69227)*
Erik Roberts Anderson (203007)
Ryan T. Gonder (No. 321027)*
McNEES WALLACE & NURICK LLC
100 Pine Street
Harrisburg, PA 17101
Ph: (717) 232-8000
Eml: dcrompton@mcneeslaw.com
eanderson@mcneeslaw.com
rgonder@mcneeslaw.com

*Pro Hac Vice forthcoming

Attorneys for Plaintiffs

38

# EXHIBIT A

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

League of Women Voters of Pennsylvania, *et al.*,        )
                                                          )
                              *Petitioners,*              )
                                                          )         **No. 261 MD 2017**
                    v.                                    )
                                                          )
The Commonwealth of Pennsylvania, *et al.*,               )
                                                          )
                              *Respondents.*              )

## AFFIDAVIT OF JONATHAN MARKS

Jonathan Marks, being duly sworn, deposes and says:

1.      I am Commissioner of the Bureau of Commissions, Elections and Legislation (the "Bureau"), a bureau of the Commonwealth's Department of State (the "Department").

2.      I was appointed to the position of Commissioner in October 2011.

3.      I have been with the Bureau since the Fall of 2002.

4.      From 2008 to 2011, I served as the Chief of the Division of the Statewide Uniform Registry of Electors.

5.      Prior to that, from 2004 to 2008, I served as the Chief of the Division of Elections.

6.      I am responsible for overseeing the day to day operations of the Bureau, which include election administration.

7.      I have supervised the administration of the Department's duties in more than 20 regularly scheduled elections and a number of special elections.

8.      The next Congressional primary is scheduled for May 15, 2018.



EXHIBIT
2

EBD Ex 1

9. The current timeline of deadlines leading up to the May 15 primary is set forth at paragraphs 130-152 of the Joint Stipulation of Facts filed on December 8, 2017.

10. All of the deadlines set forth in paragraphs 130-152 of the Joint Stipulation of Facts are required by federal or state law.

11. The earliest deadline on the current election calendar is February 13, 2018, the first day for circulating and filing nomination petitions. *See* Joint Stipulation of Facts ¶ 131.

12. In order to prepare for this February 13 deadline, it would be highly preferable to have all Congressional district boundaries finalized and in place by January 23, 2018, which would give the Department three weeks to prepare.

13. However, should there be a Court order directing that a new plan be put in place, and that plan is not ready until after January 23, it may still be possible for the 2018 primaries to proceed as scheduled using the new plan.

14. Through a combination of internal administrative adjustments and Court-ordered date changes, it would be possible to hold the primaries on the scheduled May 15 date even if a new plan is not put into place until on or before February 20, 2018.

15. First, the current elections schedule gives the Counties ten weeks between the last date for circulating and filing nomination petitions (currently March 6) and the primary election date to prepare for the primary election.

16. Based on my experience, the Counties could fully prepare for the primary election in six to eight weeks.

17. Therefore, I believe that the close of the nomination petitions period could be moved back two weeks to March 20, without compromising the elections process in any way.

- 2 -

18.     Second, if the Court were to order a time period for circulating and filing nomination petitions that lasted two weeks, instead of three, the nominations period could start on March 6.

19.     Third, as stated above, the Department would normally need three weeks of preparation time before the first date for filing and circulating nomination petitions.

20.     However, with the addition of staff and increased staff hours, it would be possible for the Department to complete its preparations in two weeks instead of three.

21.     Accordingly, if the first date for filing and circulating nomination petitions was moved to March 6, as described above, the Department would need to have a final plan in place by approximately February 20, 2018.

22.     Should there be a Court order directing that a new plan be put in place, and that plan is not ready until after February 20, 2018, it would also be possible, if the Court so ordered, to postpone the 2018 primary elections from May 15 to a date in the summer of 2018.

23.     There would be two options under this scenario: (1) the Court could postpone all of the primary elections currently scheduled for May 15; or (2) the Court could postpone the Congressional primary election alone.  Either option would require a primary date no later than July 31, 2018.

24.     Depending on the date of the postponed primary election, the date by which the new plan would be put in place could be as late as the beginning of April 2018.

25.     Postponement of the primary in any manner would not be preferable, because it would result in significant logistical challenges for County election administrators.  If postponement takes place, for administrative and cost savings reasons, the Department's preferred option would be postponement of the entire primary.

26.     Postponing the Congressional primary alone would require the administration of two separate primary elections (one for Congressional seats and one for other positions), which would result in an additional expenditure of a significant amount of public funds.

27.     The cost of holding a single primary in 2018 would be approximately $20 million. If two primaries are held, each will cost approximately $20 million.

28.     For each primary, Pennsylvania's 67 Counties will be reimbursed a portion of the costs associated with mailing absentee ballots to certain military and overseas civilian voters and bedridden or hospitalized veterans. The other costs of the primary are paid by the Counties. This is similar to the way that costs are allocated in special Congressional elections.

29.     Should the Court wish for more details regarding the costs of postponing a primary or the timeline leading up to any primary date that the Court selects, I stand ready to provide them.

30.     The Department will make every effort to comply with any schedule that the Court puts in place.

_____
Jonathan Marks

Sworn to and subscribed before me
This ___ day of December, 2017

_____
Notary Public

Commonwealth of Pennsylvania
NOTARIAL SEAL
Danielle Renee Osman, Notary Public
City of Harrisburg, Dauphin County
My Commission Expires June 26, 2018

- 4 -