```
                IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF PENNSYLVANIA


    CORNEL WEST, et al.,

                    Plaintiffs

       vs.                          Civil Action
                                    No. 24-1349

    PENNSYLVANIA DEPARTMENT OF
    STATE, et al.,
                    Defendants.

                              - - -


       Transcript of hybrid Zoom proceedings on October 7, 2024,
    in the United States District Court, 700 Grant Street,
    Pittsburgh, PA 15219, before Honorable J. Nicholas Ranjan,
    United States District Judge.


    APPEARANCES:

       For the Plaintiffs:    Matthew Hermann Haverstick, Esq.
                              J. Andrew Crompton, Esq.
                              Ryan T. Gonder, Esq.
                              Shohin Vance, Esq.
                              Samantha Zimmer, Esq.


       For the Defendants:    Jacob Boyer, Esq.
                              Stephen R. Kovatis, Esq.
                              Ian Everhart, Esq.

       Court Reporter:        Veronica R. Trettel, RMR, CRR
                              U.S. Courthouse
                              700 Grant Street
                              Suite 5300
                              Pittsburgh, Pennsylvania 15219




       Proceedings recorded by mechanical stenography;
    transcript produced by computer-aided transcription.
```

1                          I N D E X

2    WITNESSES:                                    PAGE

3
     CORNEL WEST
4
         Direct by Mr. Haverstick.....................    5

5          Cross by Mr. Kovatis.........................   18

6

7
     JONATHAN MARKS
8
          Direct by Mr. Boyer..........................   31

9          Cross by Mr. Haverstick......................   63

10         Redirect by Mr. Boyer........................   74

11         Recross by Mr. Haverstick....................   80

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           P-R-O-C-E-E-D-I-N-G-S

2                        Monday Morning, October 7, 2024

3                            (In Open Court)

4              THE COURT:  Good morning, everyone.  You may be

5     seated.  We here today in the case of Cornel West, et al.

6     versus Pennsylvania Department of State, et al., at case

7     24-1349 for a hearing on plaintiff's motion for a TRO and

8     preliminary injunction.

9              Why don't we start by having counsel enter their

10    appearance beginning with plaintiff.

11             MR. HAVERSTICK:  Your Honor, for the plaintiffs, Matt

12    Haverstick, Shohin Vance, Samantha Zimmer on behalf of

13    plaintiffs, and Mr. Andrew -- J. Andrew Crompton on behalf

14    plaintiffs as well.

15             THE COURT:  All right.  Great.  Good morning.

16             For the defendants.

17             MR. BOYER:  Good morning, Your Honor.  Jacob Boyer

18    on behalf of the defendants.  With me at counsel table is

19    Stephen Kovatis and Ian Everhart, who has not entered his

20    appearance in this matter, but is an attorney for the

21    Department of State.

22             THE COURT:  Great.  Welcome, everyone.  So you

23    received my order.  I had allocated two hours per side to use

24    however you like, whether it's through witness presentation

25    and argument.  I also received a binder of some exhibits and

```
 1           then a joint stipulation of facts from the parties.

 2                I know we have some individuals online or rather

 3           remotely observing, and my understanding is there may be

 4           witnesses also testifying remotely.  Is that right?

 5                MR. HAVERSTICK:  Yes, Your Honor.  By the way, I

 6           should add Ryan Gonder along as counsel of record.

 7                THE COURT:  Okay.

 8                MR. HAVERSTICK:  I think the plan is -- I'm going to

 9           speak to these guys, we talked about it.  We each have a

10           witness to call.  It will be done remotely.  We have an

11           affidavit to submit which counsel is reviewing presently and

12           then we have a set of stipulations.  So we may be able to

13           truncate the evidentiary proceedings today.

14                THE COURT:  Okay.  Great.  Thank you.

15                Mr. Boyer, anything to add on that?

16                MR. BOYER:  No, Your Honor.  That's consistent with

17           our understanding.

18                THE COURT:  All right.  Very good.  Then I'll hear

19           from the plaintiffs.  Mr. Haverstick, do you want to proceed?

20                MR. HAVERSTICK:  Yes, thank you, Your Honor.  And I

21           will call Dr. Cornel West as our first witness.

22                THE COURT:  All right.  Very good.

23                Dr. West, can you hear us?

24                DR. WEST:  Yes, indeed.  Yes, indeed.  Thank you so

25           very much.  Can you hear me all right?
```

1          THE COURT:  Yes, we can.  And I would advise if at

2    any point in time you cannot hear me or any of the lawyers,

3    feel free to jump in and let us know.  We'll make sure the

4    connection is working all right.

5          DR. WEST:  Thank you very much, Your Honor.

6          THE COURT:  We'll start by having my courtroom deputy

7    administer the oath to you, Dr. West.

8          THE DEPUTY CLERK:  Hi, Dr. West.  Can you please

9    raise your right hand.

10         CORNEL WEST, a witness herein, having been first duly

11   sworn, was examined and testified as follows:

12         THE COURT:  All right.  Thank you.

13         Mr. Haverstick, you may proceed.

14         MR. HAVERSTICK:  Thank you, Your Honor.

15   (Dr. West testified via Zoom)

16                         DIRECT EXAMINATION

17   BY MR. HAVERSTICK:

18   Q.  Good morning, Dr. West.

19   A.  How are you doing?  Good to see you.  Well, I can't see

20   you, but it's good to hear your voice.

21   Q.  Well, I can see you and it's good to talk to you again and

22   thank you for participating today in this hearing.

23         Dr. West, you're an active admission and theologian.  Tell

24   the Court and counsel about your background and what you do.

25   A.  Well, I am my mother's child -- (Zoom audio is distorted.)

1           THE COURT:  I'm sorry?

2   A.  Can you hear me all right?

3   Q.  Yep.

4           THE COURT:  Can you repeat that?

5   A.  Oh, I just said I'm an advantaged child.  I'm my mama's

6   kid, Irene West and Clifton West.  I'm a child that grew up in

7   the Baptist church -- (Zoom audio is distorted).

8           THE COURT REPORTER:  I'm sorry, I am having trouble

9   hearing.

10  A.  -- a member of the Black Panther Party, because remember

11  I'm a Jesus-loving free black man and blessed to be educated

12  at Harvard College and Princeton University, and I always

13  viewed myself trying to be a fallible force for good in a

14  society that I understand to be both broken but also full of

15  promise, and I decided 54 years ago to try to keep alive the

16  legacy of the great Martin Luther King, Jr., Fannie Lou Hamer,

17  Ella Baker and Rabbi Heschel and Dorothy Day, Edward Said,

18  simply trying to tell the truth and bear witness to justice,

19  and I believe that the condition of truth is to allow

20  suffering to speak and I believe that justice is what love

21  looks like in public.  So I have a particular kind of calling,

22  particular kind of vocation to try to be true to it, my

23  Brother Matt.

24  Q.  Dr. West, don't be modest, you have been a professor and

25  had academic postings at some really serious universities and

1    seminaries; right?

2    A.   I've been blessed to teach at Union Seminary and Yale and

3    Harvard University and Princeton, and I'm back now at Union

4    Theological Seminary.  I've lived an excessively blessed life

5    in terms of professional achievement.  But the most important

6    thing is trying to hold onto the integrity, honesty and

7    decency in the short amount of time I had between my mother's

8    womb and the tomb, my brother.

9    Q.   And let's not forget you are a movie star.

10   A.   No, I wouldn't go that far.  We don't want to start lying

11   now.  I made some appearances in the Matrix and other places,

12   but I'm far from a movie star.

13   Q.   Councillor West, and I know that this is not a fact of

14   record today, but I will aver that I think Matrix Reloaded was

15   the best of the three movies and you had a very good role in

16   that.

17   A.   Well, that is your fallible opinion, but I appreciate you,

18   but they are certainly opinions, they are artistic opinions,

19   no doubt about it.

20   Q.   Now, you were also participating in the political process,

21   and tell the Court about what you are doing and why.

22   A.   Well, as I said before, I have been running for justice

23   for 54 years, and I'm a christian.  That's means I'm running

24   for Jesus, too, and just a matter of trying to make sure that

25   the least of these, the poor people and working people of

1    whoever color, and whatever side of town, and the love spills

2    over, that they are treated fairly and they have equal assets,

3    not just equal protection under the law, but are treated

4    fairly and, most importantly, that their dignity is affirmed.

5         So I've always found myself in but not of the world, in

6    but not of the system, and even in but not of the Academy

7    because you are always cutting against the grain, and every

8    institution is shot through with its own forms of organized

9    breed and weaponized contempt, and therefore, you have to try

10   to somehow be a levain in that loaf, and I've always tried in

11   my own fallible way to be a levain in the loaf of any system

12   without that system somehow forcing me to become well-adjusted

13   to the injustice and well-adapted to the indifference.  That's

14   what it is to have christian witness or a particular kind of

15   prophetic witness that I've always viewed myself as being a

16   part of.

17   Q.   You formed this year the Justice For All party.  What is

18   that?

19   A.   Justice For All was simply an attempt to be fundamentally

20   what is the truth and justice and love, which is a way of

21   trying to keep alive the legacy of Martin Luther King and

22   others.   Of course, Martin believed that American democracy

23   was being devoured by militarism and racism and poverty and

24   materialism on the spiritual front, and it's -- the party

25   itself is really just rooted in Martin Luther King, Jr.'s

1    message and his life and his witness but in a 21st century

2    context.

3    Q.   You were the presidential candidate for the Justice For

4    All party for 2024?

5    A.   That's exactly right.  Exactly right.

6    Q.   Why are you running for that office?

7    A.   Well, I'm just thoroughly convinced that we are living in

8    society and there's just so much spiritual decay and moral

9    decadence, and when it comes to this indifference towards the

10   vulnerable, when it comes to dealing with the levels of

11   corruption in the system and the civic rot -- and by civic

12   rot, what I mean is our public life becomes so poisoned, our

13   public life has become so very contaminated with contempt and

14   disrespect and put down, and so forth, that I didn't see

15   anybody running at the presidential level who would raise

16   these kinds of questions.  I'm thoroughly convinced that the

17   two-party system does not allow the best of America, which I

18   understand to be the legacy of Martin Luther King and others,

19   the best of America become visible.  So it looks as if more

20   and more we're addicted to a kind of self-destruction and

21   headed towards Civil War II, not just militarily, but

22   civically, spiritually, morally.

23       And so I thought that my candidacy could be won if, in

24   fact, it had a certain kind of ability, a certain kind of

25   potency that could keep alive what I understood to be the best

1    of the country, and that has everything to do with the black

2    freedom movement.  It has everything to do with those love

3    waves that come out of a black people who have been so hated

4    and the freedom fighters of the black people been so

5    terrorized and the wounded healers of a black people who have

6    been so traumatized, and joy spreading from the black people

7    who have been so shot through with sorrow, and it has

8    everything to do with Martin King and Fannie Lou Hamer, termed

9    the love warriors.  It has everything with the Frederick

10   Douglass or Harriet Tubman termed the freedom fighters.  It

11   has everything to do with Aretha Franklin and, of course, I'm

12   in Pittsburgh, so I should mention Billy Strayhorn.  I should

13   mention Earl -- (Zoom audio is distorted).  But when it comes

14   to joy spreaders, it comes out of our churches, it comes out

15   of our clubs, it comes out of our barber shops and beauty

16   salons, and it spills over.  It's deeply humanistic, but it is

17   shaped by what it means to be enslaved.  And I should say

18   this, though, there's no doubt that Pennsylvania has been

19   ground zero for the 14th Amendment.  That's why this

20   particular hearing is so crucial because the John Harmer

21   beings of the world, the great people, the great vast

22   esteemers, these are folks who come out of Pittsburgh.  Titus

23   Basfield, the first black graduate of Presbyterian Seminary in

24   all of America graduated from Pittsburgh Theological Seminary

25   or Bishop Matthew Simpson who gave the eulogy for Lincoln when

1    he died in Springfield, deeply shaped by Pennsylvania culture.

2    There is something about Pennsylvania in regard to this 14th

3    Amendment that I think the world already knows, but it's very

4    important in terms of this hearing because equal protection,

5    probably the most litigated section of the constitution is

6    very important, and we know it began coming to terms with the

7    plight and predicament of black people, but the best of the

8    black freedom strugglers has always been universal.  It's

9    always been humanistic.  It embraces oppressed, all suffering

10   people, and in the end, all human beings tied to their dignity

11   and sanctity that I believe is endowed to them by God, but

12   that's just my own christian take on these things.  People

13   have different interpretations, secular leaders on Buddhism

14   and Judea thinkers and other traditions, but most importantly,

15   for me, I'm fundamentally committed to the best of that moment

16   in the constitution when we're talking about equal protection

17   under the law on every level.

18   Q.  Now, you mentioned Pennsylvania.  I want to talk about

19   Pennsylvania because that's why we are here.  How has your

20   message been received among Pennsylvania voters when you have

21   been out talking to them?

22   A.  Oh --

23            MR. KOVATIS:  Objection to relevance, Your Honor.

24   A.  It's been wonderful --

25            THE COURT:  One second, Dr. West, sorry.

1   BY MR. HAVERSTICK:

2   Q.  Dr. West, hold on.  There's been an objection.  Counsel

3   wants to raise an objection.

4   A.  I'm sorry.

5            MR. KOVATIS:  Objection to relevance, Your Honor.

6            THE COURT:  Okay.  Mr. Haverstick.

7            MR. HAVERSTICK:  Your Honor, I think it's important

8   for the Court to know as it evaluates the public interest what

9   the public actually thinks based on what Dr. West has seen and

10  observed about his ideas and his candidacy.

11           MR. KOVATIS:  Your Honor, the public interest is not

12  the merits of anybody's candidacy.  The issue here is the

13  public interest related to the process for getting onto the

14  ballot.  That's the topic for the hearing and the discussion

15  today, and the purpose and message -- and I appreciate

16  background is certainly appropriate here, but the depth on the

17  background and the candidate's opinion of how his message has

18  been received by the people of Pennsylvania is irrelevant to

19  whether he should be on the ballot.

20           THE COURT:  I'll note the objection.  Overrule it.  I

21  do think, though, we are at the point maybe after this

22  response to maybe segue.

23           MR. HAVERSTICK:  All right.

24  BY MR. HAVERSTICK:

25  Q.  Dr. West, here's how I'm going to do this.  I would like

to know, in short order, how your message was received by

folks in Pennsylvania, but then, if you could, tell the Court

about the difficulty you've had in general terms getting on

the ballot in Pennsylvania.

A.    Well, I've always been blessed to have a wonderful

relationship with the citizens of Pennsylvania.  There's no

doubt about it.  Philadelphia, in many ways, the city, the

great John Coltrane, and his love is supreme is inseparable

from what I'm all about, inseparable from Martin Luther King,

Jr., ethic of love, and in so many different instances, I have

been both listening and learning from the citizens of

Pennsylvania, but I have also been able to present my case,

and all I wanted to do is just to make sure I can present a

fair and strong case, and I'm concerned with each and every

candidate to be able to do that.  I want my dear Sister Kamala

Harris to be able to present her case so people can critically

reflect and respond.  I want Bother Trump to present his case

and let the people respond.  Let Sister Claudia De La Cruz

present her case.  Let Brother Randall (Zoom audio is

distorted) Brother Chase.  We just want Socratic energy, a

robust and vital public life, and I come from a people whose

anthem is lift every voice, not lift every echo, and when you

lift the voices, present the voices, and then let the people

decide.  I don't believe in spoon-feeding people.  I think

people can think for themselves.  I don't demonize people who

1    disagree with me.  I don't demonize people who choose other

2    candidates, but I just want to make sure there's equal

3    protection under the law and make sure that the voices are

4    heard.  Why is that so?  Because in the end when you lose the

5    integrity of a process, in the end when you generate distrust

6    in public life, it re-enforces the spiritual decay, it

7    re-enforces moral decadence that we are already being plagued

8    in terms of the organized greed and the weaponized hatred,

9    and, in fact, the movements and marches these days to attract

10   a sense of stability, and it's a very, very sad thing to see,

11   and that's why I refuse to simply be a spectator.  I

12   intervene.  I participate.  I try to raise my voice to keep

13   alive the best that has been poured into me by Irene and

14   Clifton and Shiloh Baptist Church, and all of that has gone

15   into the shaping of this crafted vessel named Cornel West.

16   Q.  Has it been hard for you to raise your voice and

17   participate in Pennsylvania as a candidate?

18   A.  Well, I have been able to do it in terms of conversation,

19   but in terms of institutional capacity, in terms of trying to

20   gain access to ballot, it's been very, very difficult.  I

21   think there's been a disadvantage in that.  But it's not just

22   me.  This is in no way about me.  This is about equal

23   potential of voices.  I think this is true for independent

24   candidates across the board.  This is true for third-party

25   candidates across the board because you have a situation where

1   the two-party system has a strangle hold -- we know it's got

2   big money, it's tied to corporate donors, very much tied to a

3   certain kind of greed -- I'm sorry to use that strong term,

4   but I can't help but use it because that's what I see.  So

5   it's very difficult for the citizenry to gain access to a

6   variety of different voices, and I see that two-party system

7   as an impediment in so many ways if we are going to keep alive

8   what the country has been able to produce.

