**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| **CORNEL WEST AND MELINA ABDULLAH, GERALDINE TUNSTALLE, KATHERINE HOPKINS-BOT, AND CHARLES HIER,** | : : : : : : : | No. 2:24-cv-01349<br><br>(*filed electronically*) |
| *Plaintiffs,* | : : | |
| **v.** | : : | |
| **PENNSYLVANIA DEPARTMENT OF STATE AND AL SCHMIDT, IN HIS CAPACITY AS SECRETARY OF THE COMMONWEALTH,** | : : : : : | |
| *Defendants.* | : : | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION
FOR INJUNCTION PENDING APPEAL**

## I.   INTRODUCTION

Defendants have spent months attempting to deny ballot access to Doctors Cornel West and Melina Abdullah—the presidential and vice-presidential nominees of the Justice of All political body. The likelihood that these efforts were unconstitutional, as it turns out, is indisputably clear. Yet, absent judicial intervention, Plaintiffs will be forced into a position that is anathema to First Amendment jurisprudence:  they must sit by idly, as the government continues its unabated violation of their First Amendment rights. Under our republican form of government, this cannot be. When the freedom of expression is curbed, absent a

1

specific showing of adverse impact on the rights of the public, the government must adopt every conceivable measure to ensure the restoration of those rights.

In making this entreaty, Plaintiffs are mindful of the concerns that this Court expressed in its Memorandum Order issued last week. Indeed, perhaps some aspects of the electoral process have been so thoroughly tainted by Defendants' unconstitutional conduct that, at this juncture, the cure would be worse than the disease. The present motion, therefore, seeks relief that is narrowly focused and eminently reasonable—in fact, counties routinely do that which this motion requests.

Simply put, Plaintiffs, come before this Court to obtain relief that vindicates their constitutional rights, while ensuring that order and stability in the election process is maintained. This Court should grant the relief requested and send a clear message that when the government restricts participation in the marketplace of ideas in violation of the United States Constitution,[1] it cannot avoid accountability by running out the clock.

## II.   BACKGROUND

### A.   The West/Abdullah Nomination Papers.

Although this Court is familiar with the basic facts leading up to the commencement of this action, for the sake of completeness, Plaintiffs provide a brief summary. Doctors Cornel West and Melina Abdullah (together, Candidates), Presidential and Vice-Presidential candidates for Justice for All, timely submitted

---

[1] *See e.g.*, *Williams v. Rhodes*, 393 U.S. 23, 32 (1968) ("Competition in ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms.").

their Nomination Papers to Defendants on July 11, 2024. The Candidates'
Nomination Papers contained over 13,000 signatures, had candidate affidavits for
West and Abdullah, and were complete with the filing fee. Defendants, however,
refused to accept the West/Abdullah Nomination Papers because they did not
include a candidate affidavit for each and every one of the nineteen presidential
electors originally designated by the Candidates in their Nomination Papers. As
detailed in Plaintiffs' Complaint, this rejection was based on Defendants'
interpretation that, under Section 951 of the Election Code, *see* 25 P.S. § 2911, every
individual designated as a presidential elector by a political body is a "candidate for
public office" that must submit a candidate affidavit and otherwise comply with the
requirements applicable to candidates for public office. *See, e.g.*, *id.* at § 2911. The
upshot of this interpretation was that Justice for All was forced to not only identify
and list all nineteen electors before it could even begin circulating nomination
papers and submit candidate affidavits from that specific slate of electors by the
date nomination papers were due. As further detailed in the submissions to this
Court, the Election Code's requirements relative to the presidential candidates of
political parties is markedly less restrictive, requiring only that the presidential
electors be identified in some fashion (preferably within thirty days of the party's
national convention).

By late July 2024, it became increasingly apparent that the magnitude of the
burden imposed by Defendants' interpretation of Section 951 was such that
Candidates would be unable to obtain affidavits, by the August 1, 2024 deadline,

from each of the nineteen individuals they had originally listed as presidential electors. And, indeed, Candidates' Nomination Papers were subsequently rejected and returned to them on August 6, 2024. On August 15, 2024, after it became clear that attempts to reach an amicable resolution would be unsuccessful, an action was commenced in the Commonwealth Court of Pennsylvania to compel the Pennsylvania Department of State and Secretary of the Commonwealth Al Schmidt to accept Candidates' Nomination Papers. *See Williams v. Pa. Dep't of State*, 394 M.D. 2024 (Pa. Cmwlth.).