9   Q.  Dr. West, one more question for you and let me set it up.

10  You're probably not going to win this presidential election.

11  You are probably not going to get on every ballot in

12  Pennsylvania.  Why bother?

13  A.  You know, the great Rabbi Abraham Joshua Heschel used to

14  say if you view life as a gold rush, you end up worshiping the

15  golden calf and you transform the golden rule of do unto

16  others that you would have other do unto you, and to simply

17  those who have the gold rule.  That is the triumph of

18  (indiscernible) Socrates in a republic, that might make right

19  integrity, honesty, and decency.  That's the triumph of

20  Pontius Pilate over Jesus.  What is truth?  Wash my hands.

21  Take Him and do what you will.

22      Well, winning for me is not simply about elections.  It is

23  about bearing witness to the greatness of a people.  I come

24  from a great black people, and when you win, you keep alive

25  the moral and spiritual greatness of the people who have

1    allowed you to sustain your sense of dignity, and so I'm

2    trying to witness in that way, and you can imagine, you know,

3    I got all kinds of people, not just critics, people who will

4    trash me and say it's about vanity, it's about hubris, it's

5    about so-and-so.  People are right to be wrong.  I fight for

6    people's right to be wrong.  I've got libertarian

7    sensibilities, but I know I also have a certain kind of deep

8    commitment to the truth-telling and justice-seeking, and that

9    means then that I've got to be true to my momma, my daddy, my

10   tradition.  I have to be true to the young people, they can

11   see that there are some people who are not willing to just

12   cave in and give up and sell out, and that's a very important

13   reason why talk about Bingham, the reason why we talk about

14   Basfield, the reason why we talk about Stevens, the reason why

15   we talk about Bishop Simpson is that they didn't sell out.

16   They were abolitionists.  There were just a few thousand

17   abolitionists in a fairly white supremacist society of levels

18   of bombarity for black people.  But it's a question of

19   morality.  It's not a question of skin pigmentation.  It's a

20   question of spirituality.  It's not a matter of what color

21   your skin or gender or class.  That's what it is to be a

22   christian.  That's what it is to be a freedom fighter.  That's

23   what it is to be a love warrior in my humble opinion, and

24   that's why running for justice -- in this case, running for

25   president -- it's the same thing I have been doing for 54

1    years in the classroom, (indiscernible) president for 51

2    years.  I've seen the situation of those en masse

3    incarcerated.  I don't see either party speaking to that,

4    either party speaking to deep poverty, either party can't say

5    about genocide in Gaza, the whole host of issue, they can't

6    say a word about it.  That is morally and spiritually bankrupt

7    for me, and it might not make any sense in the eyes of the

8    world, it makes all the sense in the eyes of what is going

9    through the shaping and molding of who I am, and I don't say

10   this in any spirit of self-righteous.  I could be wrong.  I

11   listen.  I can be wrong.  And as I said before, people can

12   disagree with me and vote for other candidates.  That's fine.

13   Think for yourself, but I want to be able to make my case

14   based on equal protection under a law such that is available

15   and such I'll not have every disadvantage, as we underwent, as

16   you can imagine, you know, I'm trying to get on the ballot

17   with the electors, trying to first gain access to the rules

18   and having difficulty and then finally being able to do that

19   and say that we had to undergo a whole host of procedures that

20   the two, the major two parties did not have to undergo, and

21   when you have both parties together making the rules and

22   enforcing the rules, then it marginalizes the independent

23   candidates.

24   Q.  Dr. West, thank you for being here this morning.  I

25   appreciate it.  I think the Court appreciates it and it was

1    meaningful.

2              MR. HAVERSTICK:  Thank you, Your Honor.  No further

3    questions for this witness.

4              THE COURT:  All right.  Thank you.

5              For the defense, Mr. Kovatis, any questions?

6              MR. KOVATIS:  Yes, Your Honor.

7                         CROSS-EXAMINATION

8    BY MR. KOVATIS:

9    Q.  Good morning, Dr. West.  My name is Stephen Kovatis.  I am

10   an attorney with -- for the Pennsylvania Department of State

11   in this case.  I just have a few questions for you.

12       Again, I just want to echo Mr. Haverstick and thank you

13   for coming in and spending your time with us today.

14   A.  I thank you, my dear brother, indeed.

15   Q.  You announced your candidacy for president in June of

16   2023.  Do I have that right?

17   A.  That's right, June 5th, absolutely.

18   Q.  And you formed the Justice For All party earlier this year

19   around January of 2024?

20   A.  That's right.

21   Q.  You testified earlier about delivering a message.

22       Would you agree with me that you are currently free to

23   deliver the message, as you will, in and out of Pennsylvania?

24   A.  In the public square, in churches and mosques and

25   synagogues, nightclubs, you are absolutely right, but I can

1    raise my voice and that's a beautiful thing as far as

2    libertarian commitment to make sure we can raise our voice.

3    Now, the translation of that is in the institutional capacity

4    to get on the ballot is another issue, but absolutely right, I

5    am free to raise my voice.

6    Q.  It is another issue.  In fact, you have never been shy

7    about bearing witness, to use your words; isn't that right?

8    A.  I try not to be shy, but I'm shy through fallibility and

9    imperfection though, brother is all, you know.

10   Q.  So as you just mentioned, the goal, one of your goals from

11   the outset was to get on state ballots; isn't that right?

12   A.  That's exactly right.

13   Q.  And that goal was important to you?

14   A.  Well, just not to me, but it's important to the campaign,

15   which is a moment in the movement of the great people, yes,

16   that's right.

17   Q.  And at the time that you announced your candidacy and

18   formed the Justice For All party, you understood that

19   different states have different ballot access rules; correct?

20   A.  That's right, absolutely.

21   Q.  Did you know Pennsylvania's ballot access rules yourself

22   at the time?

23   A.  No, no, no, I don't.  I got a magnificent team and I've

24   got some volunteers that I don't have a language for, but my

25   God, when I think of Sister Gianna (phonetic), my visionary

1    courageous campaign manager, and Mike McKorkle who is just

2    beyond description in the legal mind and unbelievable

3    commitment, and Brother Alex Cordinatto, (phonetic) -- I could

4    go on and on -- Brother Edwin DeJesus, we have a heck of a

5    team, but you can imagine, it's a very small team.  We raised

6    $1.2 million the whole campaign.  You got brothers and sisters

7    in the democratic party that raised 540 in one month.  So this

8    is a real David versus Goliath small (indiscernible)

9    situation, but that's all right.  We still bear witness.

10   Q.  And I understand that, Dr. West, but I want to focus

11   specifically on the campaign's efforts to obtain counsel

12   related to ballot access.

13        Did you try to obtain counsel in order to get on ballots

14   when you announced you were a candidate for presidency in June

15   of 2023?

16   A.  Well, I had access to magnificent lawyers, Brother Mike

17   and Brother Aaron, but those two particular lawyers who worked

18   25 hours a day and, for the most part, without pay are unable

19   to come to terms with 50 states simultaneously.

20   Q.  So you have --

21   A.  So that --

22   Q.  Dr. West, you had counsel in 2023 for the purpose of

23   obtaining ballot access; correct?

24   A.  Well, no, I wouldn't go that far either.  I would say that

25   I have had two magnificent lawyers who have attempted to at

1    unbelievable levels of commitment, attempted to push through

2    processes that allow us to have legal counsel, but oftentimes

3    the legal counsel that we end up having come from the outside.

4    It has no connection, no correlation, no coagulation

5    whatsoever.  They are citizens who decide to simply raise

6    their voices and to be part of a process but unrelated to us.

7    Q.  Dr. West, I'm asking specifically about lawyers

8    representing your campaign, not other lawyers who happen to

9    speak out.  Do you understand that distinction?

10   A.  Yeah, I got those two lawyers, yes.

11   Q.  So you --

12   A.  The two lawyers.

13   Q.  And you've had those lawyers for many months; correct?

14   A.  Oh, absolutely.

15   Q.  Okay.

16   A.  Absolutely.

17   Q.  On July --

18   A.  They have been superb.  They have been superb.

19   Q.  On July 11th of this year, Dr. West, your campaign

20   submitted nomination paperwork to the Pennsylvania Department

21   of State; correct?

22   A.  Well, I don't know the exact date, but it sounds right.

23   Q.  Do you have any reason to dispute that it occurred on or

24   around July 11th of this year?

25   A.  No, I don't have any reason to dispute it.

1   Q.  And those nomination papers were rejected by the

2   Department of State; correct?

3   A.  That's right.

4   Q.  And at the time you were represented by those two able-

5   bodied lawyers you mentioned early; correct?

6   A.  That's right.  Or at least to my knowledge, let me put it

7   that way, yeah.

8   Q.  And would you agree -- well, so during that time,

9   Dr. West, as of July, your campaign understood that the

10  Department of State was not accepting your nomination

11  paperwork because you did not have affidavits from all 19

12  electors; is that correct?

13          MR. HAVERSTICK:  Objection.  I think it misstates --

14  well, first of all, I don't think he has laid a foundation for

15  when the rejection actually happened.  Did it happen in July

16  or did it happen later?

17          THE COURT:  I'll overrule that.  Dr. West, you can

18  answer if you know.  Maybe can you re-ask the question.

19  A.  Could you repeat that question?  I'll listen just a little

20  closer.

21  Q.  Certainly.  On July 11th, Dr. West, you understood that

22  your campaign's nomination paperwork had been rejected;

23  correct?

24  A.  Yes, yes, yes, yes.

25  Q.  And you understood that it had been rejected because you

1   did not have candidate affidavits for the 19 electors;

2   correct?

3   A.   Well, in the context in which there was an unfair and

4   unequal treatment of the overwhelming disadvantage of what we

5   had to undergo and what the two major parties had to undergo,

6   but in light of that context and that backdrop, yeah, that's

7   true, that's what the reasons for it, as I understood.

8   Q.   I'm not asking if you agreed with the reason, Dr. West.

9   I'm asking if you understood that that was the reason?

10  A.   It's hard for me to separate those two, but, yes, okay.

11  Q.   And your campaign then endeavored in the following weeks

12  in order to correct that error; correct?

13  A.   To make sure we were being treated equally and fairly and

14  to make sure that the citizens of Pennsylvania had access to

15  our vision, our stories, our analysis and our witness, yes,

16  mm-hmm.

17  Q.   So at that point, did you believe your campaign was being

18  treated unfairly?

19  A.   Oh, absolutely.  You got electors that have to undergo the

20  processes that they do, vis-a-vis the two major parties, it's

21  clear, I mean for me it's clear it's an unequal and unfair

22  access to the ballots, very much so.

23  Q.   But then --

24  A.   But --

25  Q.   -- Dr. West, in those weaning weeks of July, you did not

1   file a lawsuit; isn't that correct?

2   A.  I don't recall.  I don't recall.  I don't think we did.  I

3   don't think we did.

4   Q.  After --

5   A.  I had Brother Mike about --

6   Q.  Dr. West, you're not aware of, certainly aware of any

7   lawsuit that your campaign filed related to ballot access in

8   late July of 2024; fair to say?

9   A.  Yeah, I don't recall that.  I don't have a date line in my

10  mind.  So I apologize for this, my brother.  I don't have a

11  date line in my mind.  But I know that we were oscillating, we

12  were swaying back and forth.  We were on the ballot.  We were

13  off the ballot.  We were on the ballot.  And I don't have a

14  date line of each one of those moves, not at all.

15  Q.  But at that point, you felt that you were being treated

16  unfairly; right?

17  A.  Oh, oh, absolutely.  But it's just not Pennsylvania we're

18  talking about.  As you know, we had struggles in Georgia.  We

19  had struggles in North Carolina.  North Carolina we were back

20  and forth.  Right now in Georgia we are on the ballot, but the

21  votes don't count.  So every voting booth has a little sign

22  "Vote For West.  It won't count, but his name is on the

23  ballot."  That's what it's been across the board just trying

24  to make sure that we have some kind of fairly equal treatment.

25  Q.  I can appreciate that, Dr. West.  Here I would like to

1    focus just on Pennsylvania.

2    A.   I understand that, I understand that, and rightly so.

3    Pennsylvania deserves the specificity --

4    Q.   We can both agree on that for sure.

5    A.   Oh, yes, there's something special about Pennsylvania, you

6    know what I mean?  No doubt.

7    Q.   Are you aware that on August 15th, three of your electors

8    filed suit in Pennsylvania state court?

9    A.   Three of my electors filed suit in Pennsylvania state

10   court?  That doesn't ring a bell.  Tell me more about that.

11   Q.   You're not aware that there was a lawsuit filed in

12   Pennsylvania state court by your electors seeking the exact

13   same relief that you are seeking in this lawsuit?

14   A.   Oh, oh, yeah.  I thought you were saying against me.

15   Q.   No.

16   A.   I got so many filed against me, it's hard to keep track,

17   but the three filing suit for the same claim that I'm making,

18   that this is unfair and unequal, yes, oh, absolutely.  I

19   thought you said against me.  I said, Oh, my God I've got to

20   check, I got another one.

21   Q.   Would you agree with me that those electors were

22   represented by able-bodied counsel?

23   A.   Well, I don't know.  I didn't keep close track.  I didn't

24   keep close track at all.

25   Q.   Dr. West --

A.  I don't know.  I pray that they were, but I just don't

know.

MR. HAVERSTICK:  Your Honor, I'll stipulate that he

was represented by able-bodied counsel.

THE COURT:  Okay.  So noted.

BY MR. KOVATIS:

Q.  They are, Dr. West, the same counsel that represent you

here today?

A.  Oh, Brother Matt would know.  Absolutely.  And Brother

Paul, too.  Paul is very, a special brother.  We won't get

into his specials.

Q.  Would you agree with me then that when that lawsuit was

filed by your electors in Pennsylvania state court, that your

interests were being ably represented?

A.  By legal counsel?

Q.  In that lawsuit, that your interests in getting on the

ballot were being equally represented.  Would you agree with

that?

A.  Yeah, I think I would agree.  See, I didn't have any close

relation to it and I didn't have any, you know, communication

with it, but, yes, I would agree.  I have confidence in my

legal counsel those who are willing to step forward.

Q.  And at that point, you also obtained, or shortly

thereafter after August 15th, I believe in another case that

was represented, it was August 22nd, the campaign retained

1   counsel for the purpose of litigating your access to the

2   ballot; is that correct?

3   A.   That sounds right.  It sounds right, yeah.

4   Q.   And do you recall on August 28th of this year, your

5   campaign filing in state court a document seeking to

6   personally what we lawyers call intervene in that lawsuit?

7   A.   What does that mean in non-legalees, though, brother?

8   Q.   To join the lawsuit.

9   A.   Oh, to join the lawsuit.

10  Q.   Do you recall being part of that?

11  A.   That sounds right, too, yeah, mm-hmm.

12  Q.   And at that point -- and this is the same counsel you have

13  here today; correct?

14  A.   I think so.  I think so, yeah.  You would have to ask

15  Brother Matt about all of these date lines.

16  Q.   I can't.  I have to ask you, Dr. West.

17  A.   I'm not one to answer all of the details because I

18  really -- I don't have a mastery of the facts and the

19  particular details of the shifts that's been taking place

20  because I have been doing three events a day in 48 states, so

21  brother, so that -- especially Pennsylvania.  It's not that I

22  wake up in the morning thinking about Pennsylvania.  You know

23  what I mean?  I've got other states I've got to come to terms

24  with, but it sounds right, but you would have to check with

25  Matt in terms of truth.  I'm very concerned about the truth

1    here and the evidence being confirmed and validated.

2    Q.  So at that point, on or about August 22nd, you had both

3    counsel for the campaign that we agreed you've had for many,

4    many months at that point and you also specifically had

5    litigation counsel for the purpose of determining what your

6    best course of action was to get your name on the ballot.  Can

7    we agree on that?

8    A.  Sounds right, brother, yes, mm-hmm.

9    Q.  And are you aware that in that Pennsylvania lawsuit, the

10   Pennsylvania Supreme Court ended up denying relief, denying

11   your ballot access on September 16th?

12   A.  Absolutely.

13   Q.  And you did not file a lawsuit on September 16th; correct?

14   A.  Not that I recall, but I do recall the Supreme Court

15   putting forward in some declaration and statement, yes.

16   Q.  In fact, you waited 12 more days until September 25th to

17   file this lawsuit that we're here on today; correct?

18   A.  Sounds right, my brother.

19   Q.  And now this lawsuit has been pending for 12 days where

20   we've had pleadings, briefing and now this full hearing; sound

21   right?