On August 19, Defendants in this action, who were Respondents in the state court matter, filed their responsive pleading in *Williams*, which was verified pursuant to Section 4904 of the Crimes Code by Deputy Secretary of the Commonwealth Jonathan Marks. As relevant here, in their New Matter, Defendants raised laches as an affirmative defense, alleging that the delay "prejudices the ability of the Secretary to certify the 2024 general election ballot to the counties," because "[u]ntil there is a final, non-appealable order resolving all objections, counties cannot begin printing balloting materials." Ex. A to Defendants' Brief in Opposition to TRO (*Williams* New Matter) at ¶ 160. Without holding a hearing or taking any evidence, on August 23, 2023, the Commonwealth Court denied relief based on laches, crediting Defendants' assertion that if the Court were to grant relief, it would be virtually impossible for the election to be administered in accordance with the Election Code's requirements. *See Williams v. Pa. Dep't of State*, 394 M.D. 2024, 2024 WL 3912684, at *6 (Pa. Cmwlth. Aug. 23, 2024). That

decision was then affirmed by way of a single-sentence *per curiam* order, issued by the State Supreme Court. *See Williams v. Pa. Dep't of State*, 25 WAP 2024 (Pa. Sept. 16, 2024).

Thereafter, Candidates and Tunstalle, Hopkins-Bot, and Hier (collectively, Voters) filed a verified complaint in this matter, alleging that Defendants' interpretation of Section 951 of the Election Code violates their rights under the First and Fourteenth Amendments to the United States Constitution. Simultaneous therewith, Plaintiffs also filed a Motion for Temporary Restraining Order and Preliminary Injunction, requesting a preliminary injunction: (1) prohibiting Defendants from enforcing their unconstitutional interpretation of Section 951; and (2) directing the Secretary to accept the Candidates' Nomination Papers and certify the names of Cornel West and Melina Abdullah as candidates for President and Vice-President of the United States, respectively.

In response, Defendants largely ignored the merits of Plaintiffs' constitutional arguments and, instead, argued, just as they had since August 19, that it was too late to provide relief.

### B.  Injunction Hearing.

This Court held a hearing on Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction, on October 7, during which, it heard testimony from Plaintiff Dr. West.[2] Defendants, for their part, presented testimony from a

---

[2] Dr. West testified about the burden that falls on Justice for All as a minor political party seeking ballot access in Pennsylvania. As Dr. West explained, in Pennsylvania, he has spread his message through conversation but not institutionally by access to the ballot, which has been difficult.

single witness: Jonathan Marks, the Department's Deputy Secretary of Elections. As relevant here, Mr. Marks testified extensively about the procedures that county boards of election must follow in the lead-up to the upcoming general election, including preparation of absentee ballots, mail-in ballots, paper ballots, and voting machine testing. Specifically, according to Mr. Marks, after the candidates are certified, the counties work with vendors to proof and print ballots and test their voting equipment. Oct 7 Hr'g Tr. at 42-43.

With regard to testing, Mr. Marks's testimony focused on logic and accuracy testing (L&A) which, according to him, could take up to a full week to complete, depending on the size of the county. Importantly, however, Mr. Marks's testimony was often generalized, equivocating, and otherwise lacking in detail. For instance, no testimony was offered regarding the specifics of how many counties had completed their testing, how quickly testing could be accomplished without compromising the integrity of the process, etc. Indeed, in expressing his concerns about a rushed L&A test, he did not explain what exactly would constitute a "rush." Nor did Mr. Marks even suggest—let alone expressly state—that he had consulted with any counties to determine the feasibility of conducting L&A tests anew. In this regard, the only guidepost that he offered was that it had taken Philadelphia a full week to complete its L&A testing. Yet, Mr. Marks did not indicate whether that was

---

Oct. 7 Hr'g Tr. at 14. He explained there is a disadvantage for minor third parties that does not exist for major political parties, which have "a strangle hold" on the system and big money and corporate donors to support their interests. *Id.* at 14-15. Further, Dr. West testified that it was difficult to identify the electors so early and comply with the various extra procedures that the major political parties do not have to undergo. *Id.* at 17. He noted that the two major parties work together to make and enforce the rules, which marginalizes the independent candidates. *Id.*

the result of a leisurely pace with no time constraints, or whether the full staff, working diligently, needed one week to complete the testing. Mr. Marks also agreed it was possible that some counties may more easily be able to accommodate any late changes to the ballot to add Dr. West as a candidate and could complete or redo L&A testing if Dr. West was certified for the ballot that week. *Id.* at 65, 67.