22   A.  Sounds right, my brother, absolutely.

23   Q.  But we are here today more than 12 weeks after, you agree

24   after, as we discussed earlier, your campaign, you personally

25   felt grieved by the lack of access in July of 2024; isn't that

1    right?

2    A.   Oh, absolutely.  I mean, when you are just feeling some of

3    the effects of the unfair and unequal treatment based on being

4    a third-party candidate, yes, absolutely.

5               MR. KOVATIS:  No further questions, Your Honor.

6               THE COURT:  Thank you.

7               Mr. Haverstick, any redirect?

8               MR. HAVERSTICK:  No, Your Honor.

9               THE COURT:  All right.  Thank you.

10              Dr. West, thank you for your testimony.  You are

11   excused.  You can remain on the line and observe or hang up.

12   I appreciate it.

13              DR. WEST:  I deeply appreciate you all giving me the

14   chance and, Your Honor, I salute you and the work that you do

15   and the staff that you have.  I just hope and pray that your

16   loved ones and your family are doing all right.

17              THE COURT:  All right.  Appreciate it.  I have to say

18   that I always love hearing reference to Billy Strayhorn, who

19   is a great Pittsburgher.  So I know you noted him during your

20   testimony.  Actually, I have a portrait of Billy Strayhorn,

21   Duke Ellington, and The Dancer that's sort of an iconic

22   Pittsburgh portrait.  So all of those Pittsburghers, I always

23   appreciate the shout-out to them.  So thank you.

24              DR. WEST:  Thank you.  I'm right here in Harlem on

25   123rd Street for that A train going right across the way as it

1  were.  Duke and Billy Strayhorn, just gave a gift to the

2  world.

3          THE COURT:  Yep.

4          DR. WEST:  So much joy and so much richness and

5  handsome, as far as you can imagine.  But thank you all.

6  Thank you, Brother Matt and Brother Mike.  God bless you all.

7  Take good care.

8          THE COURT:  All right.  Thank you.

9          Mr. Haverstick, is that your only witness?

10         MR. HAVERSTICK:  It is, Your Honor, and I think

11 considering the burden shifting that goes on for the four-part

12 test, I assume that the department is going to call Mr. Marks

13 and we'll cross him.  I suppose I can call him adversely, but

14 it makes more sense for you guys to call him.

15         THE COURT:  I'm fine with that.  If we want to

16 proceed with the defense calling him in the first instance and

17 I'll allow some leeway on cross here.

18         MR. HAVERSTICK:  Okay.

19         MR. BOYER:  Happy to discuss it, but I do disagree

20 with the burden of our presentation Mr. Haverstick just made.

21         THE COURT:  Okay.  We can get to that.  My thought

22 would be we begin this witness' testimony, and then the

23 lawyers can argue what you want to argue at that point.

24         MR. BOYER:  Thank you, Your Honor.

25         THE COURT:  Okay.  Why don't we have my courtroom

1    deputy here administer the oath to Secretary Marks.

2              And Secretary, can you hear us okay?  I just want to

3    make sure that the audio is working on your end.

4              SECRETARY MARKS:  I can most of the time.  Your voice

5    periodically is a little muffled, Your Honor.

6              THE COURT:  Okay.  Thank you for that.  I'll try to

7    speak maybe a little more slowly and clearly, and maybe

8    counsel can do that as well.  That might help with the audio.

9              So Mr. Kosloski, if you can administer the oath.

10             THE DEPUTY CLERK:  Sir, if you can please raise your

11   right hand.

12             JONATHAN MARKS, a witness herein, having been first

13   duly sworn, was examined and testified as follows:

14             THE COURT:  All right.  Thank you.

15             Mr. Boyer, you may proceed.

16             MR. BOYER:  Thank you, Your Honor.

17   (Jonathan Marks testified via Zoom)

18                         DIRECT EXAMINATION

19   BY MR. BOYER:

20   Q.  Good morning, Mr. Marks.  Could you briefly introduce

21   yourself to the Court.

22   A.  Good morning.  Yes.  My name is Jonathan Marks.  I'm the

23   Deputy Secretary for Elections and Commission at the

24   Pennsylvania Department of State.

25   Q.  And how long, Mr. Marks, have you been the Deputy

1    Secretary of Elections for the Department of State?

2    A.   I have been Deputy Secretary for about five-and-a-half

3    years, since February of 2019.

4    Q.   And can you describe what your responsibilities are in

5    that role?

6    A.   So my responsibilities include overseeing three bureaus.

7    One is the Bureau of Elections.   The other two are the Bureau

8    of Notaries and Commission, as well as the Bureau of Campaign,

9    Finance and Lobby Disclosure.

10    Q.   Okay.   And can you also describe, Mr. Marks, the

11    Department of State responsibilities with respect to

12    administering elections in Pennsylvania?

13    A.   So the Department of State, though it does not have a

14    direct role in most cases in administering elections, it does

15    have some oversight and it serves as a resource for our 67

16    Board of Elections.

17        So, for example, the department, and the reason we are

18    here today, is the one thing we do is ballot access for

19    statewide in federal and state level candidates.

20        We also provide candidate lists to our county Boards of

21    Elections prior to each election, outlining those statewide

22    federal and state level legislative candidates or judicial

23    candidates as the case may be.

24        We also provide training resources to our county Boards of

25    Elections to ensure that they understand the requirements of

1    the statute as it relates to their responsibilities, and we do

2    certified voting systems in Pennsylvania, and counties can

3    choose among any of the certified voting systems to conduct

4    their elections.

5        We also provide online resources, not only to county

6    Boards of Elections, but also directly to voters on our

7    website as well.

8    Q.   I believe you said, Mr. Marks, that the Department of

9    State doesn't directly administer elections.   Who does if not

10   the Department of State?

11   A.   Each of the 67 county Boards of Elections administer

12   elections in their individual counties.

13   Q.   Can you describe what their direct election administration

14   entails?

15   A.   Well, they pretty much do the bulk of election

16   administration and that starts with, you know, preparing the

17   voting systems that they use and that process starts well in

18   advance of election day.

19       So, you know, counties will take the list that we provide

20   of authorized candidates in municipal election years.   They

21   actually create the list themselves, and they will begin

22   setting up their ballots for the upcoming election, and then

23   that process winds on for weeks as they do additional

24   preparatory steps, which include testing of the voting

25   equipment, printing of the ballots, printing and mailing of

1    absentee and mail ballots, and they also conduct poll worker

2    training in those weeks leading up to election day and,

3    ultimately, they are responsible for delivering all of the

4    supplies to each of our 9,000 plus polling places in the

5    Commonwealth so that the poll workers that work in each of

6    those individual precincts have all of the materials and

7    equipment they need to conduct election day voting at those

8    polling places.

9    Q.   Okay.  And it's fair to say there's a lot for counties to

10   do.

11   A.   There is, and that was a very succinct version of all of

12   the various things they do.

13   Q.   Is every county uniform in how it administers those

14   elections?

15   A.   They are not.  Certainly there are -- the statutes are

16   uniform that they operate under, but in terms of the conduct

17   of the election, counties -- there are some variations in how

18   counties conduct election.

19        Probably the first thing, the most obvious thing,

20   Pennsylvania does not have a statewide voting system.  We, per

21   the Pennsylvania election code, examine and certify voting

22   systems for use of the Commonwealth, and then the counties

23   make their own choice as to which of those systems they will

24   use.  The only requirement is that they must choose from one

25   of the certified systems.

1          Currently, there are five vendors who have voting systems

2     certified in the Commonwealth of Pennsylvania.

3     Q.   And are all five of those systems at use in at least one

4     county in the Commonwealth?

5     A.   Yes.

6     Q.   Can you describe some of the differences from one system

7     to another?

8     A.   Yes.  So we -- at a very high level, there are two, sort

9     of basically two different types of voting systems.  There is

10    the type of voting system where voters on election day will be

11    marking a pre-printed paper ballot by filling in ovals next to

12    their candidates of choice.  That is the overwhelming majority

13    of our counties use that type of system.

14         And then the other sort of at a high-level type of system

15    is a voting system where voters on election day will use a

16    ballot marking device, which is a touch screen that they make

17    their selections on, and they will print out a ballot that has

18    been marked by the ballot marking device and insert that into

19    the scanner.

20         So basically the two types at eye level are hand marked

21    ballots that are fed into the scanners versus machine marked

22    ballots that are fed into the scanner.

23    Q.   Okay.  Just so I understand, with the hand marked

24    machines, those machines work with an actual ballot that has

25    been printed at some point ahead of election day; is that

1    correct?

2    A.    That's correct, yes.

3    Q.    Okay.    Are the counties themselves responsible for

4    printing those ballots?

5    A.    They are responsible for printing the ballot, yes.

6    Q.    And do they do the printing themselves?

7    A.    No.    To my knowledge, each of the 67 county Boards of

8    Elections uses a print vendor, whether it's a local vendor or

9    a natural print vendor.    Each of them use a print vendor that

10   will print their ballots.

11        There's a handful of counties who have ballot on demand

12   systems, but based on the information, based on information

13   I'm aware of in discussions with them over the past few years,

14   they are primarily using that ballot on demand for

15   over-the-counter absentee and mail-in voting by voters.    They

16   are still relying to some extent on a ballot printer.

17   Q.    Does every county have a different vendor?

18   A.    No, there are counties that use the same print vendor.

19   Again, that is a county choice.    There are a handful of

20   counties that use local print vendors that print to the

21   specifications provided for or provided by the voting system

22   vendor.

23        There are also large vendors, like Election Systems

24   Software, Phoenix Graphics.    William Penn Printing located

25   actually out there in Pittsburgh prints ballots for I think

1      two dozen or a little over two dozen of our counties.

2          So they don't each have their separate printers in all

3      cases.  Some of them rely on the same vendors that print for

4      other counties.

5      Q.  And in the course of your responsibilities as the

6      Department of State election director, do you ever have

7      conversations with any of the print vendors that serve

8      counties?

9      A.  Yes, I do.  I have fairly frequent conversations with

10     print vendors.  Earlier this year, I had a call with each of

11     the print vendors after our primary to talk about planning for

12     the November election to understand what their limitations

13     were, what their concerns were, and since then I have been in

14     contact with them to answer their questions and also provide

15     information from the department regarding the progress of

16     elections leading up to this November's election.

17     Q.  Okay.  In your position, do you also work with county

18     election officials as they go through the various steps you

19     described to prepare for an election?

20     A.  Yes, I do.  In my role, I -- so I do two things, though I

21     have a lot of conversations with individual counties.  Every

22     two weeks I host an office hours call that is open to all

23     counties.  We usually have, you know, half or two-thirds of

24     the counties join those office hours meetings.

25         I talk to the -- we have two county election director

associations in Pennsylvania, one for the eastern half of the

state and one for the western half of the state, and I talk to

the two chairs of those associations on a more frequent basis,

and then in between then, I may have individual conversations

with individual counties.

Q.  So let's start with the office hours.  Can you describe

what types of issues you discuss with county officials during

those periods?

A.  We discuss the department's guidance.  We discuss sort of

the status of what the department is doing.  So over the past

couple of months, we have discussed preparations for election

day, whether that be upcoming training that the department may

offer, changes to guidance based on either best practices or

some litigation, and we also discuss as we -- after the August

1st deadline for minor political parties and political bodies

to file, we certainly discuss the status of the candidate list

as we work towards finality there.

Q.  I believe you said you, outside of the office hours, also

have more ad hoc conversations with county officials; is that

right?

A.  That's correct, yes.

Q.  What type of issues do you discuss during those meetings?

A.  It runs the gambit.  A lot of times it is based on a

question a specific county may have or specific counties may

have.

1          I actually accompanied the Secretary on several of his

2     visits to counties.  So we were sitting in the county election

3     office just talking about what their concerns are, what their

4     questions are regarding election administration, and that can

5     be, you know, questions about some specific guidance that we

6     may have issued, concerns about sort of their timeline and

7     their capabilities leading up to election day.

8          Certainly one of the things that we discuss for several

9     weeks as nomination paper objections were working their way

10    through the Commonwealth Court and then ultimately the Supreme

11    Court, you know, we were getting questions about the status of

12    the list of candidates and we were reminding counties that

13    irrespective of that status, they still had hard deadlines for

14    certain types of absentee voters like military and oversea

15    civilian voters.

16         So it really depends on what is going on at a particular

17    point in the election cycle.  That's kind of what drives our

18    discussions and the questions that are coming from counties.

19    Q.  Okay.  And if a county is having some sort of -- any sort

20    of issue with respect to preparing for the election or

21    election administration, do they ever bring that to your

22    attention?

23    A.  Yes, we -- in addition to me, we do have individuals on

24    the department's staff.  We call them county liaisons.  They

25    are sort of the first point of contact.

1        So a county is always welcome to contact me, but if they

2    need to get ahold of somebody immediately, we have actually

3    assigned staff members to counties so that the county has sort

4    of an initial point of contact they can reach out to with a

5    question or a problem.

6    Q.  And do you know how often county officials are reaching

7    out to their DOS liaison?

8    A.  No, not all 67 counties are reaching out to their

9    liaisons.  Every week, based on what I observed, our county

10   liaisons are generally, many of them are talking to some or

11   all of their counties on a weekly basis.

12   Q.  Okay.  And if a county reports to their DOS liaison an

13   issue, will that ever get elevated to your attention?

14   A.  It will depending on the issue.

15   Q.  Okay.  Does the Secretary expect you to know what's

16   happening statewide as counties prepare for an election?

17   A.  I want to make sure I heard -- you're asking if the

18   Secretary expects me to know what status of things are in

19   counties?

20   Q.  Yes.  I can ask the question again for clarity.

21        Does the Secretary expect that you know what is happening

22   statewide as counties get ready to administer an election?

23   A.  Yes.

24   Q.  Okay.  Now, I believe you said one of the responsibilities

25   of the department in terms of election administration is

1    finalizing the list of candidates that will appear on a

2    general election ballot; is that right?

3    A.   That's correct, yes.

4    Q.   Okay.  And has that already happened for the 2024 general

5    election?

6    A.   Yes, it has.

7    Q.   And do you know when that happened?

8    A.   I believe it was the middle of September.  I want to say

9    September 16th.  I don't have it right in front of me.

10   Q.   For what it is worth, September 16th is consistent with my

11   understanding as well.

12   A.   Yes.

13   Q.   So can you walk through the steps between when the

14   Secretary certifies the list of candidates and the election

15   day, what needs to happen to get ready for the election?

16   A.   So because all of our county or most of our counties are

17   now using voting systems that require the hand mark paper

18   ballot, what will happen once we certify that list, counties

19   will finalize their election definition in their election

20   management system.

21        So each of the voting systems has sort of a central

22   software program that county election officials use to define

23   the offices and contests, as well as the candidates and ballot

24   styles that go into a specific election.

25        So counties will often start that process before we

1   certify the list of candidates so they can start inputting

2   that information.

3       Once we certify that, sort of the first step is counties

4   will finalize that ballot definition, they will then begin

5   working with their print vendors first to get proofs and then

6   sample ballots and test ballot decks that they can use to test

7   their voting equipment.

8       So it kind of goes through this progression, and they will

9   then conduct some level of ballot acceptance testing before

10  they send out absentee and mail ballots to make sure that

11  those ballots are going to be -- can be properly tabulated,

12  and then it moves on from that point to receiving test decks

13  from their print vendor and conducting logic and accuracy

14  testing on all of the equipment used in the county.

15      So for most counties, that involves feeding those test

16  decks through the scanners that will be located in precincts

17  on election day, as well as central scanners or central

18  tabulators that may be used for absentee and mail ballots.

19      And then as part of that, they will do some level of

20  functional testing on the actual hardware, the equipment

21  itself that goes out to the polling place and, ultimately,

22  that will end with them locking and sealing the voting

23  equipment for delivery to polling places on election day.

24      So once they have completed all of their pre-election

25  testing and everything is set to go, they lock and seal all of

1   the voting equipment, and that remains locked and sealed and

2   secured at the county until it is delivered to the polling

3   place.

4       In between all of that, in a presidential election cycle

5   such as this one, they are also processing voter registration

6   applications that are coming in, additional requests for

7   absentee and mail ballots.  As I mentioned earlier, they are

8   conducting poll worker training in the weeks leading up to

9   election day as well.

10      So as they are doing all of that pre-election testing,

11  they are also doing these other tasks that are higher volume

12  particularly in a presidential cycle.

13  Q.  Thank you, Mr. Marks.  So there was a lot in there, so I

14  want to try to break out a couple of those pieces and talk

15  about them more specifically.

16      I believe one of the steps you mentioned in that process

17  was something referred to as logic and accuracy testing; is

18  that correct?

19  A.  That's correct, yes.

20  Q.  Okay.  And is that ever also referred to as L&A testing?

21  A.  Yes.

22  Q.  Okay.  So if I say L&A testing, you know I'm referring to

23  logic and accuracy testing?