With regard to printing paper ballots, Mr. Marks testified that the process for printing election day ballots had begun and posited that, starting now, it would be difficult to reprint election day ballots. *Id.* at 57-59. Despite this, Mr. Marks also testified that it was not impossible for the Department and counties to adjust to late ballot changes, agreeing that such instances occurred in 2014 and 2016. *Id.* at 64, 71. He further testified that he could not precisely say where each of the 67 counties were in the ballot printing process or the L&A process, only focusing on Allegheny and Philadelphia counties for his testimony that day. *See id.* at 65, 67. Moreover, as it pertains to the difficulties, aside from stating the fairly obvious—that the paper ballots cannot be printed at any local print shop—Mr. Marks was unable to speak on the issue with any degree of specificity. He mentioned that some of the counties use the same vendor to print their ballots and noted that, generally, the manufacturer of the voting machines provides a list of recommended vendors who were previously vetted by the manufacturer. He never mentioned how long it would take if all of the counties were required to re-print ballots, and he offered no insight about how many vendors are on the pre-vetted lists for the various machines used in the counties.

Finally, Mr. Marks testified that the Department communicates with voters who receive mail-in ballots and could send an email to mail-in voters to alert them that Dr. West is on the ballot. He further agreed that, if certain counties printed ballots before the issuance of an injunction, they could post notices at polling places on election day to alert voters that Dr. West is a candidate. *Id.* at 71–72.

### C.    Order Denying Injunction.

Following the hearing and post-hearing briefs, on October 10, this Court denied Plaintiff's motion on October 10. On the merits, the Court expressed "serious concerns with the Secretary's application of the election code's restrictions to Dr. West" because the law as applied appears designed to restrict ballot access. Nevertheless, the Court found it was "constrained to deny Dr. West's Motion" because there is no time to print new ballots and printing new ballots would cause voter confusion and post-election litigation. ECF No. 33 at 1–2.

This Court concluded that, on the record, the Department's interpretation and application of the challenged provisions imposed a burden that was more than minimal and Defendants' interests were not sufficiently weighty or logically connected or tailored. *Id.* at 5–6. Plaintiffs are "clearly likely to succeed on the merits," the Court found, and further "unquestionably suffered irreparable harm" from the loss of First Amendment rights. *Id.* at 6 (citing *Kim v. Hanlon*, 99 F.4th 140, 159 (3d Cir. 2024)),

Ultimately, however, relying on the *Purcell* principle, which counsels caution in the election context, this Court denied relief. *See* ECF No. 33, at 7-10 (citing

*Purcell v. Gonzalez*, 549 U.S. 1 (2006)). In this regard, the Court identified two principal areas of concern: voter confusion and risk of error.

## III.   **ARGUMENT**

Mindful of this Court's concerns that relief at this stage could sow confusion and error, Plaintiffs present request seeks limited relief that is both feasible and reasonable. At this point, the likelihood that, on January 20, 2025, Doctors Cornel West and Melina Abdullah will be sworn in as the next President and Vice-President of the United States, respectively, is practically zero. But "an election campaign is a means of disseminating ideas as well as attaining political office." *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 185–86 (1979) (noting that "Abolitionists, Progressives, and Populists have undeniably had influence, if not always electoral success"). Thus, where the government has violated the constitutionally protected right of a candidate to appear on the ballot, absent a real risk of harm to the public's right to vote, courts should endeavor to provide redress.

For the reasons set forth below, this Court can and should order the Secretary to accept the West/Abdullah Nomination Papers and take all reasonable measures to ensure that those who vote on election day are not deprived of their constitutionally guaranteed right to cast a vote for the candidates of the Justice for All party.

The analytical framework applicable here is largely the same as it is in any

other request for injunctive relief.[3] This Court has already agreed that Plaintiffs

have established an "indisputably clear" likelihood of success on the merits and

irreparable harm. Ordinarily, with these two "most critical" factors satisfied, *see*

*Nken*, 556 U.S. at 434, Plaintiffs right to injunctive relief would be virtually

automatic because "[i]n the context of a First Amendment challenge, the most

significant and, indeed, the ***dispositive prong*** of the preliminary injunction

analysis is whether Plaintiff bore its burden of establishing that it had a reasonable

probability of succeeding on the merits." *See One Three Five, Inc. v. City of*

*Pittsburgh*, 951 F.Supp.2d 788, 810 (W.D. Pa. 2013) (cleaned up; emphasis added)

(citing *ACLU v. Ashcroft,* 322 F.3d 240, 250–51 (3d Cir. 2003)).[4] But because

---

[3] Because Federal Rule of Appellate Procedure 8 governs both injunctions and stays pending appeal, the same standards are used for both. *See Donald J. Trump for President, Inc. v. Secretary of Pa.*, 830 Fed. App'x 377 (3d Cir. 2020). Under this rubric, the Court considers four main factors together: (1) whether the applicants makes a strong showing that they are likely to succeed on the merits; (2) whether the applicants will be irreparably injured absent an injunction; (3) whether issuance of the injunction will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). The first two factors, likelihood of success on the merits, and irreparable injury, are considered the "most critical." *Nken v. Holder*, 556 U.S. 418, 434 (2009).  But "all four stay factors are interconnected," and the Third Circuit has often employed a "'sliding scale' approach," meaning that the more likely the movants are to win, "the less . . . the balance of harms [need to] weigh in [their] favor[.]" *In re Revel, AC, Inc.*, 802 F.3d 558, 569 (3d Cir. 2015). Conversely, the less likely the appellants are to win, the more the balance of harms need to weigh in their favor. *Id.* Therefore, if the movant makes a sufficient showing under the first two considerations, the Court balances the harms under all four factors. *Id.* at 571.