24  A.  Yes, that is the acronym we use to describe logic and

25  accuracy testing.

1  Q.  Okay.  Can you explain in a bit more detail what logic

2  accuracy testing is?

3  A.  At a very high level, logic and accuracy testing is a

4  pre-election testing that is conducted to confirm that all of

5  your offices, contests, candidates are correctly programmed

6  into the voting equipment and also that they're correctly

7  identified on the paper ballot component.

8      And then probably the core of logic and accuracy testing

9  is the process of feeding those, feeding the test decks that I

10  mentioned earlier through the tabulation elements of the

11  voting equipment to ensure that those tabulators are properly

12  tabulating the results from an election.

13     So the way this works, you'll create test decks with some

14  faux pattern.  Then you know what the outcome should be based

15  on that faux pattern.

16     You feed those through.  You -- just it's sort of like

17  what you will do after election day.  You feed those through.

18  There's -- you know, and then you feed them into the central

19  election management system to make sure that from start to

20  finish, that process is resulting in accurate tabulated

21  results.

22  Q.  So before I asked you about a couple of the components you

23  just referenced.  Does the department have any role with

24  respect to L&A testing?

25  A.  We did not have a direct role in conducting logic and

accuracy testing, but we do have an oversight role.  One of

the things that the Secretary of the Commonwealth has the

authority to do under the election code is to issue directives

regarding electronic voting systems, and one of those

directives is the directive on logic and accuracy testing.

So we provide training on best practices on how to conduct

logic and accuracy testing.  We also provide -- we also

require that at the completion of logic and accuracy testing,

each of the 67 Boards of Elections certify to us that they

completed logic and accuracy testing.

Q.  So I believe you said the Secretary's role is to certify

the machines, and under that is issued a directive requiring

logic and accuracy testing.

Is completing logic and accuracy testing a condition of

having a certified voting system in Pennsylvania?

A.  It is.  And though it is not referenced in Pennsylvania

election code, pre-election testing is also a statutory

requirement.

Q.  Okay.  And why does the department require counties to

conduct L&A testing?

A.  Well, again, its primary purpose is to ensure that the

equipment is in proper working order and that it is accurately

tabulating results for each election.

Counties need to go through that process in advance of

election day so that they can assure the public and candidates

1    who are represented on the ballots and political parties who

2    are represented on the ballots that the equipment is going to

3    properly and accurately tabulate votes that are cast on

4    ballots by millions of voters across the Commonwealth.

5    Q.  And can L&A testing begin before the list of candidates

6    has been finalized for an election?

7    A.  No, it cannot.  As I mentioned earlier, the election

8    definition files have to be finalized, and then you progress

9    from one step to the next.  So you are printing proofs that

10   you use to proofread everything that's on the ballot, and then

11   you -- using that data, you are also creating test decks that

12   will then be used for logic and accuracy testing.

13        So in order to get to that logic and accuracy testing

14   step, you have to finalize your general election ballot

15   definition files to complete logic and accuracy testing.

16   Q.  Okay.  Just so I can make sure we all understand what some

17   of these terms are, what is the election definition file?

18   A.  Again, that is the -- it's basically the framework of an

19   election.  So the election definition file is all the offices,

20   contests, candidates, ballot styles, everything that goes into

21   setting up an election, it is that defined in a database.

22   Q.  And I think once you said -- I believe you said once you

23   have the election definition, you create the test decks; is

24   that correct?

25   A.  Yes, because, again, the overwhelming majority of our

1   counties are using hand mark paper ballots.  On election day,

2   counties are creating test decks that will be used for logic

3   and accuracy testing.

4        So the way logic and accuracy testing works is that you --

5   in order to properly test the equipment, you have to run test

6   ballots through that equipment, and the way it works, you have

7   a, sort of a vote pattern that you've decided in advance that

8   will robustly test the tabulating elements.

9        That's how you determine what ballots are going to be on

10  the test deck, and then you feed those through the equipment

11  and compare what the expected results are against the results

12  that you actually get when you complete the logic and accuracy

13  testing to ensure that they match.

14  Q.  Okay.  So if I understand correctly, a test deck is

15  effectively sample ballots that are used for the logic and

16  accuracy testing?

17  A.  Correct.

18  Q.  Okay.  For logic and accuracy testing, do counties only

19  test some of the equipment that they are going to use in an

20  election?

21  A.  I'm sorry, I missed part of that.  Do counties --

22  Q.  Sure.  Do counties test -- during logic and accuracy

23  testing, do counties test every single piece of equipment that

24  they will use for an election?

25  A.  Yes.  Our directive requires them to test each piece of

1    equipment.  So in the overwhelming majority of counties,

2    again, you have tabulators that are attached to a ballot box,

3    and voters are feeding those ballots through the tabulators.

4    So you have to run test ballots through each of those

5    tabulators to ensure that they are accurately tabulating and

6    to ensure that the equipment is in working order.

7    Q.  Are there any types of machines apart from tabulators that

8    need to be tested as well?

9    A.  So in those counties that use ballot marking devices on

10   election day, which is, I think it is about ten counties, they

11   also have to do testing on the ballot marking device, and

12   going back to my earlier testimony, those ballot marking

13   devices are used by voters on election day to make their

14   selections, and then a machine mark ballot is printed out and

15   that is then fed through the scanners.

16       So counties that use ballot marking devices as their

17   primary voting method on election day have to go through

18   functional testing.

19       I will note that every county in the Commonwealth for

20   accessibility purposes has to have at least one ballot marking

21   device in each precinct.  So every county is doing this at

22   some level, but those counties that are relying on it as their

23   primary voting method are doing a lot more of that sort of

24   functional testing of the ballot marking device.

25   Q.  In some of Pennsylvania's larger counties, do you know how

1    many machines that they would have to test as a part of the

2    logic and accuracy testing?

3    A.   I think in Philadelphia, which has 1700 divisions, I

4    believe they have upwards of 4,000, between 3500 and 4,000

5    voting machines, and Allegheny, the second largest

6    jurisdiction, has a few thousand pieces of equipment as well.

7    Q.   Okay.  And in those larger counties, do you know how long

8    it takes to complete logic and accuracy testing?

9    A.   My understanding is that it took Philadelphia County a

10   week to do the logic and accuracy testing component.

11   Philadelphia County is one of those counties that actually

12   uses ballot marking devices as their primary system.  It took

13   them a week to do logic and accuracy testing, and then I

14   believe the better part of another week to do the functional

15   testing on the ballot marking devices.

16   Q.   Okay.  Before counties can even begin logic and accuracy

17   testing, do they have any requirement to provide advanced

18   public notice of when testing will begin?

19   A.   They do.  They have to provide -- they are actually

20   required, as I recall, to provide notice specifically to the

21   political parties, political body represented on the ballot,

22   as well as any other organization that notifies them in

23   advance.

24        So they have to provide notice directly to those groups,

25   as well as public notice of the date and times when to conduct

1   the logic and accuracy testing.

2   Q.   Okay.  Once a county completes logic and accuracy testing,

3   what do they do with the machines?

4   A.   Once they have completed logic and accuracy testing and

5   functional testing as necessary, they will lock and seal the

6   voting machines in advance of election day, and those machines

7   will remain locked and sealed, and the way this works in

8   practice, counties are using, you know, approved locks, and

9   they are also using tamper evidence seals over all of the

10  ports and the locks so that if somebody attempts to open that

11  equipment after testing has been completed, it will be

12  apparent that somebody tampered with the voting equipment.

13  Q.   Okay.  Is there a deadline to complete logic and accuracy

14  testing?

15  A.   We require, through the directive, counties to submit

16  their logic and accuracy testing affirmation by 15 days before

17  each election.

18  Q.   Okay.  If a new candidate was added to a ballot, would

19  counties have to redo logic and accuracy testing?

20  A.   Yes, they would have to, because they would have to make a

21  change to the election definition.  So the list of candidates

22  is one of those components of the definition of an election.

23        So making that change would necessarily require them to go

24  through another round of logic and accuracy testing to ensure

25  that votes are still being tabulated accurately.

1    Q.  Okay.  And are you aware is any county for the 2024

2    general election already begun logic and accuracy testing?

3    A.  Yes.  I mentioned Philadelphia.  I know they did theirs a

4    couple of weeks ago.  I believe Allegheny has completed logic

5    and accuracy testing.  Several other counties, to my

6    knowledge, have completed logic and accuracy testing as well,

7    and I know based on recent conversations with counties, that

8    many of them are -- if they haven't completed it, they are in

9    the process of completing that.

10          I believe Lebanon County, for example, completed logic and

11   accuracy testing a couple of weeks ago.  Not every county has

12   submitted the affirmation to us yet, but my understanding is

13   that a number of counties have completed logic and accuracy

14   testing, and additional counties are in the process of doing

15   that now as well.

16   Q.  Okay.  So if for any reason a county had to redo logic and

17   accuracy testing, are there any steps that would have to take

18   place before they could even begin the process of re-doing

19   that testing?

20   A.  Yes.  In the overwhelming majority of counties that use

21   pre-printed ballots that are marked by hand, those counties

22   would have to run another set of test decks to complete the

23   logic and accuracy testing test.

24   Q.  Would they have to unseal the machines if they already

25   completed testing?

1    A.   Yes.   If they have locked and sealed the machines, they

2    would have to unseal them.   Basically they would repeat the

3    process again and go through another round of logic and

4    accuracy testing and then, again, seal the machines in advance

5    of election day.

6    Q.   Okay.   So if they had to redo it, they would have to

7    basically restart again from the very first step?

8    A.   Correct, yes.

9    Q.   Okay.   What are the risks if logic and accuracy testing is

10   not completed before an election?

11   A.   One of the risks if logic and accuracy testing is not

12   completed before the election, well, the risk is that there

13   was an error made in the ballot definition file, and that

14   logic and accuracy testing is designed to catch those types of

15   errors.

16        So that the risk is that you -- by not conducting logic

17   and accuracy testing, the risk is that there will be a

18   malfunction on election day or vote titles will not be

19   tabulated accurately.

20   Q.   Are the risks if logic and accuracy testing has to happen

21   under a compressed schedule?

22   A.   Yes.   I mean, any time you do a process that normally

23   takes several days in a very compressed period of time, you

24   are putting the process at risk because you're rushing through

25   that or you are doing less than you would normally do.

1    Q.  Okay.  And correct me if I am wrong, I believe you said

2    earlier that in the larger counties, the poll process might

3    take more than several days, but could, in fact, take closer

4    to two weeks; is that right?

5    A.  So I used Philadelphia as the example, and this election,

6    I believe it took a week to do the logic and accuracy testing,

7    and then another, nearly another week to do functional testing

8    on the ballot marking devices.  So I would think it would take

9    Philadelphia, for example, another week.

10   Q.  Okay.  If counties had to redo logic and accuracy testing,

11   do you think it would increase the risk of other problems for

12   the upcoming election?

13   A.  You know, I think it goes back to the compressed time

14   schedule.  If they are re-doing that in a compressed period of

15   time, it does increase the risk.  We already have a lot of

16   ballots that have been sent out as well.

17       So we are talking about a change after a point in time

18   where voters are already receiving and, in some cases,

19   returning ballots.  So there are a lot of risks and logistical

20   concerns at this point in the process.

21   Q.  So let's transition to the topic of ballots that have been

22   sent out which you just mentioned.

23       Is it true that ballots have already been sent to voters

24   for the 2024 general election?

25   A.  Yes.  In I believe over half of the counties have made

1    absentee and mail ballots available to voters in their

2    offices.  I think last time I checked, it was 35 counties.  We

3    also, about two-thirds of the counties have sent ballots out

4    to voters.

5         The last time I checked this morning -- I get statistics

6    every morning -- it appears that over 1.1 million absentee or

7    mail ballots have already gone out in the mail and about

8    137,000 have actually been received, filled out and returned

9    by voters to their county election office.

10   Q.   Okay.  Just quickly, could you explain what mail-in and

11   absentee voters are?  I believe that's a term you referenced.

12   A.   Yes.  Absentee is something that the Commonwealth has had

13   for decades, and it is a mechanism by which a voter who will

14   be absent or has some disability, this is a mechanism for them

15   to vote.

16        Mail-in voting is a method of voting that was added by our

17   legislature in October of 2019.  It is basically no excuse

18   mail-in voting that every voter in the Commonwealth is

19   entitled to use if they wish to do so, and those were -- it

20   was enacted in October 2019, and the 2020 primary was the

21   first election in which that was available to voters.

22   Q.   Okay.  And for the upcoming general election, do you know

23   how many people have already applied to vote by mail-in or

24   absentee ballot?

25   A.   Looking at the report this morning, it was a little over

1  1.5 million approved applications.  So individuals who

2  requested and had their applications approved for either an

3  absentee or mail-in ballot.

4  Q.  Has the deadline to apply for an absentee or mail-in

5  ballot already past?

6  A.  The deadline to apply for an absentee or mail-in ballot

7  has not past.  That is a week before election day.

8  Q.  Okay.

9  A.  So the statutory deadline.

10  Q.  So that 1.5 million number could still increase?

11  A.  It could, yes.

12  Q.  Okay.  And just to make sure I have some of the other

13  numbers you mentioned correct, I believe you said 1.1 million

14  ballots have already been sent to voters; is that right?

15  A.  Yes.  Based on the data I have available, 1.1 million

16  ballots have been sent out to voters, over 1.1 million.

17  Q.  What data do you rely on for that number?

18  A.  So we are relying on either what counties have recorded in

19  statewide voters registration systems or on mail house vendors

20  data that we have available to us through the mail house

21  vendors.

22  Q.  Okay.  And I believe you said as well that over 30

23  counties already have ballots available on demand; is that

24  correct?

25  A.  Yes.  I believe that the number is 35.  So it's a little

```
 1    over half of the counties have indicated that they have

 2    over-the-counter voting by mail available at their county

 3    office at this point.

 4    Q.   Okay.  And can you remind me the number you said of how

 5    many ballots have already been returned for the upcoming

 6    election?

 7    A.   As of this morning, it was a little over 137,000 have been

 8    returned.

 9    Q.   Okay.  And is the process of counties sending ballots to

10    voters ongoing, meaning tomorrow?  Will the number of ballots

11    sent be higher than it is today?

12    A.   Yes.  I think in the last week, we probably added about a

13    hundred thousand.  That number was significantly lower a week

14    ago.

15    Q.   Okay.  And is the process of returning ballots also

16    ongoing, such as the 117,000 I believe mentioned will also

17    increase each day?

18    A.   Correct, yes.

19    Q.   Okay.  Do counties also need to print hard copy ballots

20    for use -- for use of in-person voting on election day?

21    A.   Yes.  All but about ten of our counties that use ballot

22    marking devices as their primary voting method on election

23    day, all but that group of counties have to preprint ballots

24    that voters then mark by hand by filling it in.

25    Q.   How -- the counties that do have hard copy ballots at
```

1    polling places on election day, how many ballots do those

2    counties need to have printed for election day?

3    A.   Well, per the Pennsylvania election code, counties have to

4    print a hundred percent, ballots equal to a hundred percent of

5    their registered voters in each precinct, minus whatever

6    absentee and mail ballots have been requested.

7    Q.   Okay.  And I believe you said earlier --

8    A.   So it's basically every registered voter, they have to

9    print numbers equal to that.

10   Q.   And I believe you said earlier that counties often or

11   always use vendors for printing ballots, is that correct, for

12   election day ballots?

13   A.   Yes.

14   Q.   Are you aware, has the process for printing election day

15   ballots in Pennsylvania already begun?

16   A.   It has, yes.

17   Q.   Okay.  How do you know that it's already begun?

18   A.   Again, that's based on discussions either I have had

19   directly with counties or our liaisons have had during the

20   past few weeks as counties prepare for the November election.

21   Q.   Okay.  And do you know when printing of election day

22   ballots began?

23   A.   When it began, I think -- so the earliest discussion I had

24   was with one of the print vendors.  They began doing their

25   ballots in the third week of September.

1        So, and that print vendor is William Penn.  Because they

2   use such a large number of counties, they actually schedule

3   ballot printing for each of their county clients, and based on

4   our recent discussion, my understanding is they started

5   shortly after we certified the candidate list on September

6   16th, they already printed ballots for a number of their

7   clients and I believe that process is still ongoing.

8   Q.   I believe you said earlier you have specifically talked to

9   the print vendors about them, about their printing of ballots

10  for the 2024 election?

11  A.   Correct.

12  Q.   Okay.  And are you aware, do the vendors at Pennsylvania

13  counties use -- do they have any clients outside of

14  Pennsylvania?

15  A.   Yes.  So Phoenix Graphics -- so there are two vendors that

16  are located in New York, and one of the print vendors is

17  actually located in Ohio.

18       ES&S, Election Systems and Software is one of our system

19  vendors.  I know they -- some of the ballot printing is

20  conducted by William Penn and they may use other partners to

21  print ballots to their specifications, but the three that I'm

22  aware of that are located outside of Pennsylvania, two are

23  located in New York and the other one is located in Ohio.