[4] Other Circuit Courts of Appeals agree that "[w]hen a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (holding plaintiffs were likely to succeed on their claim that Ohio's statute governing the process for in-person voting was unconstitutional and, on that basis, granting a preliminary injunction); *see also, e.g.*, *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) ("Consideration of the merits is virtually indispensable in the First Amendment context, where the likelihood of success on the merits is the dominant, if not the dispositive, factor." (citing *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) ("When a party seeks a preliminary injunction on the basis of a potential First Amendment violation, the likelihood of success on the merits will often be the determinative factor.").

election cases present unique challenges, *Purcell* (at least arguably) changes this general rubric and requires courts to weigh the equities, regardless of how egregious and palpable the constitutional violation may be. And because this Court declined to grant relief based on its assessment of the equities under *Purcell*, Plaintiffs' discussion is focused on whether the more limited injunction they presently seek can be granted without running afoul of the admonition to avoid undue interference with the election machinery.

As developed in greater detail below, the limited injunction Plaintiffs seek is in the public interest as it strikes the proper balance between, on the one hand, the concerns articulated in *Purcell* (and highlighted in this Court's Memorandum Order), and, on the other hand, Plaintiffs' right to obtain some degree of relief for a deprivation of constitutional rights that are fundamental to our republican form of government.  In short, while some of the relief Plaintiffs originally sought understandably gave this Court pause, the injunction they presently seek does not implicate those concerns. *Purcell*, therefore, should no longer stand as an obstacle to ballot access and Plaintiffs are entitled to an injunction pending appeal directing Defendants to accept the Nomination Papers of Cornel West and Melina Abdullah for President and Vice President, respectively, of the Justice for All political body pending Plaintiffs' appeal, and to take all reasonable measures to notify voters who vote on election day that Cornel West and Melina Abdullah are candidates on the ballot.

Before turning to the specific equitable considerations identified by this Court, a brief summary of the *Purcell* doctrine is helpful. Reduced to its essence, *Purcell* stands for the proposition that courts should "weigh 'considerations specific to election cases[,]' in addition to the traditional considerations for injunctive relief." *Kim*, 99 F.4th at 160 (quoting *Purcell*, 549 U.S. at 4). As the *Kim* Court recently recognized, "that caution is certainly sound because '[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls[,]' and '[a]s an election draws closer, that risk will increase.'" *Id.* (quoting *Purcell*, 549 U.S. at 4-5). Its precise contours remain somewhat nebulous. But a review of the authorities suggests that *Purcell* is subject to two overarching limitations.

*First*, as the *Kim* Court noted, "*Purcell* is a consideration, not a prohibition, and it is just one among other considerations specific to election cases that [courts] must weigh for injunctive relief." *Kim*, 99 F.4th at 160 (cleaned up).[5] As such, "*Purcell* is not a magic wand that defendants can wave to make any unconstitutional election restriction disappear so long as an impending election exists." *Id.* (quoting *People First of Ala. v. Sec'y of State for Ala.*, 815 F. App'x 505, 514 (11th Cir. 2020) (Rosenbaum, R., and Pryor, J., concurring)). This Court

---

[5] *La Union Del Pueblo Entero v. Abbott*, 24-50783, __F.4th__, __, 2024 WL 4487493, at *3 (5th Cir. Oct. 15, 2024) ("To be sure, *Purcell* is not an absolute principle."); *VoteAmerica v. Raffensperger*, 609 F.Supp.3d 1341, 1368 (N.D. Ga. 2022) ("*Purcell* does not function as a bright line rule."); *Namphy v. DeSantis*, 493 F.Supp.3d 1130, 1141 (N.D. Fla. 2020) ("*Purcell* did not create a per se rule prohibiting against enjoining unconstitutional voting laws or procedures on the eve of the election."); *Harding v. Edwards*, 484 F.Supp.3d 299, 318 (M.D. La. 2020) ("The *Purcell* doctrine does not command judicial abstention in late-breaking election cases.").

12

seemingly recognized as much, given that it analyzed *Purcell* in the context of balancing the equities.