24  Q.   Okay.  And they are serving clients both inside

25  Pennsylvania and outside of Pennsylvania?

1   A.   That's correct, yes.

2   Q.   I believe you said earlier -- actually, scratch that.

3        If every county had to reprint election day ballots

4   starting now, are you confident the vendors could actually

5   complete that by election day?

6   A.   I am not confident that that could be done by election

7   day.

8   Q.   Why not?

9   A.   Well, as I said, particularly the small vendor that I

10  mentioned earlier, William Penn, they have a large number of

11  clients.  They do not have the capacity to print ballots for

12  all of their clients simultaneously.

13       Phoenix Graphics, I believe their list of clients has

14  grown to 14 that they print absentee and mail ballots for.  I

15  don't recall if they do election day ballots for all of them.

16       But probably the biggest risk I see is that one vendor

17  that is serving over two dozen of our counties, I know based

18  on conversations that they do not have the capacity to print

19  ballots for their clients all at once, and that is why they

20  schedule it over the period of several weeks.

21  Q.   Okay.  So we talked about logic and accuracy testing and

22  ballot printing, and I believe when I asked you a while ago

23  about the list of tasks that need to be completed between

24  certifying the list and election day, you also mentioned

25  processing registration applications; is that correct?

1    A.   That's correct, yes.

2    Q.   Okay.  Can you describe what that entails for a county

3    election official?

4    A.   Well, it -- depending on how the application comes

5    through -- so we have -- there are different methods by which

6    a voter can or an individual can register to vote.  They can

7    register through voter -- voter applications, those are coming

8    in electronically.  They can register online.  Those are also

9    coming through electronically.

10        But in a presidential election cycle in particular, we do

11   see a large number of paper applications that come in and that

12   requires some data entry on the part of county officials.

13        There are a lot of voter registration drives that are

14   either mailing applications to potentially qualified

15   individuals or they're conducting in-person voter registration

16   drives, collecting applications from individuals, and

17   submitting them to county election offices.

18   Q.   Okay.  So just to make sure I understand you correctly, I

19   believe you said the month before a presidential election,

20   there's typically more registration applications coming in

21   then, say, October of 2023?

22   A.   Yes, certainly, there's -- 2023 is the municipal election

23   cycle, and, sadly, the interest in municipal elections in

24   Pennsylvania is much, much lower than the interest in

25   presidential elections and even mid-term federal elections.

1    Q.   Okay.  And are counties still processing mail ballot

2    applications?

3    A.   They are.  So counties are still receiving mail ballot

4    applications in addition to those lower registration

5    applications.

6    Q.   Okay.  I think you also said counties are still conducting

7    poll worker training; is that correct?

8    A.   Yes.  Depending on the size of the county, that some

9    counties are able to do their poll worker training during the

10   last weeks before election day.  A county the size of

11   Philadelphia actually starts in September, and they have, you

12   know, they have multiple sessions over the course of several

13   weeks.

14   Q.   Okay.  If counties had to redo logic and accuracy testing,

15   would that take resources away from processing registration

16   applications?

17   A.   It would, I would expect, take resources away.  You may

18   have specific staff that are in charge of the election

19   equipment to conduct logic and accuracy testing.

20        My understanding is that counties will use their election

21   staff to do the process of, you know, feeding the -- marking

22   ballots, feeding those ballots through the voting system units

23   to complete logic and accuracy testing.

24   Q.   Okay.

25             THE COURT:  Why don't we break here.  I don't know

1    how much more you have.

2              MR. BOYER:  I probably have about three more

3    questions.

4              THE COURT:  That's fine.

5    BY MR. BOYER:

6    Q.  If counties have to redo logic and accuracy testing, would

7    that take resources away from processing mail ballot

8    applications?

9    A.  I could not say that in every county that would be the

10   case, but I would think certainly in large counties that are

11   using significant portions of their staff to do logic and

12   accuracy testing, I believe it would.

13   Q.  Okay.  And if counties had to redo logic and accuracy

14   testing, would you expect at least in some counties that would

15   take away resources from poll worker training?

16   A.  Yes.

17             MR. BOYER:  Just one moment.  May I confer?

18             THE COURT:  Sure.

19        (The attorneys are conferring).

20             MR. BOYER:  No further questions, Your Honor.

21             THE COURT:  All right.  Thank you.  Why don't we

22   break then at this point.  The time is 11:07.  Why don't we

23   break for 15 minutes here and we will pick up on cross.

24             Mr. Marks, you'll still be under oath during the

25   break, and I would ask that you refrain from talking with

1    anyone about your testimony.

2              THE WITNESS:  Understood.  Thank you, Your Honor.

3              THE COURT:  Thank you.

4              THE DEPUTY CLERK:  All rise.  This Court is now in

5    recess.

6         (A recess was taken.)

7                        (In Open Court)

8              THE COURT:  You may be seated.  All right.

9    Mr. Marks, you're still under oath and, Mr. Haverstick, your

10   witness.

11             MR. HAVERSTICK:  Thank you, Your Honor.

12                       CROSS-EXAMINATION

13   BY MR. HAVERSTICK:

14   Q.  Good afternoon -- well, no, good morning, Mr. Marks.

15   A.  Good morning, Mr. Haverstick.

16   Q.  Nice to see you.  I know you can't or don't think you can

17   see me, but thanks for taking the time today.

18        Mr. Marks, late changes to ballots are common, are they

19   not?

20   A.  I'm sorry, you broke up --

21   Q.  Late --

22   A.  -- towards the end of that.

23   Q.  Late changes to ballots are common, are they not?

24   A.  They have occurred multiple times, yes.

25   Q.  In fact -- and for the sake of being transparent, I'm

1  reviewing an affidavit you submitted in a case Corman v.

2  Torres from 2018.  In 2014, a republican gubernatorial

3  candidate was taken off the ballot 19 days before the primary.

4  Do you recall that?

5  A.  Yes, that sounds correct, yes.

6  Q.  And in 2016, a candidate for U.S. Senate was reinstated

7  and put back on the ballot one week before the primary?

8  A.  I believe that's correct, yes.

9  Q.  So I guess where I'm going with this is it's not an

10  absolute impossibility for the department or counties to

11  adjust ballots even very close to an election?

12  A.  It is not impossible, no.

13  Q.  It mostly is a question of resources and money.

14  A.  Is that a question, Counselor?

15  Q.  Yes, that's a question.

16  A.  It is those two things.  Since Act 77 was enacted, it is a

17  little more involved than that because we have that paper

18  ballot component.

19     Prior to Act 77, all about 14 counties in the Commonwealth

20  were using a type of voting system called a direct recording

21  electronic voting system where every voter was casting their

22  votes on a touch screen system and those votes were tabulated

23  electronically.  There was no paper ballot component.  So

24  things have changed substantially since enactment of Act 77.

25  Q.  And I want to ask about mail-in ballots in a moment, but

1    at least as far as hard ballots are concerned, it is not an

2    impossibility and may even be a strong possibility that they

3    can be adjusted close to an election?

4    A.   Certainly the election definition files can be adjusted.

5    Again, I don't think it is inconsequential, though, that you

6    have the paper ballot component because in a large number, the

7    majority of counties you are preprinting ballots before

8    election day.

9        So while I am saying it's not impossible, but it is

10   significantly different now than it was, say, in 2018 or 2016.

11   Q.   Before I get into the mail-in ballot questions, is it fair

12   to say as you sit here today, you can't give a precise answer

13   about where all 67 counties are in their printing process

14   either for mail-ins or for hard ballots; right?

15   A.   Not all 67, no.

16   Q.   Fair to say that you focused your testimony today on

17   Allegheny and Philadelphia Counties?

18   A.   Certainly in my testimony I used those as the two

19   examples, yes.

20   Q.   So it's possible that, at least in part, if the Court were

21   to order Dr. West to be put on the ballot, some counties might

22   be able to accommodate that more easily than others?

23   A.   I think that's fair, yes.

24   Q.   Now, I want to ask some questions about mail-ins and the

25   L&A process.

1      I'm correct, am I not, that in some counties, mail-in

2   ballots were sent out prior to the L&A process being

3   completed?

4   A.  Yes.  So L&A is primarily testing that is done for

5   election day.  So, and I want to be clear just so there's no

6   confusion.  Absentee and mail-in ballots are not the only

7   paper ballots that are printed in advance of election day.

8      Most, in fact the overwhelming majority of our counties

9   use pre-printed election day ballots with their type of voting

10  system.

11     But yes, the counties will do what's called ballot

12  acceptance testing to -- so when they print their absentee and

13  mail ballots, they'll go through a testing that is not

14  necessarily logic and accuracy testing, but ballot acceptance

15  testing to ensure that those absentee and mail-in ballots can

16  be read by the central tabulators.

17  Q.  The requirement that logic and accuracy testing be done 15

18  days prior to the election is not a statutory requirement,

19  it's a directive from the department; right?

20  A.  Yes, it is a directive.

21  Q.  And that directive, if I'm doing my math right, has, at

22  least consistent with your directive, a date of October 21st

23  for L&A to be completed?

24  A.  Yes.

25  Q.  We agree, given at least the parameters you talked about

1    for the City of Philadelphia, that even within that 15 days,

2    if a county was required to do or redo L&A, it probably could

3    accomplish that; right?

4    A.   It certainly could be accomplished.  They could do another

5    round of logic and accuracy testing.  Again, there are other

6    components of that, and certainly outside of Philadelphia, it

7    is different because those counties are not using ballot

8    marking devices, but I think it's fair that they can do

9    another round of L&A, at least at this very moment in time.

10   Q.   And again, for a lot of the 67 counties in the

11   Commonwealth, as you sit here today, you can't say precisely

12   where they are in the L&A process and even whether they

13   started it?

14   A.   I do not know for all 67 counties where they are in the

15   L&A process, no.

16   Q.   Am I right that the public announcement prior to the L&A

17   process is a two-day lag?

18   A.   I believe it is 48 hours that notice that must be

19   provided.

20   Q.   So the record is clear, if this Court was to order

21   Dr. West to be put on the ballot say this week, a county could

22   advertise that it was going to do the L&A process say again,

23   and that would only need two days to happen, and then they

24   could do or redo the L&A process?

25   A.   That is certainly possible, yes.

1   Q.   No county has locked and sealed yet, has it?

2   A.   I'm sorry, what was -- I missed the second half of that

3   question.

4   Q.   Sorry.  It may be me and the mic.  I have a loud voice.

5   A.   It was a little muffled toward the second part of your

6   question.

7   Q.   No county has locked and sealed yet, has it?

8   A.   I believe the counties that have completed logic and

9   accuracy testing have locked and sealed.  That would be the

10  next logical step, but I do not have firsthand knowledge of

11  that, no.

12  Q.   So you don't know as you sit here today whether any county

13  is locked and sealed?

14  A.   I don't know.  I don't have firsthand knowledge.

15  Q.   And certainly, can we agree that at least some of the 67

16  counties in the Commonwealth have not locked and sealed?

17  A.   I think that is fair to make that assumption, yes.

18  Q.   You may have answered this question, but I'll ask it again

19  just so I'm complete in my head.

20       It would be possible at this point for vendors to reprint

21  hard copy ballots for polling places?

22  A.   Without asking the vendors that question, I don't know the

23  answer to that, no --

24  Q.   So --

25  A.   -- because --

1    Q.   I apologize, go ahead.

2    A.   Because a lot of those vendors have clients not only here

3    in Pennsylvania, but also elsewhere.   I can't answer the

4    question as to whether they could reprint ballots for all of

5    their clients all at the same time essentially.   I just don't

6    know the answer to that.

7    Q.   You don't know the answer because you haven't actually

8    consulted with any of those vendors?

9    A.   Not about that specific question.   I do know that vendors

10   raised that as their -- when I spoke to them earlier this

11   year, vendors did raise that as one of their concerns, the

12   litigation that dragged on very close to the election and, you

13   know, each vendor has its own abilities and capacity.

14        So I'm simply saying I don't know the answer to the

15   question, whether all of the print vendors could print

16   another -- could print additional ballots for all of their

17   clients all at once.

18   Q.   Let me ask it another way and maybe rephrase your answer.

19        You can't testify today that any vendor would be unable to

20   reprint ballots if asked to?

21   A.   That's correct, I cannot.

22   Q.   And by the way, what prevents a county, or the

23   Commonwealth for that matter, from bringing in an additional

24   vendor if it had to?

25   A.   Well, I don't know that anything prevents them from doing

1    that.  I will say that because the ballots have to be scanned

2    by voting equipment, they -- the way this works in practice is

3    that voting system vendor will provide specifications.  So I

4    don't know that you could just choose any print vendor, if

5    that's what you are asking.

6        Typically, the vendors who do the printing have gone

7    through some level of sort of approval from the voting system

8    vendor saying, yeah, this vendor can print ballots to our

9    specifications.

10   Q.  Presuming --

11   A.  So I'm not saying it's impossible, but I'm also not trying

12   to make it sound simple where you can just go to any printer

13   to print ballots.  It's a little more sophisticated than that.

14   Q.  I understand that, and I get that you are not -- your

15   testimony isn't that we can run out to a Kinkos and get these

16   printed, but presumably if there are vendors to approve

17   ballots who weren't being used, the Commonwealth could hire

18   them, too, or the county can hire them, too?

19   A.  Yes, I think that's fair.

20   Q.  And on the question of resources, it's not uncommon for

21   counties to scale up for elections with more workers.  For

22   instance, it's happening in Luzerne right now where workers

23   are being hired on a temp basis to assist.  So it's not

24   unusual for this to happen; right?

25   A.  For counties to staff up, it's not unusual, no.

1  Q.  Let me ask a couple of questions to conclude, Mr. Marks,

2  on some other alternatives.

3     Now, we know that counties have until October 22nd to send

4  out mail-in ballots; right?

5  A.  Yes, two weeks before election day is October 22nd, that's

6  correct.

7  Q.  So if this Court ordered Dr. West on the ballot and there

8  were counties that hadn't printed mail-in ballots yet, it

9  would not be difficult -- it would not be impossible for those

10  ballots to be printed with his name on it?

11  A.  Yes, I will testify it would not be impossible.  It would

12  certainly be difficult at this point, but perhaps not

13  impossible.

14  Q.  Well, how about this alternative.  In counties where

15  mail-in ballots -- let me ask a foundational question first.

16     The department communicates via email with folks who have

17  received mail-in ballots; right?

18  A.  Yes, we do voter registration communications directly to

19  voters who receive ballots if we have an email address for

20  them.

21  Q.  Sure.  For instance, I voted by mail in Montgomery County,

22  my home county, and I got an email from the department saying,

23  "We've received your vote."  So you have the ability to do

24  those emails; right?

25  A.  Yes.

Q.  Would anything prevent the department from sending out a
notice to someone who voted by -- who sought a mail-in ballot
to alert that person that "Dr. West is now on the ballot, you
should know that."  You could send that notice if you
wanted to?

A.  We could.  I would certainly have to talk to our staff
both here in the department and our Office of Administration
about the logistics of that, but, yes, we could send a message
to voters.

Q.  And that wouldn't even require alteration of the ballot.
That's simply notifying a voter of the change in status and
letting the person know that Dr. West is now on the ballot?

A.  Yes, if it's a pure notification, yes, we could send
notification to voters to the extent that we have contact
information for all of them.

Q.  In fact, you could do the same thing, could you not, for
hard copy ballots.  I mean, the department has, for instance,
posted notice at polling places of last-minute changes; right?

A.  The department hasn't, but on occasions counties have
posted notice in voting booths at polling places on election
day notifying voters of some important information or some
change, yes.

Q.  So if it was literally impossible for a county this
week -- if Dr. West was added to the ballot, if it was
literally impossible for a county to change a ballot, there's

1    still a way that notification could be given to voters that

2    Dr. West was on the ballot at the polling place?

3    A.  Yes, it has been done before.  So I think counties would

4    have time to print and distribute notices for posting at the

5    polling place.

6    Q.  Mr. West, thank you.

7            MR. HAVERSTICK:  I don't have anymore questions for

8    this witness, Your Honor -- oh, yeah, sorry, you are

9    Mr. Marks, not Mr. West.

10           THE COURT:  All right.  Thank you.

11           THE WITNESS:  That's okay.  Mr. West is quite

12   accomplished, more accomplished than me.  So I'll take it as a

13   compliment.

14           MR. HAVERSTICK:  Thank you, Mr. Marks.

15           THE COURT:  Thank you.

16           THE WITNESS:  Thank you.

17           THE COURT:  Any redirect?

18           MR. BOYER:  Briefly, Your Honor.

19                        REDIRECT EXAMINATION

20   BY MR. BOYER:

21   Q.  Mr. Marks, you were asked I believe about a candidate in

22   2014 who was ordered to be removed from the ballot 19 days

23   before the primary.  Do you recall that?