*Two*, in deciding whether *Purcell* counsels against granting relief, a court's inquiry should focus on the potential impact of an injunction on the right to exercise the franchise. *Curling v. Kemp*, 334 F.Supp.3d 1303, 1326 (N.D. Ga. 2018) ("[T]he real question posed in this context is how injunctive relief at this eleventh-hour would impact the public interest in an orderly and fair election, with the fullest voter participation possible and an accurate count of the ballots cast."), *aff'd in part*, *appeal dismissed in part sub nom. Curling v. Sec'y of Ga.*, 761 Fed. Appx. 927 (11th Cir. 2019).[6] Accordingly, "[t]he focus of the *Purcell* principle . . . is on avoiding election issues that could lead to voter confusion shortly before an election." *Kim*, 99 F.4th at 160; *see also Voto Latino v. Hirsch*, 712 F.Supp.3d 637, 681 (M.D.N.C. 2024) ("A court considering an injunction close to an election should consider the risk of 'voter confusion.'"); *VoteAmerica v. Raffensperger*, 609 F.Supp.3d 1341, 1369 (N.D. Ga. 2022) ("[T]he key issue here is whether an injunction at this stage of the current election cycle would cause further voter confusion.").

And to the extent administrative difficulties are relevant to the *Purcell* analysis, withholding relief in the face of a clear likelihood of success on the merits is appropriate only where an injunction would pose a significant risk to the integrity

---

[6] *Get Loud Arkansas v. Thurston*, __F.Supp.3d__, __, 5:24-CV-5121, 2024 WL 4142754, at *23 n.24 (W.D. Ark. Sept. 9, 2024) ( "*Purcell* is not at issue where, . . . the preliminary injunction 'does not fundamentally alter the nature or rules of the election, create voter confusion, or create an incentive for voters to remain away from the polls[.]'" (quoting *Craig v. Simon*, 493 F. Supp. 3d 773, 789 (D. Minn. 2020))).

of the election (*e.g.*, risk of error, inability to provide updated training for all local poll workers and employees, or substantial harm to voter confidence). *See, e.g.*, *People First of Ala. v. Sec'y of State for Ala.*, 815 Fed. Appx. 505, 514 (11th Cir. 2020) ("At most, [the requested relief] requires defendants to provide additional training to ballot workers—a feat hardly impossible in the allotted time."); *Gonidakis v. LaRose*, 599 F.Supp.3d 642, 666 (S.D. Ohio 2022) ("*Purcell* reflects a desire to prevent voter confusion and election administrator confusion—***all in service*** of the state's interest in running an orderly, efficient election and in giving citizens (including the losing candidates and their supporters) confidence in the fairness of the election." (cleaned up; emphasis added)); *Mi Familia Vota v. Abbott*, 497 F.Supp.3d 195, 220 (W.D. Tex. 2020) ("Historically, typical court actions that do not pass the *Purcell* principle touch on the protection of the security and integrity of an election process, or involve the ability of Election Administrators to ensure an accurate and reliable count of the ballots. The *Purcell* principle seeks to protect this integrity by providing sufficient time, in advance of an election, to notify voters and election officials, to provide training of poll workers, and to prevent disruptive changes.").

Granting Plaintiffs their requested relief here does not fundamentally alter the election or disrupt the election process. And Defendants have not and cannot prove otherwise sufficient to justify their continuing denial of constitutional rights. *Philip Randolph Inst., of Ohio v. LaRose*, 493 F.Supp.3d 596, 615 (N.D. Ohio 2020) ("[G]ranting Plaintiffs' preliminary injunction would not disrupt the State's election

process[.]"); *Longoria v. Paxton*, 585 F.Supp.3d 907, 935 (W.D. Tex. 2022), *vacated and remanded*, No. 22-50110, 2022 WL 2208519 (5th Cir. June 21, 2022) (determining the requested injunction did not affect any voting procedures).

Against this backdrop, granting the limited relief Plaintiffs now request does not implicate any of the *Purcell* concerns that may have been attendant in their previous request for relief. Turning initially to voter confusion, this Court's primary concern in this regard centered on the confusion that would result among those choosing to vote by mail. But the relief that Plaintiffs presently request is limited to election-day ballots. While a discrepancy in the ballots provided to the same class of voters (*e.g.*, mail-in voters) could arguably result in confusion, it is difficult to imagine how placing Dr. West's name on the election-day ballot would trigger the same concerns. Notably, Defendants have never attempted to develop the notion of confusion in any meaningful way, making (at most) only passing and conclusory references to the potential for voter confusion in their closing argument and post-hearing brief. Certainly, common sense dictates that certain types of changes (*e.g.*, moving polling locations, altering district lines, implementing new identification requirements, instituting new rules on how ballots must be marked or returned, etc.) will inevitably cause voter confusion and, thus, do not require specific proof or empirical evidence. But the "confusion" here is hardly self-evident. Without a detailed and persuasive explanation of how confusion would ensue if the voting public is given an additional candidate choice, the Court should not readily assume that the people are so easily befuddled. *See Longoria v. Paxton*, 585 F.Supp.3d 907,