24   A.  I do, yes.

25   Q.  Okay.  And I believe you were asked about another

1   candidate who was ordered added to the ballot in 2016, some

2   short period of time before the primary election.  Do you

3   recall that?

4   A.   Yes.

5   Q.   Okay.  Have there been meaningful changes in how elections

6   are administered between 2016 and today?

7   A.   There have, yes.

8   Q.   Can you describe what those are?

9   A.   Yes.  So I referenced earlier Act 77 in 2019, which

10  actually, at least in Pennsylvania, represented a see change

11  in the way elections were administered.  We now have this

12  mail-in ballot component that -- so in a typical presidential

13  election, for example, we may have 250 to 300,000 absentee

14  ballots prior to Act 77.

15       Now, in 2020, in November, we had over 2.6 million mail

16  ballots, though I don't know that we're going to approach that

17  number this year, but we're already at 1.5 million.  So you

18  have a lot more absentee and mail ballots.

19       The other significant change was that every county has

20  updated their voting system.  So as I mentioned earlier,

21  counties prior to 2020, all but 14 counties were using a

22  direct recording electronic type of voting system that did not

23  have a paper ballot component and certainly not a pre-printed

24  paper ballot component.

25       So that was a significant change the department issued and

erected in 2018 for counties to update their voting equipment.
Most counties did that in 2019.  There were a handful of
counties that didn't implement those new voting systems until
2020.

So the two biggest changes are statutory changes that
provided for no excuse mail voting and also the new voting
equipment that now has this paper ballot component.  So those
are probably the two most significant changes since 2016.

Q.  And was it -- when counties were using direct recording
electronic devices, how hard was it to make late changes to
those devices?

A.  I will say, relatively speaking, I'm not going to testify
that it's easy to make late changes.  It is never easy, it is
never perfect, and it is certainly never preferred and it is
error (sic) hard.

But, relatively speaking, it was easier with direct
recording electronic voting systems because you had to update
the election definition files.  You would have to do logic and
accuracy testing again, but that was largely automated.  You
did not have the paper ballot component.  You didn't have to
worry about ordering test decks, running them through
tabulators, and you didn't have to worry about, you know,
proofreading ballots and printing a hundred percent or ballots
equal to a hundred percent of registered voters.

So that's probably the most significant difference between

1   the two types of voting systems that were used then versus

2   now.

3   Q.  Okay.  Just to make sure I understand, when counties were

4   using direct recording electronic devices prior to 2019, the

5   counties that were doing so did not need to preprint ballots

6   for election day for those machines?

7   A.  Correct, there was no paper component.  There was a paper

8   report that printed out on election night, but votes were

9   recorded electronically on the touch screen.  They were also

10  tabulated electronically on those special units.

11  Q.  The testing that needs to be performed on direct recording

12  electronic devices, if I understand you correctly, is

13  different than the testing that needs to be used on the sorts

14  of devices that are now spread across the Commonwealth?

15  A.  Correct, yes.  The testing now has the paper ballot

16  component included in it.

17  Q.  Okay.  So is it fair to say changes to ballots -- excuse

18  me -- changes to a candidate list in 2024 are substantially

19  more difficult than they would have been in 2016?

20  A.  I believe that's fair, yes.

21  Q.  Okay.  If -- I believe you said that there's a world in

22  which it would be possible to add a new candidate to the

23  ballot today.

24      Would it be possible to add a new candidate to the ballot

25  two weeks from now and still complete logic and accuracy

1    testing in every county before election day?

2    A.  It would become exponentially more difficult as time

3    passes, and I want to be clear about my testimony earlier.  I

4    am not suggesting that it would be easy to do it today.  We

5    still have the issue of -- unless we completely ignore it, we

6    still have the issue of the 1.1 million plus ballots that have

7    already gone out.  We have the issue of, you know, ballots

8    that may have already been printed by the counties for

9    election day, all of the other components I testified about.

10        So I don't want to -- I don't want to imply that it's

11   easy.  My testimony was simply it's possible to do it at this

12   point.  Doing it two weeks from now, which would be very close

13   to the deadline by which counties have to send mail ballots,

14   in fact, I think it would bump right up against that deadline,

15   would certainly be more difficult, a lot more difficult than

16   it is at this moment in time.

17   Q.  Okay.  And from an administrative perspective, what

18   challenges would there be if there were 1.5 million people who

19   received a ballot with one list of candidates and some million

20   others that received a list of -- a ballot with a list of

21   different presidential candidates?

22   A.  Well, I would think, you know, the administrative

23   challenges, I'll set aside -- I'm not the attorney in this

24   room, so I'll set aside the potential legal issues with that,

25   but administratively I think the counties would have to have a

1    process in place to keep those groups of ballots segregated.

2        When we have had late changes and it's been necessary for

3    a county to accommodate that, as often has been the case, that

4    certainly would be our guidance to counties to keep those

5    different ballots segregated to preserve the record at the

6    very least.

7        So, you know, what is really different about now versus

8    then is, you know, we're not just talking about the different

9    types of voting systems.  We're also talking about a much

10   larger volume of ballots and sort of the logistics of

11   segregating them if that were to become necessary.

12   Q.  Okay.  And to back up just to make sure I understand your

13   testimony, I believe you said there's a world in which it

14   would be possible to complete all of the various steps we have

15   talked about this morning between now and election day.

16       If every county in Pennsylvania had to do so, would you

17   expect that the risk of election day problems would be

18   greater?

19   A.  I do, yes.  I mean, the idea -- as I said, it's never

20   easy.  It's never been easy.  It would certainly cause me

21   great concern if we tried to make a change at this late stage.

22   I would certainly be concerned about errors that may not

23   become apparent until election day.

24       I think -- at least it seems to me that's logical that if

25   you tried to fast or compress, you know, time lines that are

1    usually much longer than that, you open yourself up to

2    unforced errors.

3    Q.  And how long have you been with the department?

4    A.  With the department, 30 years.  Working in elections

5    specifically in a variety of capacities, over 20 years.

6    Q.  Are you aware of any prior presidential election in

7    Pennsylvania during which a presidential candidate was added

8    to the ballot after over a million ballots have already been

9    sent to voters?

10   A.  No.  This circumstance is unique in my career.

11           MR. BOYER:  One moment, Your Honor.

12           THE COURT:  Sure.

13           (Counsel conferring)

14           MR. BOYER:  Nothing further, Your Honor.

15           THE COURT:  All right.  Thank you.

16           Mr. Haverstick?

17           MR. HAVERSTICK:  Real quick.

18           THE COURT:  Sure.  Go ahead.

19                        RECROSS-EXAMINATION

20   BY MR. HAVERSTICK:

21   Q.  Mr. Marks, Matt Haverstick.  It's unique in your

22   experience that no candidate who has tried to get on as a

23   presidential candidate after mail-ins have gone out because

24   mail-ins only started being a widespread phenomena after

25   Act 77?

1    A.   That's correct, yes.

2    Q.   So this is only the second presidential election

3    essentially between 2020 and now where this possibility even

4    became a possibility?

5    A.   That's correct, yes.

6    Q.   And it is, again, talking about mail-ins being segregated,

7    which I think is what you referred to when you were talking

8    about ballots being segregated, that, in fact, has happened

9    multiple times since the advent of Act 77; right?

10   A.   Yes, but the volume of ballots has been much lower.  I

11   know there were individual counties that had some issues, but

12   we're talking about hundreds of -- I think the most may have

13   been 29,000 ballots that had to be segregated in one county.

14   Q.   There was --

15   A.   The volume was certainly a lot different.

16   Q.   Well, it would only be significant in counties where some

17   ballots had gone out and a reprinted ballot went out.  If

18   there was no reprinted ballot that went out, it wouldn't be a

19   problem, would it?

20   A.   I wouldn't say it wouldn't be a problem, but if your

21   question is if the change is made and there's no consideration

22   for ballots that have already gone out or have already been

23   printed, I suppose that certainly would be easier than a

24   circumstance where you had to replace all of the ballots that

25   have already gone out.

1    Q.   Right.

2    A.   If that's your question.

3    Q.   And it is and you gave the answer.   This is a

4    consideration -- well, this is not a consideration if ballots

5    that already went out and were voted simply were accepted as

6    voted; right?

7    A.   I wouldn't say it's not a consideration, but it is

8    certainly -- it certainly becomes much easier if you do not

9    have to account for replacing ballots that already went out.

10   Q.   Thank you.

11            MR. HAVERSTICK:   No further questions, Your Honor.

12            THE COURT:   All right.   Thank you.

13            Anything further from the defense?

14            MR. BOYER:   No, Your Honor.

15            THE COURT:   I just had a couple quick questions to

16   understand the testimony, Mr. Marks.

17            Your testimony before logic and accuracy testing, I'm

18   just sort of curious on that.   What, if any, types of errors

19   would pop up during that process?

20            THE WITNESS:   Your Honor, if you are asking what does

21   the county do if an error pops up during the process?

22            THE COURT:   I guess I'm kind of asking more of what

23   are the common errors that you would see through that process?

24            THE WITNESS:   So, you know, the common errors would

25   be misspelling of a name, for example.   Or you may have a --

1    you know, generally these things are set up kind of like a --

2    I'm trying to think of a nontechnical way to describe it, but

3    you are programming these and there are columns or rows that

4    are associated with a candidate for purposes of, you know,

5    printing the paper ballot component and also calibrating the

6    tabulator.

7            If an error is made in doing the election definition,

8    you could have a situation where it either incorrectly

9    tabulates the votes or it doesn't tabulate the votes at all

10   for a candidate, and that's really the purpose of logic and

11   accuracy testing, to make sure that you identify any of those

12   errors that have occurred, and we have seen a couple of

13   occasions over the last several years where a county may have

14   made a change in a municipal election, did not do -- you know,

15   they caught an error during logic and accuracy testing,

16   corrected it, but did not do adequate logic and accuracy after

17   that point, and as a result, there was a problem on election

18   day, and the one that I recall most readily, I believe,

19   occurred in North Hampton County where because of that change

20   in calibration with the touch screen, votes were not being

21   recorded for a candidate.  I want to say it may have been like

22   a magisterial district candidate, but those are the kinds of

23   things.

24           So it can be as simple as a misspelling or it could

25   be a situation where votes are either not being tabulated

1    correctly or not being tabulated at all for a candidate.

2            THE COURT:  Okay.  Another question I had, you

3    testified before about the vendors printing out the ballots to

4    send to the counties, at least the 57 counties that don't use

5    the machines.

6            Do those -- is there any process by which those

7    counties vet or check the ballots that they get from the

8    printer?  Do they go through each one by one or is there any

9    kind of sampling they do to make sure there's not a printer

10   error?

11           THE WITNESS:  Yes, the counties do go through a

12   process.  So I mentioned -- I think I used the term "proof."

13   So they will send -- they'll send the ballot definition files

14   to their print vendor, and probably the very first step would

15   be to get back proofs from that print vendor to make sure

16   everything checks out, that everything is aligned correctly

17   before they push forward with, you know, ordering the printing

18   of all of their ballots for the election.  So there is a

19   vetting process.

20           Before that, you know, I mentioned the voting system

21   vendors, kind of the relationship between the voting system

22   vendors and the print vendors.  They have specifications.

23           So often what you'll see is the voting system vendors

24   will say, these are our specifications, we have already

25   verified that these printers can print ballot stock to our

1    specifications.

2            So that's why you see counties using in many cases,

3    you know, multiple counties using the same vendor because that

4    vendor has already been -- the print vendor, because that

5    vendor has already been vetted by the voting system vendor.

6            THE COURT:  Okay.  All right.  Thank you.  I don't

7    know if there's any follow-up questions, counsel, has as to my

8    questions.  Defense?

9            MR. BOYER:  No, Your Honor.

10           MR. HAVERSTICK:  No, Your Honor.

11           THE COURT:  All right.  Thank you, Mr. Marks.  I

12   appreciate it.  You are excused.  You can stay on the line

13   also or hang up.  I appreciate it.

14           THE WITNESS:  Thank you, Your Honor.

15           THE COURT:  All right.  Thank you.

16           Mr. Haverstick.

17           MR. HAVERSTICK:  As a housekeeping measure, Your

18   Honor, plaintiffs would offer, because I think we're getting

19   ready to close the record, plaintiffs would offer the

20   affidavit of Paul Hamrick.  It's been provided to counsel for

21   the Commonwealth.  I don't know if they'll have objections to

22   it.  If they do, they'll tell you, and I can respond to those

23   if they have any.  And we have a set of stipulated facts that

24   one or both of us can submit to the Court.

25           THE COURT:  Okay.  Mr. Boyer.

1          MR. BOYER:  We did have a chance to look at the

2    declaration this morning and would object to it.  It is

3    largely legal conclusions, many of which are wrong.  There's

4    very little fact in it.  If he wants to pare it down to only

5    make accurate factual representations, we would be willing to

6    consider it, but as is, it's largely a legally incorrect

7    statement.

8          THE COURT:  Okay.

9          MR. HAVERSTICK:  Your Honor, the affiant,

10   Mr. Hamrick, is a lawyer, but naturally the Court is free to

11   disregard any legal conclusions.  I mean, we are not in front

12   of a jury.  You can disregard any supposed legal conclusions.

13   I'm sure, I agree, there are there, but, and accept it purely

14   for the statement of fact in the affidavit and -- because we

15   are in a TRO context and we didn't want to clog up the court

16   with trooping witnesses in or online, we thought that was an

17   easy way to get in the basis of facts.

18         THE COURT:  One thought would be -- I don't have that

19   particular declaration in front of me.  One option would be

20   have the plaintiff file it and I suppose maybe have a short

21   response filing so that I have both on file and then I can

22   give it whatever weight is appropriate based on the submission

23   and the objections.

24         MR. HAVERSTICK:  That's what we'll do.

25         THE COURT:  Okay.  Is that fine?

1        MR. BOYER:  Yes, Your Honor.

2        THE COURT:  And then I do have the joint stipulation

3  of facts.  I think also for purposes of the record if one of

4  the attorneys can file that just so it's on the docket as

5  well.

6        I also have the exhibit binder I received.  It looks

7  like Exhibits 1 through 11.  I'm not sure if these were

8  jointly prepared or prepared by one of the parties here.

9        MR. BOYER:  They were our exhibits, but they are all

10  exhibits to the joint stipulation.  My understanding is that

11  plaintiffs don't have an objection to them, but I will, of

12  course, let them speak if that's incorrect.

13        THE COURT:  Okay.  Any objections?

14        MR. HAVERSTICK:  No, we have no objection to the

15  admission of those documents.

16        THE COURT:  So I guess just from mechanics, if those

17  could be filed then as a supplement to the joint stipulation,

18  then they'll be included on the record, I would appreciate it.

19        Okay.  So with that, I certainly open it up to

20  argument if anyone wants to present any argument, and I guess

21  before we get into that, another maybe more sort of

22  housekeeping issue would be if anyone would be seeking to file

23  any kind of post-hearing submissions or brief, that would be

24  helpful to know now or counsel just plans to just present

25  argument here in lieu of anything or a combination of both?

1      MR. HAVERSTICK:  I suppose really it's what the Court

2  wants.  I was planning to present argument.  If we think

3  there's anything that wasn't addressed by me or that we would

4  like to respond to, since I assume we're not going to do

5  rebuttal or anything like that, we'd ask for the right to

6  submit something quickly and succinct.

7      THE COURT:  Okay.  Mr. Boyer, any thoughts on that?

8      MR. BOYER:  We are happy to follow the Court's leave.

9  If the Court feels argument today is sufficient, we're happy

10 to leave it there.  If the Court would like supplemental

11 briefing or if the plaintiffs want to file anything, I think

12 we certainly would like the chance to address the Court's

13 questions or arguments that might be raised.

14     THE COURT:  All right.  We'll start with argument

15 here and then play it by ear.

16     Mr. Haverstick.

17     MR. HAVERSTICK:  Thank you, Your Honor, and thank you

18 for the attention today.  This is an important issue

19 naturally, and we appreciate the Court making time when you

20 are trying to pool a jury and get something else done.

21     So I'm going to endeavor to be quick, although I

22 would ask the Court to acknowledge that -- and I don't know

23 how long counsel intends to argue, but I think there's been a

24 disproportionate amount of time used today for Mr. Marks and I

25 think we reached two hours.  I don't know if the Court is

1    tracking the time.

2          THE COURT:  Yeah, we are not.  We can provide an

3    update here.

4          THE DEPUTY CLERK:  Each side has used about an

5    hour-and-a-half.

6          THE COURT:  Okay.  About an hour-and-a-half by each

7    side.

8          MR. HAVERSTICK:  All right.  Your Honor, let me start

9    with getting what I think is a distraction, something designed

10   to draw your attention away from the real issue, and that's

11   the supposed delay issue.  It's been characterized a couple of

12   different ways throughout this litigation as laches or delay

13   or whatever they want to call it.