935 (W.D. Tex. 2022) (noting that, absent a specific and substantiated allegation that the purported "confusion . . . would disenfranchise anyone, like misunderstandings about voting procedures—deadlines, eligibility, voter identification requirements, polling locations, etc.—are wont to do[,] . . . voters' potential, subjective confusion is clearly outweighed by the irreparable harm that Plaintiffs will suffer absent injunctive relief"), *vacated and remanded on other grounds*, 2022 WL 2208519 (5th Cir. June 21, 2022) (instructing the court to dismiss for lack of standing).

Second, granting the present motion would not create a significant risk of error. To begin, there no reasonable basis for concluding that, with well over two weeks before the election, placing Dr. West's name to the ballot would pose such a monumental risk of mistake that it would warrant the Commonwealth's unconstitutional conduct.  In fact, even as it relates to the potential mistakes associated with reprinting absentee and mail-in ballots, which appears to have been this Court's principal concern, the evidence adduced at the hearing on this topic was hardly compelling. For example, although Defendants refer to the sixty-seven counties and express concern about whether all or some of those counties would be able to make the necessary changes, Defendants did not present any evidence—in any form whatsoever—from a single county. Defendants, in fact, did not even ***suggest*** that they had broached the subject with a single county. Instead, the only facts adduced during the hearing by Defendants were from Mr. Marks. Yet his testimony was hopelessly vague, lacking in detail, and largely speculative.

16

Among other things, Mr. Marks had no idea how many counties had already conducted the L&A testing, couldn't say how long the testing would take in those counties that had already gone through the process, and didn't present any evidence (empirical or otherwise) suggesting that retesting leads to an increased error rate. Importantly, as well, aside from stating that it took Philadelphia one week to complete its testing (a fact that any member of the public could have learned from media reports), Mr. Marks did not suggest that anything less than a week could jeopardize the integrity of the process. Mr. Marks also acknowledged that some of the testing has nothing to do with the ballots and did not specifically state that the entirety of the testing process would have to start anew. The absence of any direct evidence from a single county is particularly troubling given that Mr. Marks has a direct line of communication to each of the county boards. Put simply, Mr. Marks could have found the answer, but he seemingly chose not to.

Even at the time of the hearing, Mr. Marks's testimony left much to be desired. But based on information that subsequently come to light, it appears that Mr. Marks's evasiveness was likely no accident. On the same day this Court held a hearing on the injunction, a Stipulated Order was entered in a state court case pertaining to L&A testing in Montgomery County. *See Republican Nat'l Committee v. Montgomery Cnty. Bd. of Commr's*, No. 2024-22251 (C.P. Montgomery) (Exhibit ##). And the factual stipulations of the Montgomery County Board of Elections in that case regarding the timeline show the degree to which Mr. Marks exaggerated. As this Court is aware, the Supreme Court affirmed the denial of mandamus relief

17

in *Williams* on Monday, September 16 and Defendants certified the ballots. According to the Stipulation mentioned above, the very next day, Montgomery County started making ballots available for walk-in applicants. Following proper notice, L&A testing commenced in Montgomery County on Monday, September 23 at 8:00 a.m. and concluded at approximately 11:30 a.m. ***on the same day***. By 2:30 p.m., Montgomery County had started to mail out ballots.

Thus, according to Montgomery County Board of Elections, the whole process ***took less than a day***. That the L&A testing took less than four hours casts serious doubt on the error concerns, but it is particularly important because Montgomery County is the ***third largest county in Pennsylvania***. Thus, L&A testing can plainly be completed without compromising the accuracy of elections—even in very large counties—in less than four hours.

That's not all. Remarkably, the only specific instance of ballot printing or configuration error referenced by Mr. Marks (and highlighted in this Court's opinion) was not the result of any changes to the ballot. Specifically, during the hearing Mr. Marks referred to machine malfunctions in Northampton County in 2023 and, during his closing argument, counsel for Defendants pointed to Northampton County as an example of what could happen if relief were granted. But the malfunction in that case related to a statewide judicial retention race for two Superior Court judges, which were certified to the counties months in advance. There were no changes to the retention ballot in the months leading to the election. In time, Mr. Marks should be held to account for his suggestions to the contrary.

But for now, one thing is plain: the record is bereft of a single piece of credible evidence suggesting that a change at this juncture would increase the risk of error for election-day voting.