14         You heard today the kind of budget we're talking

15   about for the presidential operation for Dr. West.  It's a

16   shoestring.  It is not -- it doesn't have the resources to

17   engage in what a former colleague of mine on the bench in

18   Philly referred to as recreational litigation where, you know,

19   you are in court every time somebody coughs or somebody puts a

20   period on a sentence and you are fighting about it.

21   Nonetheless, I think the parties here moved with speed and

22   with appropriate care.

23         This issue sort of materialized in the middle of

24   July.  I've been litigating against my friends in the

25   Commonwealth long enough to know that had somebody come to

court in July before the August 1st absolute deadline for the candidate affidavits or electors, we would have drawn a standing objection, a ripeness objection, and would have spent weeks litigating about that.

But more importantly in that in interim period, they did what you want litigants to do.  They tried to self-help and problem solve.

The parties on Dr. West's side were out trying to fix the affidavits and ameliorate the problem that was flagged by the department, and that is getting all 19 folks to actually either submit their affidavits or submit the affidavits they have to submit before they can withdraw, and there was a mighty effort to get it done, and it came up short.

So shortly after it came up short in early August, the litigation started, and there are lots of extension reasons.  At that point Dr. West probably couldn't have come in federal court, but if you think about, even if you say the middle of July to now on an issue like this and when all the facts actually materialized and crystalized the issues and the problems, you have been on the bench long enough to know and I have been doing this long enough to know, to be where we are through one process all the way up to the Supreme Court of Pennsylvania and now here in this court, we are moving pretty quick.

I don't think this is an instance where under the

circumstances anybody can fairly be faulted for slowing things
down or taking too long once the actual issues materialized.
So that's what I have to say about that.

Now, that leaves us with our injunction test, and we
know there are four factors, and we have the burden on two.
They have the burden on two.  I know they don't agree with me,
and they don't agree with you because you have indicated in
opinions that the latter two elements of the injunction test
shift the burden over to the nonmoving party.

So let me talk about the ones where I think are --
certainly the ones we have the burden and what I think are
really the critical elements here.  Irreparable harm and the
likelihood of success on the merits.

Irreparable harm I think is easier of the two from an
explanation standpoint.  Take a look at really any election
law jurisprudence about what irreparable harm looks like for a
1st Amendment and a 14th Amendment claim, and this is sort of
sine qua non.  When you can't get on the ballot, when you
can't vote for who you want to, that's irreparable harm, and
that's -- I mean, I really don't think that's going to be
seriously debated by the Commonwealth, and I certainly think
the cases establish it.

That leaves us with likelihood of success on the
merits.  I imagine the Court is familiar with the
Anderson-Burdick test.  It's a balance test, and you balance

1    the burden against the hardship.

2          Now, let's say at the outset -- and I want to be very

3    clear about this at the outset -- we heard no evidence today

4    from the Commonwealth justifying any of the restrictions

5    placed on political body candidates to get on the presidential

6    ballot.  Not one bit of evidence.  You heard Dr. West testify

7    about some of the burdens.  Mr. Hamrick in his affidavit

8    factually talks about some of the burdens and, frankly, the

9    burdens are self-evident, and the Court can take judicial

10   notice of what statutory scheme requires for minor party

11   electors and minor party candidates to get on the presidential

12   ballot versus what it requires for democrats and republicans.

13   It's discriminatory.  There's no good reason for it.  And they

14   haven't offered one.

15         So I don't think -- I don't think they can at this

16   point as an evidentiary matter challenge the evidence

17   presented to you about the patent unfairness, frankly

18   discriminatory unfairness that prevents a candidate like

19   Dr. West or really any minor party or third-party candidate

20   from starting out a whole furlong behind the major parties in

21   trying to get on the presidential ballot, and I'm happy to go

22   through those with you, Your Honor, but I think our brief does

23   a good job of elucidating what they are, and again, they are

24   fairly self-explanatory.

25         THE COURT:  Can I ask you this?  I mean, in terms of

1    the argument that you are making that the state hasn't

2    proffered any type of countervailing interests, I guess the

3    question is do they have to as a factual matter, you know, if

4    it's a situation of a rational basis type of review, level of

5    review or even something higher, but let's just assume for

6    now, you know, lower level of review, and I agree with you

7    it's a burden of some kind -- you know, in other areas of the

8    law, it's kind of what the judge thinks is conceivable or

9    rational based on the structure here.

10            So it's more of a question of is that something

11    that's required, they are required to put on as a factual

12    matter here to win on the merits?

13            MR. HAVERSTICK:  Yes.  And let me explain why.  I

14    think when you look at the Anderson-Burdick test, I don't

15    think there's a -- I don't think there's a rational basis

16    component to it at all.  I think it's either an application of

17    strict scrutiny or an application of intermediate scrutiny,

18    and that depends on the burden.

19            And back to the burden, a severe burden which

20    requires them to put on evidence to satisfy a strict scrutiny

21    standard is certainly implicated in a case where you can't

22    vote for who you want to and you can't get on the ballot, and

23    I direct the Court to look at, for instance, the -- I think

24    it's the Patriot Party of Allegheny County case from the Third

25    Circuit in the late '90s where I think it articulates what a

severe burden looks like, and if you can't participate in the political process at all, like you can't get on the ballot or you can't vote for when you want to, that's a severe burden, and they have to show up with evidence to explain, well, yeah, we get that it's a severe burden, but this is why we can beat a strict scrutiny test.

But even if the burden wasn't severe in this case, they still have to satisfy a heightened scrutiny standard, and they can only do that with evidence. They can't just come in as an ipse dixit and say, well, you know, the state did it, and the state is presumed to be rational because there's no rational basis test here. So they have to do something, and I think the something they have to do in this case, again, because we're talking about a candidate who can't get on the ballot and the 13,000 people who signed this petition can't vote for him, that's a severe burden to their 1st Amendment and 14th Amendment rights.

So my long-winded answer is, yes, Your Honor, they have to put on some evidence explaining why this is something the state needs to do or should do or has to do, and they haven't. They haven't talked about it at all. They don't talk about it really in their brief, and they certainly didn't put on any testimony about it today.

Now, acknowledging -- well, I'm going to acknowledge that -- the Court may not agree, but I'm going to acknowledge

1    that the burden shifts to them on the public harm and the

2    balancing of the equities test.

3        Nonetheless, in the interest of time and sort of

4    logical order, I'm going to present our arguments to the Court

5    on those now.

6        I think, again, of the two tests, public interests is

7    the easier to satisfy.  There's a real life quote in the Kim

8    case that, you know, from earlier this year, that has

9    something to the effect of it's always in the public interest

10   to vindicate constitutional rights.  I mean, that seems sort

11   of per force.  Well, yeah, of course.  So that leaves the

12   balancing of the -- or balancing the harms test.

13       The harm to Dr. West and, by extension, to the people

14   who want to vote for him and his vice president candidate are,

15   I think, plain.  They can't exercise their 1st and 14th

16   Amendment constitutional rights and neither can Dr. West.

17       People who want to vote for Dr. West can't vote for

18   him.  Dr. West, who wants to, by his own testimony, not just

19   win, he doesn't think he is going to win, but he wants to

20   contribute to the political discourse, he wants to push ideas

21   and get the major parties and other people thinking about

22   these ideas and considering them in the public square.  He

23   can't do that in this forum because of the way the department

24   has chosen to interpret the election code.

25       So what does that leave the department with?  Well, I

think it largely depends on how you characterize the relief
that we want, and this Court can put Dr. -- what we heard from
the department today is this is a disaster.  It's not
impossible, they'll never say it's impossible, because they
can't and, frankly, they shouldn't because they know it's not
possible.  But they characterize the harm in a way that
suggests it's a zero-sum game.  You either have to crater the
entire thing and start all over again or you just have to let
it go and, you know, yeah, the constitutional rights are
violated, but what are we going to do?  But that's a false
presentation of the options open to this Court in terms of a
remedy.

First of all, as Mr. Marks testified, they have no
idea of the state of affairs in all 67 counties of the
Commonwealth.  It may be eminently possible for some counties
to print mail-in ballots because they haven't completed it
yet, and it may be eminently possible for those counties to
print hard copy ballots that have Dr. West's name on them so
people can vote in precincts on election day.  I mean, we just
don't know.  We just don't know.  And it may not be that big a
deal to get Mr. West on the ballot in those counties and make
adjustments.

We also heard that even in places where it is a
little more difficult, it is going to cost money and it's
going to be hard.  But that happens every election, Your

Honor.  Every single election military ballots go out and they're not complete and you got to figure out what to do about it.

Every single election there are problems with ballots that get litigated because Commonwealth Court maybe didn't get done or Supreme Court didn't get done with the petition challenges and there's flux in the ballots.

This is not an irregular process, and the department is well-accustomed to figuring out how to put resources and people behind it to make the elections work.

And I asked Mr. Marks very purposely, "Could there be things that are done simply to alert voters that Cornel West is on the ballot?"  And he said "yes."  And that seems to me to be sort of self-evident and obvious.

We are not asking this Court today to fashion a remedy to crater the entire thing and make the Commonwealth start from scratch.  We are asking for a remedy that honors what Dr. West asked for, which is participation in the process.  And some participation is better than no participation.

This is a case, Your Honor, where we shouldn't strive for perfection, but the Court can strive to do what it can to make Dr. West an option as best as the Court can and as best as the Commonwealth can.  It's not going to be perfect.

We are not going to be able and we're not asking the

Court to ask people who have already submitted mail-in ballots
to have the right to go back and resubmit them or to have new
mail-in ballots be sent out if they've already been printed,
already been filled out, already been returned.  We're not --
we don't want that.

And if there's a legitimate basis that makes it
impossible for a county to reprint ballots, hard copy ballots,
then we're asking simply for notification for voters that,
Hey, Dr. West is an option.  You don't see him on the paper,
but he's an option there.  If you want to vote for him, write
him in.

I think why this case is so important, Your Honor, is
and, frankly, why all of the concerns about delay are really
hot air, is that it's part of a continuum of opening access to
third parties so they have the ability in future races, not
just this one.  We want some participation in this one, but
it's about the next one and the next one and the next one
after that.

And so we don't want perfection.  We know we can't
get it this time around, but there's things that this Court
can do and there's things that the department can do and
there's things that the counties can do to make it better than
it is today.  And that's all we want.  And that's all Dr. West
wants.  And I think probably, that's if you could ask them,
that's all the other minor parties and political bodies want,

1    a fair shake to participate in the process in a way that makes

2    sense.

3          So when you are balancing the equities, we're not

4    asking for the expenditure of zillions of dollars.  We're not

5    asking for the entire process to be halted and to be redone if

6    it's honestly too late to do it in that process.  We're just

7    asking this Court to fashion a remedy that does what it can.

8          Your Honor, I don't know if the Court wants to

9    entertain rebuttal.  I certainly probably have things I'd like

10   to say in rebuttal, but I also understand that we're on the

11   clock.

12         But I do hope the Court heard Dr. West, understands

13   why the restrictions on minor political parties and minor

14   bodies or political bodies trying to get on the presidential,

15   the presidential ballot is such an unfair issue, and it

16   certainly is violative of the constitution, and I hope, above

17   all, the Court asks and understands that we're not asking for

18   the whole thing to be blown apart.  We're asking the Court to

19   do what it can to let Dr. West participates in the process.

20   Thank you.

21         THE COURT:  Before you step down, I'll give a chance

22   for rebuttal.

23         MR. HAVERSTICK:  All right.

24         THE COURT:  So let's assume that I grant your relief.

25   Let's assume Dr. West wins, gets the popular vote.  How does

the presidential electors get sorted out with the 19 electors at that point?

MR. HAVERSTICK:  I would say the same way that they get sorted out for the major parties.  The major parties don't have to way ahead of time identify who their electors are.

The major parties can pick democrats, republicans, libertarians, greens, anybody they want to be their electors, and they get to do it at the department's grace.

There's nominally a deadline 30 days after the nomination, but the department -- let's backslide.  They say get it to us as soon as practicable.

There's a way we could do it.  It can be -- we can accommodate identifying the electors.  If it was as easy as just getting -- and I don't, by the way, think that there's any good reason Dr. West's electors have to sign candidate affidavits and the major parties don't, but let's say the Court says you still have to do the candidate affidavit.  I believe it would be entirely possible, perhaps easy, to get 19 candidate affidavits now from electors who are willing to be electors for Dr. West.  The problem, of course, is they had to identify all 19 of these people a long time ago and, you know, they changed their minds.  They get sick.  They -- one became incommunicado.  Stuff happens.

But if we're allowed to participate in the process the same way that the majors are, I think we could identify

1    19 electors within a day who would be willing to do it.

2         THE COURT:  Okay.

3         MR. HAVERSTICK:  Thank you, Your Honor.

4         THE COURT:  Thank you.

5         MR. BOYER:  Thank you, Your Honor.  As you heard this

6    morning, running a statewide election is a complicated

7    endeavor.  It involves thousands of actors, with advanced

8    preparation, getting ready for processing applications,

9    registrations in a presidential election, billions of ballots.

10   You can't just snap your fingers and make those happen, and

11   snap your fingers and be ready to administer a presidential

12   election.

13        Not surprisingly, given both how complex election

14   administration is and how important it is, election litigation

15   is different than an ordinary litigation, and it's different

16   in a couple of respects.

17        One, there's a principle, the common sense, laches,

18   whatever, that layer that's on top of any injunctive request

19   for relief, and we talked about who has what burden here.

20        I think the clearest distillation of the injunctive

21   standard when we are close to election, as we are here, is

22   from Justice Kavanaugh's concurrence in Merrill v. Milligan

23   and what he says in sort of explaining how the Purcell

24   principle applies is the plaintiff, if you are close to an

25   election, has to establish at least four things:  The

underlying merits are entirely clear-cut in favor of the plaintiff, the plaintiff would suffer irreparable harm absent the injunction, the plaintiff has not unduly delayed in bringing the complaint and the changes in question are at least feasible for the election without confusion, cost or hardship.  All of those in election litigation are the plaintiff's burden to establish.

Merrill v. Mulligan, as Justice Kavanaugh said, relief was being denied because the underlying merits the plaintiffs have failed to demonstrate were entirely clear-cut. The plaintiffs have not established the changes are unfeasible without significant cost, confusion or hardship.

In election litigation, it is the plaintiff's burden to establish all four of those things.

THE COURT:  Can I ask you how do you square that with Kim, the Third Circuit case, because I agree with you, I actually thought that's a very helpful distillation of the Purcell principal, probably the first time anyone has actually done it in a way that makes any sense, and then when you read Kim and the Third Circuit says, well, we just haven't considered this, you are just supposed to kind of consider this as part of the last two factors, I mean, how do you square those I suppose?

MR. BOYER:  I think what happens in Kim is that the plaintiff had met the standard, had met their burdens.  I

don't think, as I'll get to, that's happened here, but I don't think Kim changes what needs to be shown and who needs to show it.

And just to sort of finish the point about election litigation being different, one of the ways in which it is different is that by necessity, parties have to move fast. There isn't time for leisure. There are a huge number of steps that need to be completed.

And just to give the Court a frame of reference for how fast parties need to be moving, the required objections period under state law, which is when a third party or a political body has submitted nomination papers, that the Department of State, in its review, has deemed, facially at least, sufficient, objections have to be filed within seven days, and there's a reason for that. It's because further delay compresses the period of time of what needs to be completed between certification and election day in ways that introduce intolerable risk, as I'll expand on.

That seven-day objection period is not an aberration. Post election, if someone is challenging a county's decision as far as the ballots are counted, they have two days. These are normal timelines for election litigation. This isn't a drawn-out process where there's an opportunity to sort of wait and wait and wait. If there is going to be an issue, it needs to be raised.

1              So I do want to walk through three of the factors

2     that apply when there are requests for injunctive relief this

3     close to an election.  I'll take them a little bit out of

4     order starting with delay, talking about hardship, and then

5     finally finishing with the merits.

6              The question of delay has already been resolved in

7     this case by the Commonwealth Court.  Commonwealth Court had a

8     petition filed 15 days after the objection that said this is

9     just too late, or the objection was notified to -- was sent to

10    Dr. West's campaign on August 2nd.  On August 15th they

11    finally filed.  That is too long of a period of time.  Here we

12    are weeks later after weeks and months of more delay and that

13    consideration is no different here.

14             As you heard, as in the stipulated facts, Dr. West

15    had counsel as of June 2023.  As of July 11th, his nomination

16    papers had been rejected.

17             I know my colleagues said that we would argue there

18    is no standing, maybe he didn't have standing, but that's

19    squarely consistent with Third Circuit precedent in

20    Constitution Party versus Aichele, 757 F.3d 347.  The Third

21    Circuit resolved that political bodies do have standing to

22    challenge the requirements for the submitting nomination

23    papers even before they have been rejected.  If they have

24    sufficient declarations attesting to their intent, that was

25    enough to say there's standing.  So without question, by July

1    11th, there was standing.