But there are other indications that Defendants have been less-than-honest throughout this entire dispute. As noted above, Defendants have been arguing that it is "too late" to offer relief since August 19, 2024, based on a verified statement from Mr. Marks, that "[u]ntil there is a final, non-appealable order resolving all objections, counties cannot begin printing balloting materials." Ex. A to Defendants' Brief in Opposition to the TRO (*Williams* New Matter) at ¶ 160. But before this Court, Mr. Marks testified as follows:

> Certainly one of the things that we discuss for several weeks as nomination paper objections were working their way through the Commonwealth Court and then ultimately the Supreme Court, you know, we were getting questions about the status of the list of candidates and we were reminding counties that irrespective of that status, they still had hard deadlines for certain types of absentee voters like military and oversea civilian voters.

Oct. 7 Hr'g Tr. at 39:8-15.[7]  In 2018, before a three-judge panel in the United States District Court for the Middle District of Pennsylvania, Mr. Marks submitted an affidavit assuring the Court that the last-minute implementation of new congressional districts would not cause any confusion or chaos. And with regard to finalizing ballots in a short period, Mr. Marks noted that elections have been

---

[7] Candidly, it is difficult to overstate the profound damage that Mr. Marks's inconsistent representations have caused.  The Commonwealth Court's refusal to grant relief based on laches was based principally (if not entirely) on the purported need to finalize and resolve all challenges to candidacy before military and overseas ballots were sent. Had Defendants (and their counsel) refrained from making such misrepresentations of law and fact, it is possible (perhaps even likely) that this action would never have even been brought.

conducted without any serious issues even when a United States Senate candidate was reinstated to the ballot ***one week*** before the election.

These pervasive discrepancies, at a minimum, should require Defendants to come forward with specific, credible, and detailed evidence regarding the purported difficulties with reinstating Dr. West at this juncture.

So, with that notion dispelled, it appears the only alleged burden here relates to resources and additional work. And, as this Court astutely noted, where all that is at stake is "money and manpower[,] . . . if someone's constitutional rights are violated, the state and counties should figure it out." ECF No. 33 at 11; *see also State ex rel. DelMore v. LaRose*, 217 N.E.3d 715, 726 (Ohio 2022) ("While we are mindful of the burdens it may place on a few boards to prepare a new ballot after the UOCAVA date has passed, we will not hesitate to order that a wrongly exclude candidate be added to the ballot, notwithstanding the passage of the UOCAVA date."); *In re Green Party of Texas*, 630 S.W.3d 36, 40 (Tex. 2020) (concluding that although "changes to the ballot at this late point in the process will require extra time and resources . . . a candidate's access to the ballot is an important value to our democracy" and added expense does not justify denying access). And, as noted above, the relief Plaintiffs presently seek is different from their initial request and simply does not raise concerns under *Purcell*. As opposed to asking for changes to absentee ballots or mail-in ballots, Plaintiffs ask this Court to direct Defendants to accept the West/Abdullah Nomination Papers and take all reasonable measures to

notify voters who vote on election day that Cornel West and Melina Abdullah are candidates on the ballot.

Ordering candidates to be placed or removed from ballots this close to an election is in no way a new phenomenon. And while mail-in ballots present unique challenges that sometimes compel courts to refrain from making changes to them, courts generally do not refrain from making the necessary changes to election-day ballots. *See, e.g.*, *Wilson v. Hosemann*, 185 So.3d 370, 379–80 (Miss. 2016) (granting injunctive relief ordering a candidate's name be included in the electronic statewide election management system for voters on election day regardless of the fact that military and absentee ballots were different); *United States v. Pennsylvania*, No. 1:cv-04-830, 2004 WL 2384999 (M.D. Pa. Oct. 20, 2004) (involving litigation removing a candidate's name from the ballot two weeks before the election); *see also Bryan v. Fawkes*, 61 V.I. 416, 469 (V.I. 2014) ("The fact that the general election ballot has been printed and that some voters have already cast early or absentee ballots does not, without more, prevent this Court from fashioning appropriate relief with respect to ballots that have not yet been cast.").[8] Mr. Marks himself

---

[8] In their post-hearing submission to this Court, cited *Bryan* for the proposition that *Purcell* was inapplicable to ballot-access cases. *See id.* at 469 ("*Purcell* and similar cases, in addition to involving injunctions, did not involve challenges to a candidate's access to the ballot, but instead involved requests for courts to impose large-scale changes to the election process itself that affected both voters and poll workers."). Although this Court found *Bryan* distinguishable on this particular point, that decision illustrates a more fundamental point: whether applicable or not, *Purcell*'s rationale is at its nadir in ballot-access cases and, thus, the fact that mail-in and absentee voting has begun is not a proper basis for denying relief. *See id.* 469-71 (collecting cases from Ohio, Texas, Minnesota, Maryland, and Illinois); *see also Johnston v. Ing*, 441 P.2d 138, 140 (Haw. 1968) (directing correction of ballots for use on election day, despite the fact that some absentee ballots had already been sent and returned).

acknowledged that local and statewide candidates have been removed or added to the ballot with less time remaining.