2          Here, we are more than two months later with the

3    Commonwealth Court having already said that 13 days was too

4    long, and even if you set aside the period of time when things

5    were proceeding in Commonwealth -- and I'll get to that in a

6    minute -- the state court action was finally resolved on

7    September 16th.

8          Even from that point, we have a nine-day wait.  Nine

9    days in the context of an election administration is too long.

10   And, of course, you add that to the 13 days that they waited

11   from August 1st, you add that to the July period when they did

12   nothing -- as you'll see in the stipulation, they were on

13   notice of this requirement as early as June 7th and still they

14   waited and did nothing, all the while there was counsel

15   involved representing Dr. West's electors, representing

16   Dr. West.

17         So even if you completely carve out the period of

18   time where there were state court proceedings, we have over 20

19   days of delay when Pennsylvania's election code says you can't

20   move that slowly.

21         Although I don't think it -- I believe the Court can

22   decide there's an undo delay here even without the complete

23   inaction for the duration of the state court litigation.  They

24   referenced extension as a possibility, but just as Your Honor

25   did in 2020, a federal case could have been filed, extension

documents could have been applied, could have been stated the

second there was a state court's decision, we're here to go,

and just precisely what Your Honor did in 2020.

Moving to plaintiff's burden to establish that the

changes they want are feasible without cost, confusion or

hardship.  You heard no witnesses to say -- you heard no

witnesses today say that that's possible.

The standard isn't is there a world in which

something could be done.  The standard is is there a world in

which these changes could be made and, again, it's plaintiff's

burden to establish that without cost, confusion or hardship.

Before I get to the testimony today, we now have

three Pennsylvania state court decisions saying we are too

late.  We have the Williams' decision relating to electors,

and two on Saturday this week from the Pennsylvania Supreme

Court rejecting efforts to bring cases at this stage that

would have been far less disruptive than the relief requested

here, on betting it's just too late.

For a Federal Court, this would be directly contrary

to what the Supreme Court has repeatedly said are the

standards that apply here.  For a federal court to come in and

say, no, I disagree with the state courts, there is relief

available now, would be squarely contrary to what the Supreme

Court has repeatedly said the role of federal courts is this

close to an election.

1          So not only had plaintiffs not put on a single

2     witness to say that they can meet their burden, the changes

3     here are feasible without cost, confusion, or hardship.

4          What you heard from Mr. Marks is these changes would

5     cause immense cost, confusion and hardship.  Logic and

6     accuracy testing would need to be done on a compressed

7     schedule.  As he explained in response to Your Honor's

8     questions, doing so risks the possibility of machines not

9     tabulating votes correctly, not tabulating votes at all.  We

10    saw that issue in 2023 in the primary in North Hampton County.

11    These are real concerns and real risks, and we can't just toss

12    them to the side.

13          Ballots being printed.  You heard Mr. Marks saying,

14    you know, it's possible that the vendors wouldn't be able to

15    print it, and my colleague said, well, we just don't know.

16    "We just don't know" is not a good enough answer when their

17    burden is to say we need to show this is possible.  "We just

18    don't know" given the weight going forward with the election

19    administration or whether there might be other problems isn't

20    an answer to whether this change would cause significant

21    problems in the next four weeks.

22          Of course, as bad as things would be today, we are

23    still weeks away from the possibility of Dr. West being a

24    candidate.  If -- and this is the requested relief, probably

25    the only possible relief, the Department of State is ordered

to accept Dr. West's nomination petitions, that just begins
the state court objection process that every other political
body has been subject to.  It's a statutorily-required process
before a candidate can be certified, and that process exists
under 25-PS-2937.  There are seven days to raise objections to
a candidate.  There are certain, I think 1200 pages of
signatures that Dr. West's campaign submitted.  We have no
sense of what those signatures are.  There is a threshold that
needs to be met that at this point has not been shown has been
met.

So even if there's a showing here, it only means that
the Department of State would need to accept it, which then
begins -- the objections period for this year took six weeks,
and if you cut that even by a third, we're already two weeks
from election day, and everything that has been testified to
today needs to happen in two weeks, which is not possible.

Now, there was some reference in Dr. West's brief to,
well, you know, we could just forego that objections period
all together or, you know, the Court can change the rules.

I'm unfamiliar with anything that would permit a
court to just change state or a required state court procedure
without any claim that such procedures are unconstitutional or
violated any other legal principle; of course, doing so, every
other political body candidate was subject to the exact same
objection procedures would raise issues.

1          So as bad as it would be today, the changes wouldn't

2     even begin till several weeks from now at the earliest, and

3     then by that point, I think it would be fair to say everything

4     would be impossible.

5          Now, there was also a reference in their reply brief

6     from Dr. West that, well, DOS should have at some point begun

7     the objections period.  But the statutory obligation that the

8     DOS is under, 2936, is that no nomination's paper shall be

9     permitted to be filed if there's a material deficiency, as

10    there was in this case.

11         So I don't know where the DOS has unilateral

12    authority to begin a statutory process when its obligation is

13    that the papers can't be filed.  I'm not entirely sure where

14    that idea comes from.

15         Moreover, of course, at no point in the state court

16    litigation did anyone on Dr. West's side say, hey, well, let's

17    begin the objection period now.  There was never a reference

18    there.

19         So to the extent they thought that this should have

20    been happening long ago, the appropriate way to have dealt

21    with that would have been to ask someone in state court to

22    order that relief.  That didn't happen.

23         Now, on the last piece of this, the merits, again,

24    going back to the relevant standard that applies when the

25    federal court is asked to change state election procedures

1    this close to the election, it's not just a likelihood of

2    success standard.  As Justice Kavanaugh says, the merits need

3    to be entirely clear-cut.

4         The exact claims that are being raised by Dr. West

5    now have been raised in the state court proceedings in the

6    Klimer case were adjudicated by the Commonwealth Court of

7    Pennsylvania, and the decision affirmed by the Pennsylvania

8    Supreme Court.

9         I will address now in a moment why I think that was

10   the right outcome, but even if this Court has some

11   reservations, the fact that the State Supreme Court just

12   rejected the same constitutional argument made in here, I

13   think by itself supports the idea that the constitutional

14   claims here are not entirely clearcut, as is their burden to

15   establish.

16        Moving on from that, I think it is quite clear that

17   the state court in their resolution rejects the exact same

18   constitutional claim before this Court their resolution was

19   right.

20        Now, I'm not entirely clear what burden or what

21   provision Dr. West is challenging.  Sometimes it seems like

22   it's an affidavit requirement and sometimes it seems like,

23   well, it's just the requirement to name 19 electors at some

24   point, but in neither instance is that a significant burden,

25   and in both cases it is, we'll get to justify it by a

compelling interest.

As to identifying 19 people willing to serve as your electors, I think it is, frankly, as minimal of a requirement that can be asked of someone who wants to participate in the presidential process.

If the candidate is to be on the ballot and have people voting for them, it is imperative that they have 19 electors willing to vote for them, and Pennsylvania can send to the Electoral College that Pennsylvania is fully represented to participate in electing a president.

That process could have begun as early June 2023. You heard that from Dr. West, announce his campaign, there was no reason that it should have been -- that he could have started at that point looking for electors so that when the signature period began in February, he was ready to go. And as counsel just said a moment, it's incredibly easy to find 19 people, he thinks they could do it in a day.

We agree. It's an incredibly minimal ask, and there's no reason that a candidate with eight months to do it suffered any great burden being able to find 19 people willing to serve the role of presidential elector.

If it's the affidavit requirement that they are challenging, it is a simple attestation of facts that the Pennsylvania Supreme Court has repeatedly said is perfectly appropriate to confirm a person is willing and able to serve,

and, of course, this case itself illustrates that it's important, since both here and other places it's been reported there were people being listed as Dr. West's electors who had no idea or who didn't want to do so.  It's incredibly important that Pennsylvania know that someone is going to be on the ballot.  They had 19 people who are going to vote for them should they win and, of course, as you also heard Dr. West testified earlier, he intended to win.  If he was on ballot, he intended to win.  If that's the case, it's important that he habe 19 electors who then would be sent to the Electoral College.

THE COURT:  Well, what about, I guess, the plaintiff's argument that well, why?  Why do you need it for a minor political candidate versus all the grace afforded to the major political parties?

MR. BOYER:  Sure.  So as the Supreme Court has repeatedly said, there are different considerations with major parties and minor parties.

It is not unreasonable to impose normal requirements for a political body to establish that it has sufficient support and can do what is needed to get on the ballot if it wins to have 19 electors.

That's true from Clements v. Fashing, 457, US 957. It's true from Rogers V Corbett, which is 468 F.3d 188. American Party versus White, 415 U.S. 767.  They are not

similarly situated.  Major parties are only major parties
because they have a long-standing documented history of
support.

The questions that might arise is, well, if you are
on the ballot, are you actually going to have 19 people,
aren't the same as the questions that arise from a political
body where it is important for Pennsylvania to know do you
have sufficient support to put on the ballot, you are on the
ballot and win, can you actually deliver 19 electors to the
Electoral College.

The courts that have distinguished between political
parties and major political parties have also recognized an
important state interest in making sure the only parties that
appear on the ballot are legitimate candidacies that can
demonstrate that sort of base-level support and can perform
the necessary steps if they were to actually prevail,
otherwise you are inundated with unserious candidates, and
Pennsylvania's courts have repeatedly said, have a legal
interest sufficient to not permit those types of candidacies
on the election -- or excuse me -- on the ballot.

So for all those reasons, I think there are three
clear ways in which the plaintiffs have failed to establish
that a federal court can enter relief this close to election
between the delay, the failure to establish it's feasible
without cost, confusion or hardship, and that the merits here

1    are not entirely clearcut, and, of course, the state courts

2    having now signaled at least three times that it's too late, I

3    think would be inappropriate, Your Honor, for a federal court

4    to second guess that.  Thank you.

5           THE COURT:  All right.  Thank you.

6           Mr. Haverstick, I'll give you the last word.

7           MR. HAVERSTICK:  Thank you, Your Honor.  Quickly, the

8    Klimer case to which counsel referred, that was a one-sentence

9    per curiam.  It's not precedential.  The case that supposedly

10   decided this issue in Pennsylvania, only from a precedential

11   standpoint goes to Commonwealth Court.  It was affirmed per

12   curiam in a one-sentence opinion by the Supreme Court, one

13   sentence per curiam order by the Supreme Court.

14           Let me address Purcell, because it's become I think a

15   great distraction, and I don't think its parameters are being

16   accurately communicated.

17           Purcell is not a one-stop shop to end election cases.

18   If it was, we wouldn't need to go through the test that we do

19   for a preliminary injunction or a TRO.  All they would have to

20   do is stand up and say, Oh, it's too close to the election.

21   There's nothing we can do about it.

22           Purcell makes clear that that case in that context is

23   about changes to rules.  It's about changing election rules

24   too close to an election because it's about confusion.

25           Kim does a good job of explaining that Purcell has to

be taken in the correct context, as you noted, a factor.  It's something to think about.  Are we too close to the election and will it cause confusion?

But I posit to the Court that we're not talking about a rule.  We're talking about whether somebody can be on the ballot, and I think it's less confusing for at least the 13,000 people who signed a petition to see Dr. West's name on the ballot than to not see it on the ballot.

So Purcell's application is correctly cabined in this case by Kim, which I think explains this is how you look at it in context.

And then finally, let me talk about that context, and I find it lacking in advocacy, particularly in election cases, that there's not more plain speaking.  So I'm going to try to speak clean, Your Honor.

You don't look at the individual aspects of the requirements put on political bodies.  It is sort of abstract separated terms.  The cases counsel, if you look at them sort of collectively in the aggregate holistically, if you break all of these requirements into their constituent parts, I'm still not sure that they're not discriminatory, and they still don't have anything to do with demonstrating the requisite level support of a minor political party or a political body. That's done by the petition process.  And in this case, Dr. West got 8,000 more signatures than he was required to to

1    participate.

2          So the question here isn't about whether these rules

3    are designed to make sure that this is a legitimate

4    participant in the process.  These are about electors, people

5    that nobody knows, nobody votes for, are not candidates, even

6    though they call them candidates, and it's being done to make

7    it hard for minor parties to be on the ballot.  I wish the

8    department would just acknowledge that.  It won't.  It won't

9    ever say that, even though that's exactly what's going on here

10   and we all know it.

11         If there really was a good reason for electors to

12   have to sign candidate affidavits, then every single elector

13   for democrats and republicans would have to submit a candidate

14   affidavit.

15         If there was really a good reason why electors for a

16   political body had to pay money to be electors and democrats

17   and republican electors didn't, then they would have told us

18   what that good reason is.

19         If there really was a good reason why minor body

20   electors had to disaffiliate 30 days before they signed their

21   affidavits and republicans and democrats can be anything they

22   want, they don't have to be registered, they can be

23   republicans, they can be democrats, they can be libertarians,

24   greens, they could be whatever, they tell us what that good

25   reason is, and if there really was a good reason why a minor

party or political body had to identify, set in stone who its electors were well in advance of even circulating petitions, but democrats and republicans get an amazing amount of grace period to run up close to the election before they actually ever have to tell the department who their electors are, and even then, they don't have to do it in a formal way -- as far as I know, they can send an email to someone in the department say here are the 19 electors, well, then they would have said that. But there is no good reason for any of those rules. There's only one reason for those rules. It is to make it hard, as Dr. West said, to get around the duopoly, and we may all -- you know, we may all think that's, I don't know, a good thing. I don't happen to think that it is, but you can't deny that it's discriminatory, and you certainly can't deny that it impinges on Dr. West's 1st Amendment and 14th Amendment rights.

And let me leave you with this, Your Honor. The presentation from the Commonwealth today is about bureaucracy. It's about, well, we do things a certain way in a certain order, and we can't do it a certain way in a certain order because if we do, it will cost money. It's hard. It's confusing.

We are talking about people getting to vote for who they want to. We're talking about what an election actually is there for. It's for people to show up and, through voting

for people they want to vote for, express their ideas and what they want from government and to have choice. And when you look at it in that context, I don't think, particularly given the minimal thing that we're asking for today from this Court, which is just to allow Dr. West to be on the ballot where it is practicable and not onerous for him to do so.

When you look at it in the competing interest, the Commonwealth having a very mechanical, orderly way of wanting things done versus people, at least 13,000 of them in this Commonwealth wanting to stand up and say, hey, neither of the two major parties represent me. I want to tell the world, the voting public, whoever, my neighbor, that this is what I stand for and this is who I stand for, then I don't think this becomes and should become a hard decision for the Court.

We're asking for grace to allow, to the extent possible, those 13,000, and maybe other people, to say, you know what, I don't like either of the majors. I want to vote for somebody else. Thank you, Your Honor.

THE COURT: All right. Thank you. All right. Thank you, everyone. I appreciate it. So just to wrap things up, we'll have counsel file the joint stipulation of facts with the exhibits.

Plaintiff's counsel file the declaration, and if there's any objection, it sounds like there will be, we'll have the defense file an objection to that declaration.

1          I think I'll give the parties an ability or I guess
2     an option to file any kind of supplemental brief of any kind
3     if they'd like.
4          Obviously time is short here, and so what I'm
5     thinking now would be if the plaintiffs want to file
6     something, they could file it by, you know, the end of today.
7     When I say "today," I mean midnight, and then if the defendant
8     wants to file some kind of a response, you know, by 5 p.m.
9     tomorrow.
10          And I will say the one thing that would be helpful,
11     at least from the plaintiff's standpoint, there was some
12     discussion here and argument portion of our proceeding here
13     today on the relief that's requested, you know, emails and
14     that sort of thing.  If there's any change to the relief that
15     was requested as part of the original motion for preliminary
16     injunction, submit a proposed order exactly what you're asking
17     me to do as part of the motion for a preliminary injunction,
18     and that way also the defense can respond to that precise
19     relief, that would be helpful for me.
20          Any questions on any of that or any issues anyone
21     wants to address here?  From the plaintiff's side?
22          MR. HAVERSTICK:  No.  Thank you for the time, Your
23     Honor.  We appreciate it.
24          THE COURT:  Thank you.
25          Defense?

1              MR. BOYER:  No, Your Honor.

2              THE COURT:  All right.  Thank you.  I appreciate it.

3     We'll get some orders out and we'll go from there.  Thank you.

4              THE DEPUTY CLERK:  All rise.  This Court is now

5     adjourned.

6              (The hearing concluded at 12:54 p.m.)

7                    C E R T I F I C A T E

8              I, VERONICA R. TRETTEL, RMR, CRR, certify that
      the foregoing is a correct transcript from the record of
9     proceedings in the above-entitled case.

10

11     _\s\ Veronica R. Trettel____        10/10/2024_____
       VERONICA R. TRETTEL, RMR, CRR        Date of Certification
12     Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25