Defendants' inevitable retort that accepting the Candidates' Nomination Papers only begins the clock for objectors to challenge those nomination papers is misguided and, again, not a relevant concern under *Purcell*. Once nomination papers are filed with Defendants, they are presumptively valid,[9] and Secretary Schmidt has a duty to transmit an amended certification of the candidate list. This process, in fact played out in the 2004, when the Secretary was required to amend the certified list of presidential candidates twice—first time to include Ralph Nader and then, after further judicial proceedings, to exclude him. *See U.S. v. Pennsylvania*, 2004 238499, at *1.[10]

Defendants' interpretation otherwise turns that presumption of validity on its head and suggests that the West/Abdullah Nomination Papers are somehow only provisionally valid unless and until the seven-day period has run without objections. In fact, as Marks's own testimony makes clear, challenges to nomination papers have sometimes taken weeks to be resolved. *See* Oct. 7 Hr'g Tr. at 39. It is hard to square how all nomination papers can be considered provisionally valid for weeks leading up to the election unless an objection process is complete.

---

[9] *In re Makhija*, 136 A.3d 539, 546 (Pa. Cmwlth. 2016) ("A nomination petition is presumed valid; thus, challenges to a nomination petition must overcome the presumption of validity." (internal quotation marks and citations omitted)).

[10] In fact, as Judge Kane noted, "[d]espite the courts' best efforts however, the appeal process resulted in resolution of Nader's candidacy less than two weeks before the November 2, 2004 election." *Id.*

But even if a subsequent challenge to the Candidates' Nomination Papers were successful, counties and states can easily ***not*** count votes that have been cast for someone or something, but they cannot do the inverse. *Accord. Stoddard v. Quinn*, 593 F.Supp. 300, 309 (D. Maine 1984) ("The mere **possibility** that a voter may be deprived of his statutory right to challenge petitions is hardly sufficient grounds to withhold a remedy from voters who otherwise would suffer injury to their **constitutional** rights." (emphasis in original)). Given the constitutional violations resulting from Defendants' interpretation of the Election Code here, the presumptively valid Nomination Papers should be accepted, and the Department should take the steps necessary to alert voters on election day of this fact, regardless of any objection period Defendants rely on.

On the whole, as this Court agrees, it is nearly indisputable that Defendants have violated Plaintiffs' constitutional rights.[11] During the pendency of Plaintiffs' appeal, an injunction should be granted to remedy this constitutional violation to the extent possible this close to the election by directing Defendants to accept the West/Abdullah Nomination Papers and take all reasonable measures to notify voters who vote on election day that Cornel West and Melina Abdullah are candidates on the ballot.

---

[11] Plaintiffs recognize that this Court (wisely) qualified its conclusion by noting that it was based on the present record. But it is inconceivable that, after two months of no explanation for their interpretation, Defendants will be able to offer a compelling justification for their treatment of political bodies in the context of presidential elections.

## IV.    CONCLUSION

Because Plaintiffs are likely to succeed on the merits of their appeal, will suffer irreparable harm in the absence of an injunction pending appeal, and satisfy the balance of the equities, Plaintiffs ask this Court to grant an injunction pending appeal.

Respectfully submitted,

Dated: October 17, 2024

/s/ Matthew H. Haverstick
Matthew H. Haverstick (No. 85072)
Shohin H. Vance (No. 323551)
Samantha G. Zimmer (No. 325650)*
KLEINBARD LLC
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
Ph: (215) 568-2000
Fax: (215) 568-0140
Eml: mhaverstick@kleinbard.com
svance@kleinbard.com
szimmer@kleinbard.com

*Pro Hac Vice forthcoming


/s/ J. Andrew Crompton
J. Andrew Crompton (No. 69227)*
Erik Roberts Anderson (203007)
Ryan T. Gonder (No. 321027)*
Matthew L. Hoke (No. 331634)
McNEES WALLACE & NURICK LLC
100 Pine Street
Harrisburg, PA 17101
Ph: (717) 232-8000
Eml: dcrompton@mcneeslaw.com
eanderson@mcneeslaw.com
rgonder@mcneeslaw.com
mhoke@mcneeslaw.com

*Pro Hac Vice

Attorneys for Plaintiffs

25

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 17, 2024, I caused a true copy of the Notice of

Appeal to be served via the Court's ECF System.

*/s/ Matthew H. Haverstick*

1