**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CORNEL WEST AND MELINA ABDULLAH, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>PENNSYLVANIA DEPARTMENT OF STATE, et al.,<br><br>Defendants. | : | CIVIL ACTION<br>No. 24-1349 |

**PLAINTIFFS' BRIEF IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

Twice already this Court has found the construct at the center of this case constitutionally suspect — first on the preliminary-injunction record, ECF No. 33, and again in denying the Secretary's Rule 12(b)(6) motion "for the reasons stated in" that same Memorandum Order, ECF No. 49. Under that construct — Section 951 of the Pennsylvania Election Code,[1] as the Secretary reads it and as Pennsylvania's courts have now construed it — the nineteen people a political body names as its presidential electors are "candidates" who must be identified on the body's nomination papers before circulation begins, must each file a candidate's affidavit by the filing deadline, and must each swear to disaffiliation from any political party, all on pain of the ticket's total exclusion from the ballot.

[1] Act of June 3, 1937, P.L. 1333, No. 320, as amended, 25 P.S. §§ 2600 et seq.

At the preliminary-injunction stage, the Court held that the challenged restrictions are "facially discriminatory, directed only to minor political parties and political bodies," that heightened scrutiny applies, and that "Defendants' interests aren't, as applied, sufficiently weighty and logically connected or tailored to Plaintiffs' case." Indeed, "at least based on the . . . record" before it at the time, this Court concluded that Plaintiffs were "clearly likely to succeed on the merits[.]" ECF No. 33 at 4–6; *West v. Pa. Dep't of State*, 753 F. Supp. 3d 424, 427–28 (W.D. Pa. 2024). Relief, at that time, was denied for one reason only: because the motion came weeks before a presidential election, *Purcell* counseled against a court-ordered change to the composition of the ballot. ECF No. 33 at 7–12.[2]

What remained after those rulings was to complete the record. That task has been accomplished and the bulk (if not all) of the material facts have been stipulated by the parties. Stip. ¶¶ 1–58. The stipulated record establishes each of the elements this Court sketched in October 2024 when it first analyzed the constitutionality of the scheme before it — the facially discriminatory treatment of political bodies, the combined effect that nullified a ticket supported by more than 13,000 signing voters over a single missing affidavit, and a Secretary who has never named a "precise interest" that passes constitutional muster.

One other change since this action was commenced is worth highlighting. In 2024, Plaintiffs challenged the Department's interpretation of the Election Code. That interpretation has since become the law of Pennsylvania: in *Clymer v.*

[2] Months later, the Court also denied the Secretary's second motion to dismiss, holding Plaintiffs' claims ripe, not moot, and properly directed at the Secretary under *Ex parte Young*. ECF No. 77.

*Schmidt*, 324 A.3d 640 (Pa. Cmwlth.), *aff'd*, 322 A.3d 929 (Pa. 2024), the Commonwealth Court adopted the Department's reading as the correct construction of Section 951.[3] What Plaintiffs challenge today, therefore, is the statute itself, as authoritatively construed by Pennsylvania's courts and as enforced by the Secretary. *Clymer* settles what the statute means; it does not touch the federal question, which this Court decides for itself. *See Wisconsin v. Mitchell*, 508 U.S. 476, 483–84 (1993) (federal courts are bound by a state court's construction of a state statute, not by its resolution of the federal constitutional question).

The 2024 election is behind us; the 2028 cycle is ahead; and no equitable doctrine now stands between the merits and a judgment. This is the earlier-brought case the Court described when it wrote that "if this case had been brought earlier, the result, at least on the present record, may have been different." ECF No. 33 at 12. Plaintiffs respectfully request that the Court enter summary judgment on both counts, declare that Section 951, as authoritatively construed, is unconstitutional as applied to political bodies, their candidates, their presidential electors, and their supporters, and permanently enjoin the Secretary from enforcing it.

[3] The sequence explains the framing of the 2024 submissions. The Department construed first — its guidance issued and its rejections occurred before any lawsuit existed — so the 2024 papers took aim at "Defendants' interpretation." *Clymer* was commenced in the Commonwealth Court on August 5, 2024, weeks before this action. Decided on August 23, 2024, it was initially an unreported decision without precedential effect, *see* 210 Pa. Code § 69.414(a), until it was affirmed per curiam and, on September 19, 2024, ordered published.

## II. STATEMENT OF FACTS[4]

### A. The Election Code's two paths to Pennsylvania's presidential ballot.

The Election Code sorts political organizations into political parties — with the Republican and Democratic parties the only "major" parties for decades — and political bodies, with minor political parties nominating in the same manner as political bodies.[5] *See* 25 P.S. §§ 2831(a), (c), 2872.2; ECF No. 77 at 3–4 (surveying the framework); Stip. ¶¶ 1–2 (Justice for All is a political body).

A major party nominates its presidential ticket at its national convention, and the party's presidential nominee then — "within thirty days after his nomination" — nominates the party's presidential electors by certifying their names, residences, and post-office addresses to the Secretary. *See* 25 P.S. § 2878; Stip. ¶ 31. All that is required of the major parties is some species of communication relaying names and addresses: their electors file no candidate's affidavit, make no disaffiliation attestation, and pay no fee. Stip. ¶¶ 32–34. Nor is the thirty-day period a true deadline at all: a nomination made late is effective if made "as soon as

[4] Per the Court's Summary Judgment Briefing Order, ECF No. 94, this section sets out a narrative of the facts Plaintiffs contend are undisputed and material, with a citation to the record for each statement. Citations to "Stip." are to the parties' Joint Stipulation of Facts, executed and filed contemporaneously with this brief and included in the Joint Appendix as Exhibit 1; citations to "JA Ex." are to the Joint Appendix; citations to "ECF No." are to this Court's docket.

[5] Section 801 of the Election Code defines a "political party" by prior-election vote share, 25 P.S. § 2831(a); a group that does not meet that threshold is a "political body," *id.* § 2831(c). Section 912.2 separately defines a "minor political party" as a political party whose statewide registration is below fifteen percent of the combined statewide registration of all statewide parties and directs that minor political parties nominate their candidates through the nomination-paper process of Section 951. 25 P.S. § 2872.2. As of the 2024 election, the Libertarian Party was the only minor political party in Pennsylvania. Because the ballot-access process for political bodies and minor political parties is identical in all respects relevant here, "political body" as used in this brief includes minor political parties.

may be possible after the expiration of thirty days," and a party's delay in naming electors does not cost its presidential ticket its place on the ballot. *See* 25 P.S. § 2878.

A political body reaches the same ballot by nomination papers. Its presidential candidate must gather at least 5,000 signatures of registered Pennsylvania electors,[6] Stip. ¶ 6, during a circulation period that in 2024 ran from February 14 to a filing deadline of 5:00 p.m. on August 1, Stip. ¶ 5. The nomination papers themselves must set forth the names, residences, and occupations of nineteen presidential electors, and the Department's form requires all nineteen to appear on every sheet. Stip. ¶ 37; Stip. Ex. A ¶ 2 (Instructions for Filing as a Candidate of a Political Body (2024)).

The papers must be accompanied by "an affidavit of each candidate nominated therein," 25 P.S. § 2911(e), and any person registered and enrolled in a political party during the statutory window is ineligible to be a political body's candidate. *See* 25 P.S. §§ 2911(e)(6), 2911.1. Each candidate nominated by a nomination paper must also submit the same filing fee required of candidates filing nomination petitions for the same office — $200 for a statewide office — and the Department's instructions provide that "[a] separate filing fee must be submitted for each candidate named in the nomination paper." *See* 25 P.S. § 2914; Stip. Ex. A

[6]Section 951(b) prescribes a higher, formula-based signature requirement, but in *Constitution Party of Pa. v. Cortes, No. 12-2726* (E.D. Pa. Feb. 1, 2018), the court held that requirement unconstitutional as applied and substituted a 5,000-signature minimum for statewide presidential candidates, and the Secretary has since applied that minimum to the nomination papers of all political bodies. *See* Stip. Ex. A ¶ 7.

¶ 11(a)–(b). As a matter of practice, the Department has not required a filing fee for any presidential elector. Stip. ¶ 34.

The genesis of this case is the treatment of a political body's nineteen presidential electors as themselves "candidates" within these provisions. Specifically, according to the Department's 2024 filing instructions and the guidance it posted in June 2024, "minor political party and political body candidates for the office of presidential elector must file candidates' affidavits by the August 1 filing deadline," citing 25 P.S. §§ 2911(e) and 2913(a). Stip. ¶¶ 7, 43; ECF No. 29 ¶¶ 9–11 (JA Ex. 5) (Department FAQ, including the disaffiliation answer and the requirement that a presidential candidate "must nominate 19 individuals to serve as candidates for the office of presidential elector"). Notably, the page announcing the elector-affidavit requirement was posted as of June 7, 2024 — nearly four months after the 2024 circulation period had opened. Stip. ¶ 43.

The combined consequence, as this Court has described it, is that a political body "must identify all 19 electors before submitting nominating papers (25 P.S. §§ 2911(a), 2912), that the presidential electors must be disaffiliated with any political party (25 P.S. § 2911.1), that presidential electors must complete affidavits (25 P.S. § 2911(e)), and that electors cannot be substituted unless Defendants first accept the nomination papers." ECF No. 33 at 4 (citing *In re Scroggin*, 237 A.3d 1006, 1022–23 (Pa. 2020), and 25 P.S. §§ 2940, 2941). The Commonwealth Court has since confirmed every element of that description as a matter of Pennsylvania law. *See*

*Clymer v. Schmidt*, 324 A.3d 640, 649–55 (Pa. Cmwlth.), *aff'd*, 322 A.3d 929 (Pa. 2024).

**B. Presidential electors have no public-facing role.**

The role of presidential electors in the electoral process is negligible and entirely ministerial. *See* ECF No. 60 ¶¶ 38–48; Stip. ¶¶ 9–12, 35. Once designated, individual presidential electors — for the candidates of political parties and political bodies alike — remain largely unknown to the general public and have virtually no involvement in the political process until several weeks after the general election. ECF No. 60 ¶ 39; Stip. ¶ 11. For no political party or political body are the names of presidential electors printed on the general-election ballot. Stip. ¶¶ 10, 35. A sample ballot instructs voters to "[v]ote for the candidates of one party for President and Vice-President," listing only the tickets and offering a single write-in line — so a voter could not vote for an individual elector even if she wished to. ECF No. 60 ¶ 41; ECF No. 60-1 (JA Ex. 3).

Nor do electors' names appear in the Department's "Candidate Database," its "Unofficial List of Candidates," or anywhere else on the Department's website. ECF No. 60 ¶ 44. Electors chosen at the election have no official function until, weeks later, they assemble in Harrisburg to cast Pennsylvania's electoral votes. Stip. ¶ 11; *see* 25 P.S. § 3192. Putative electors file no campaign-finance reports with the Secretary. Stip. ¶ 12.

### C. The West/Abdullah nomination papers and the Department's rejection.

Plaintiffs Cornel West and Melina Abdullah were the 2024 candidates of the Justice for All political body for President and Vice President. Stip. ¶¶ 1–2. The campaign began identifying Pennsylvania supporters willing to serve as presidential electors in 2023, Stip. ¶ 39; received a summary of Pennsylvania's petition requirements on or about February 29, 2024, Stip. ¶ 38; and finalized a petition template identifying the full nineteen-person slate on or about April 24, 2024, making it immediately available to volunteers, Stip. ¶ 40.

On July 11, 2024 — three weeks before the deadline — a Justice for All representative presented the Department with nomination papers listing Dr. West, Dr. Abdullah, and nineteen individuals as presidential electors, together with a committee of three authorized to fill vacancies, candidate's affidavits for Dr. West and Dr. Abdullah, and the filing fee. Stip. ¶¶ 13, 41. The papers comprised 1,282 pages of signature sheets, Stip. ¶ 14, bearing the signatures of more than 13,000 registered Pennsylvania electors, Stip. ¶ 36, including Plaintiffs Geraldine Tunstalle, Katherine Hopkins-Bot, and Charles Hier, Stip. ¶ 3.

The Department issued a same-day "pending" notice — annotated "0 of 19 Electors" — advising that it had not received a valid candidate's affidavit, and its staff advised the campaign in person that an affidavit from each of the nineteen listed electors was a prerequisite to completing the filing. Stip. ¶¶ 15–17; Stip. Ex. C. The notice directed that papers with valid affidavits be received "no later than 5:00 P.M., Thursday, August 1st, 2024" — the filing deadline itself. Stip. ¶ 44.

The campaign then mounted the affidavit chase the record describes: a candidate-affidavit template sent to the identified electors on or before July 12 with a requested return date of July 18, Stip. ¶ 42; telephone, text, e-mail, and in-person outreach to the listed electors, joined personally by Dr. West and by ballot-access counsel as the deadline neared, Stip. ¶¶ 45–48; counsel's calls to the Department seeking clarification of the rules for substituting electors, Stip. ¶ 49; and the recruitment of substitutes, for whom the vacancy committee convened on July 24, 2024 and executed a Substitute Nomination Certificate and accompanying affidavit, Stip. ¶ 50.

Affidavits arrived — but not all nineteen, and not all unqualified. The Department received two by mail on July 30, but issued deficiency notices because each mis-stated the municipality or election district. Stip. ¶¶ 18–19; Stip. Ex. D. On August 1 it received eight more by mail, seven by e-mail at 4:21 p.m., and one by e-mail at 5:42 p.m.; five signed originals were presented at the Department's office before 5:00 p.m. Stip. ¶¶ 20–23. Two of the affidavits — those of Plaintiffs Hier and Hopkins-Bot — struck through the clause attesting to the disaffiliation requirement. Stip. ¶ 24.

Meanwhile, the changed circumstances of identified electors were beyond the campaign's reach: one identified elector advised before the deadline that she could not truthfully execute the affidavit because she had been registered and enrolled in a political party during the window specified in 25 P.S. § 2911(e)(6), Stip. ¶ 54; two others had been unreachable for more than two weeks despite regular attempts,

Stip. ¶ 52; and others distrusted the authenticity of the outreach itself — one believed a voicemail from Dr. West was artificially generated, Stip. ¶ 53.

The Department rejected the nomination papers by notice dated August 1, 2024, transmitted August 2. Stip. ¶ 25; Stip. Ex. F. The sole ground stated was "Invalid Candidate's Affidavit," with the comment: "Department is not in receipt of valid affidavits for all 19 electors." Stip. ¶ 26. The sufficiency of the 13,000-plus signatures was never questioned; the ticket's own affidavits and fee had been accepted; nothing else was found wanting. *See* Stip. Ex. F. The Department's own withdrawal form, meanwhile, set the deadline for a nominated candidate to withdraw at August 12, 2024 — eleven days after the filing deadline by which a completed slate's affidavits were due. Stip. Ex. J.

Justice for All was not alone. The presidential tickets of two other political bodies — the Constitution Party and the Party for Socialism and Liberation — were kept from Pennsylvania's 2024 ballot not because they failed to submit a sufficient number of valid signatures, but because of defects associated with their presidential electors' affidavits. *See* ECF No. 60 ¶ 69; ECF No. 77 at 8 (citing *Clymer*, 324 A.3d 640, and *In re De la Cruz*, 324 A.3d 632 (Pa. Cmwlth.), *aff'd*, 322 A.3d 883 (Pa. 2024)); JA Ex. 26 (*Clymer* petition). The Constitution Party's experience tracked this one: its ticket presented fifteen of the nineteen elector affidavits by the end of the filing day; its papers were rejected as to the presidential ticket alone; and the Commonwealth Court sustained the rejection as compelled by the Code — fifteen of nineteen, like eighteen of nineteen, equals zero. *Clymer*, 324 A.3d at 643–44, 655.

### D. The state-court proceedings and this action.

Three individuals identified as West/Abdullah electors sought mandamus in the Commonwealth Court on August 15, 2024. Stip. ¶ 28. The Secretary's verified Answer and New Matter in that action — sworn by Deputy Secretary for Elections and Commissions Jonathan Marks — admitted the mechanics of the filing-and-rejection sequence, Stip. ¶ 29; Stip. Ex. G ¶¶ 133–45, and offered, as its entire constitutional justification, a single sentence: "requiring affidavits from a political body's presidential elector candidates is a minimal but reasonable burden that is more than justified by the Commonwealth's interests." Stip. Ex. G ¶ 156. No interest was named. *See id.* The Commonwealth Court dismissed principally on laches, the Supreme Court of Pennsylvania affirmed, and Dr. West and Dr. Abdullah's application to intervene in those proceedings yielded no relief before the election. *See Williams v. Pa. Dep't of State*, 325 A.3d 1041 (Pa. Cmwlth.), *aff'd*, 326 A.3d 393 (Pa. 2024); Stip. ¶ 30.

When the Department posted its guidance in June 2024, no court had decided whether a political body's presidential electors are "candidates" within Section 951. That question has since been settled, and the Department's interpretation is now the law of Pennsylvania. In *Clymer v. Schmidt* — a mandamus action commenced in the Commonwealth Court on August 5, 2024 by the Constitution Party's presidential ticket — the court adopted the Department's reading as the correct construction of the Election Code. Decided on August 23, 2024, *Clymer* was initially an unreported decision without precedential effect, *see* 210 Pa. Code § 69.414(a); it was affirmed per curiam and, on September 19, 2024, ordered published. *aff'd*, 322

A.3d 929 (Pa. 2024). As published, *Clymer* holds that political-body presidential electors are "candidates" who must file Section 951(e) affidavits; that the Election Code "affords the Department … no discretion to accept a facially deficient nomination paper"; that papers presenting fewer than all nineteen affidavits must be rejected in their entirety; and that substitution "is only possible where the initial candidate was properly nominated," so a slate broken before acceptance cannot be repaired. 324 A.3d at 649–55; *see id.* at 658 n.17 (absent acceptance there is "no nomination … from which to withdraw").

Plaintiffs filed this action on September 25, 2024. ECF No. 1. Following an evidentiary hearing on a stipulated factual record, ECF Nos. 26, 29, the Court issued an order denying a temporary restraining order and preliminary injunction. In the accompanying opinion explaining the basis for its decision, the Court agreed that, on the record before it, Plaintiffs were clearly likely to succeed on the merits but, citing *Purcell*'s prohibition against late-breaking changes to the electoral machinery, concluded that an order directing the Secretary to include Plaintiffs West and Abdullah on the ballot would be inappropriate. ECF No. 33 at 6, 12.[7]

Following the election, the Court denied the Secretary's Rule 12(b)(6) motion "for the reasons stated in" ECF No. 33 and directed an answer, ECF No. 49; *see* ECF No. 51, and Plaintiffs filed the Amended Complaint on February 7, 2025, reasserting both counts as facial and as-applied challenges directed to the 2028 cycle, ECF No. 60 ¶¶ 77–81, 104.

[7] Injunctions pending appeal were denied at every level. ECF No. 41; ECF No. 77 at 2.

On September 11, 2025, the Court dismissed the Department on Eleventh Amendment grounds and otherwise denied the Secretary's Rule 12(b)(1) motion, holding the claims ripe and within the capable-of-repetition exception to mootness, and the Secretary amenable to suit under *Ex parte Young*. ECF No. 77; *West v. Pa. Dep't of State*, 801 F. Supp. 3d 559 (W.D. Pa. 2025). Limited fact discovery ensued and has now concluded. Indeed, although Plaintiffs answered the Secretary's interrogatories and document requests, JA Exs. 27–31, and fact discovery closed on March 31, 2026, ECF No. 83, the record contains no deposition testimony and no expert opinion and is in most (if not all) material respects stipulated. *See* Stip. ¶¶ 1–58.

**E. Plaintiffs and the 2028 election.**

Dr. West is keeping open the option of a 2028 presidential candidacy, and it is likely, though not certain, that he would again seek to run as the candidate of the Justice for All political body; Pennsylvania supporters have continued since 2025 to organize a Justice for All political body as part of the Justice for All National Committee, formed in 2025, in anticipation of identifying electors in advance of the 2028 nomination-papers deadline. JA Ex. 28, Answers to Interrogatory Nos. 3–4. Neither Dr. West nor Dr. Abdullah has made a final decision, and no formal recruiting of electors for 2028 has begun. Stip. ¶¶ 57–58. The Voter Plaintiffs — registered Pennsylvania electors who signed the 2024 nomination papers, two of whom were themselves named as electors and one of whom submitted substitute-elector documentation — intend to vote in the 2028 general election and hope to cast their votes for political-body candidates. Stip. ¶ 3; ECF No. 60 ¶¶ 18–22, 78.

## III. STANDARD OF REVIEW

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A dispute is genuine only if a reasonable factfinder could resolve it for the nonmovant, and material only if it could affect the outcome. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where cross-motions are anticipated, each motion is evaluated on its own merits. *See Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008). Here the material facts are stipulated, Stip. ¶¶ 1–58, and the application of the *Anderson–Burdick* framework to undisputed facts presents questions of law for the Court.

## IV.ARGUMENT

### A. The *Anderson–Burdick* framework governs both counts and requires the Secretary to justify the burden with precise, record-supported interests.

The First Amendment's guarantee of freedom of association includes not only "the right of individuals to associate for the advancement of political beliefs" and to "select a standard bearer who best represents [their] ideologies and preferences," but also the right of the chosen candidate to access the ballot. *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979); *Patriot Party of Allegheny Cnty. v. Allegheny Cnty. Dep't of Elections*, 95 F.3d 253, 258–59 (3d Cir. 1996) (quoting *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 224 (1989)). Ballot-access restrictions implicate the right to vote itself, because "voters can assert their preferences only through candidates or parties or both" —

and "[f]reedom to associate for political ends has little practical value if the [political parties or bodies] cannot place their candidates on the ballot and have an equal opportunity to win votes." *Socialist Workers Party*, 440 U.S. at 184 (cleaned up); *Const. Party of Pa. v. Cortes*, 116 F. Supp. 3d 486, 499 (E.D. Pa. 2015), *aff'd*, 824 F.3d 386 (3d Cir. 2016).

In this context, associational and equal-protection claims "are nearly identical" and are analyzed together under the same general framework: the Court examines the degree to which the challenged state action burdens the constitutional right and, based on that assessment, determines whether a sufficiently strong justification has been proffered for imposing such a burden.[8] *Cortes*, 116 F. Supp. 3d at 498; *see* ECF No. 33 at 3 n.3; *Patriot Party*, 95 F.3d at 258.

Under *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992), that analysis "requires a weighing process": courts "consider what burden is placed on the rights which plaintiffs seek to assert and then [] balance that burden against the precise interests identified by the state and the extent to which these interests require that plaintiffs' rights be burdened." *Rogers v. Corbett*, 468 F.3d 188, 194 (3d Cir. 2006); *see Burdick*, 504 U.S. at 434. If the burden is severe, "the state's interest must be compelling and the law must be narrowly tailored to serve the state's interests." *Reform Party of Allegheny Cnty. v. Allegheny Cnty. Dep't of Elections*, 174 F.3d 305, 310 (3d Cir. 1999) (en banc); *see Timmons v.*

---

[8]Under the "general framework for analyzing constitutional challenges to state election laws," a court "applies a fact intensive balancing test that weighs the burden that the state election law places on a political party against the state's asserted justification for the law." *Patriot Party*, 95 F.3d at 258 (cleaned up).

*Twin Cities Area New Party*, 520 U.S. 351, 358 (1997); *Norman v. Reed*, 502 U.S. 279, 288–89 (1992). Where "the burdens, although not trivial, [a]re not severe," courts apply "an intermediate level of scrutiny, in which the State's asserted regulatory interests need only be sufficiently weighty to justify the limitation imposed on the minor party's rights." *Reform Party*, 174 F.3d at 314.

Only "reasonable, nondiscriminatory restrictions" earn deferential review, *Kim v. Hanlon*, 99 F.4th 140, 155 (3d Cir. 2024) (cleaned up) — and because "[a] burden that falls unequally on new or small political parties or on independent candidates impinges, by its very nature, on associational choices protected by the First Amendment," courts have been "especially skeptical" of ballot restrictions that, in practice or in effect, impose additional barriers to ballot access for upstart candidates. *Patriot Party*, 95 F.3d at 262 (quoting *Anderson*, 460 U.S. at 793); *accord Reform Party*, 174 F.3d at 315.

Two more features of the framework are significant. First, the justification burden is the Secretary's, and it is exacting: a court "cannot speculate about possible justifications" but "must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Reform Party*, 174 F.3d at 315 (cleaned up).[9] Second, in judging the severity of the burden, the Court "must look to the actual effect that the restriction will have on the party," *Patriot Party*, 95 F.3d at 259 — a holistic examination, because "a number of

[9] Notably, this principle holds true even under intermediate scrutiny, for a court may not "supplant the precise interests put forward by the State with other suppositions." *Edenfield v. Fane*, 507 U.S. 761, 768 (1993); *see Reform Party*, 174 F.3d at 315.

facially valid provisions of election laws may operate in tandem to produce impermissible barriers to constitutional rights." *Storer v. Brown*, 415 U.S. 724, 737 (1974).[10] The Third Circuit has therefore rejected "fragmentation" of a combined scheme into discrete — seemingly harmless — pieces, cautioning that such an approach "would prevent meaningful review of the real harm caused by the statutory scheme." *Const. Party of Pa. v. Cortes*, 824 F.3d 386, 398 (3d Cir. 2016) (cleaned up).

### B. The stipulated record establishes a severe, discriminatory burden triggering heightened scrutiny.

#### 1. *The construct discriminates on its face between political bodies and the major parties.*

This Court has already held — correctly — that the challenged restrictions "are facially discriminatory, directed only to minor political parties and political bodies," and that this discrimination forecloses rational-basis review. ECF No. 33 at 4–5. The stipulation now locks in the comparison. A political body's nineteen presidential electors must be identified by name, residence, and occupation on every sheet of the nomination papers before circulation, Stip. ¶ 37; must each file a candidate's affidavit by the filing deadline, Stip. ¶ 7; must each satisfy the disaffiliation requirement, Stip. ¶¶ 7, 24; ECF No. 29 ¶ 10 (JA Ex. 5); and cannot be

---

[10] *See also Molinari v. Powers*, 82 F. Supp. 2d 57, 71 (E.D.N.Y. 2000) ("The conclusion that the New York ballot access scheme poses an undue burden in its totality invokes the application of the principle 'that a number of facially valid provisions of election laws may operate in tandem to produce impermissible barriers to constitutional rights.'" (quoting *Storer*, 415 U.S. at 737)); *McLaughlin v. N.C. Bd. of Elections*, 850 F. Supp. 373, 393–94 (M.D.N.C. 1994) (the court must examine whether the "totality" of the scheme, with its provisions "operating in conjunction," "freeze[s]" the status quo by preventing all candidates other than the two major parties' from any realistic access to the ballot), *aff'd*, 65 F.3d 1215 (4th Cir. 1995).

substituted unless and until the Secretary accepts the papers, *see* ECF No. 33 at 4 (citing *Scroggin*, 237 A.3d at 1022–23).

A major party's electors, performing the identical December function, are named by the party's presidential nominee thirty days (or more) after the convention, by a bare communication of names and addresses; they file no affidavit, make no disaffiliation attestation, pay nothing, and the party's tardiness costs its ticket nothing. Stip. ¶¶ 31–34; 25 P.S. § 2878. Indeed, a major party's electors need not even be members of the party whose ticket they serve. *See* 25 P.S. § 2878; Stip. ¶ 33.

The Election Code, as authoritatively construed, thus makes the same office — presidential elector — a regulated "candidacy" for political bodies alone, and none of this remains contestable as a matter of state law: *Clymer* grounds the affidavit obligation in the Code's treatment of political-body electors as "candidates," and identifies no corresponding obligation of any kind for the electors of the major parties. 324 A.3d at 649–51, 656–57. The multitude of hurdles that a presidential candidate faces because of contrived formalities relative to presidential electors plainly skews the electoral landscape against political participation by disfavored upstart parties.

The filing-fee dimension confirms both the discrimination and its source. Because Section 954 attaches the nomination-petition fee to "each candidate nominated by a nomination paper," 25 P.S. § 2914, and because the Department's own instructions direct that "[a] separate filing fee must be submitted for each

candidate named in the nomination paper," Stip. Ex. A ¶ 11(b), the challenged construction prices a political body's presidential filing, by the Code's terms, at $4,200 — $200 for each of twenty-one "candidates" — where a major party's ticket and slate file for nothing. *See* 25 P.S. §§ 2878, 2914; Stip. Ex. A ¶ 11(a); ECF No. 33 at 4 n.5 ("the affidavit requirement triggers a filing fee for not only the presidential candidates but the presidential electors too, totaling $4,200"; "[a]s the Court understands it, the major parties don't pay the elector fee").

The Department, to be sure, has not in practice demanded the elector fee from anyone. Stip. ¶ 34. That forbearance is no answer: after *Clymer*, the "candidate" label — and the fee Section 954 attaches to it — is a consequence of the statute, and all that stands between a political body and a nineteen-fee surcharge is an unwritten restraint appearing in no statute, regulation, or published instruction. A statute is measured by what it authorizes, not by the government's present willingness to hold back. *See United States v. Stevens*, 559 U.S. 460, 480 (2010) ("[T]he First Amendment protects against the Government; it does not leave us at the mercy of noblesse oblige."). And the Department's selective administration of the label — enforcing its affidavit incident to the point of total exclusion while waiving its fee incident entirely — confirms that no asserted state interest actually requires the full weight of treating electors as candidates.

#### 2. *The requirements operate in tandem to make ballot access turn on the least available signature: the nineteenth affidavit.*

The severity of the burden lies in the combination. Under the challenged construct, if any one of the nineteen individuals identified as presidential electors

becomes unable or unwilling to serve in that role, every signature obtained to that point is rendered invalid. Because all nineteen electors must appear on each sheet before circulation, the slate is frozen from day one — in this case, from the moment the campaign finalized its template on April 24, 2024, and as a practical matter from the February 14 opening of the circulation window. Stip. ¶¶ 5, 37, 40. Because each of the nineteen must then deliver a compliant affidavit by the filing deadline, every signature gathered over the six-month window is hostage to the continuing availability, eligibility, and cooperation of nineteen private volunteers for an unpaid, unlisted role. Stip. ¶¶ 7, 37; *see* Stip. ¶¶ 10–12, 35.

And because the Department's "cure" deadline is the filing deadline itself, Stip. ¶ 44, with its own withdrawal form setting a withdrawal deadline eleven days after the papers came due, Stip. Ex. J, the scheme offers no functioning mechanism by which even a diligent campaign can repair a slate broken by events outside its control.

That the obstacle was nearly insurmountable is illustrated by the only "options" available to Justice for All when it learned, shortly before the deadline, that some of the individuals originally listed as presidential electors would have to be replaced. The first was to persuade individuals no longer willing or able to serve to nonetheless execute a candidate's affidavit — completing the nomination so that, upon acceptance, they could withdraw and the committee authorized to fill vacancies could appoint replacements. *See Scroggin*, 237 A.3d at 1023 ("The authorized party committee can make substituted nominations only when the duly

nominated candidate of the party dies or withdraws as a candidate. Before there can be a 'substituted nomination' there must have been a nomination." (quoting *Watson v. Witkin*, 22 A.2d 17, 21 (Pa. 1941))). After the process was explained to them, some of the individuals originally listed agreed to do exactly that, and the vacancy committee convened and executed substitute-nomination paperwork. Stip. ¶ 50; Stip. Exs. J–K. But an elector who could not truthfully execute the affidavit — like the identified elector disqualified by the disaffiliation rule, Stip. ¶ 54 — could not take even that step, and *Clymer* has since confirmed that absent acceptance there is "no nomination … from which to withdraw." 324 A.3d at 658 n.17.

Alternatively, Justice for All could have struck the names of the original electors on the already-circulated papers and replaced them with a new lineup. But the Secretary must reject nomination papers materially altered after circulation, *see* 25 P.S. § 2936; *Wilds v. Sec'y of Com. of Pa.*, 475 A.2d 847, 850 (Pa. Cmwlth. 1984), and because electors are "candidates" under the challenged construction, striking and replacing them would have been exactly such an alteration. The only remaining avenue was to discard the original nomination papers — reflecting the will of more than 13,000 registered voters — and begin the process anew, a practical impossibility in the time remaining. Stip. ¶¶ 5, 36.

Every path ended in the same place: rejection. Indeed, if all that were required of Justice for All had been the submission of affidavits from nineteen individuals eager to serve as presidential electors, in conjunction with the filing of the nomination papers, it is highly unlikely that this action would ever have been

brought: West and Abdullah could easily have obtained affidavits from nineteen willing individuals. The constitutional infirmity lies in the combination — a slate frozen before the first signature, an affidavit from each frozen member of that slate, and no lawful way to repair a break.

The 2024 record, set out in the Statement of Facts, shows exactly how this operates: a campaign that identified willing electors beginning in 2023, locked its slate in April, filed three weeks early with 13,000-plus signatures, and mounted every cure the construct nominally allowed nonetheless watched eighteen affidavits arrive instead of nineteen — because one identified elector was disqualified by the disaffiliation rule, two were unreachable, and others distrusted the outreach itself. Stip. ¶¶ 13–26, 36, 38–54. The Department rejected the nomination on a single stated ground: it was "not in receipt of valid affidavits for all 19 electors." Stip. ¶ 26 & Ex. F. More than 13,000 voters' signatures, never challenged, were nullified by one missing affidavit. Stip. ¶¶ 26, 36.

Nor was this a one-campaign misfortune: the same construct kept the tickets of the only other two nascent political bodies seeking statewide presidential access off the 2024 ballot, for the same reason. *See* ECF No. 60 ¶ 69; ECF No. 77 at 8; *Clymer*, 324 A.3d at 643–44. "[M]inor political parties are not the step-children of the American political process," *Patriot Party*, 95 F.3d at 261 — yet that is precisely the role to which the challenged construct relegates them. It does not merely "threaten to reduce diversity and competition in the marketplace of ideas," *Anderson*, 460 U.S. at 794; it has a proven track record of doing so.

Finally, the severity of these burdens is more pronounced because the restrictions have national implications. "[I]n the context of a Presidential election, state-imposed restrictions implicate a uniquely important national interest," and "the State has a less important interest in regulating Presidential elections than statewide or local elections, because the outcome of the former will be largely determined by voters beyond the State's boundaries." *Anderson*, 460 U.S. at 794–95; *see Cousins v. Wigoda*, 419 U.S. 477, 490 (1975) (the "pervasive national interest in the selection of candidates for national office … is greater than any interest of an individual State"). Courts have routinely treated the national-election dimension as an important factor in ascertaining the level of scrutiny. *See Council of Alternative Political Parties v. Hooks*, 179 F.3d 64, 73 (3d Cir. 1999) (state interest "appreciably greater" where a statute governs state and local rather than presidential elections); *Nader v. Connor*, 332 F. Supp. 2d 982, 988 (W.D. Tex. 2004), *aff'd*, 388 F.3d 137 (5th Cir. 2004).[11]

Yet Section 951, as authoritatively construed, turns *Anderson* on its head: it makes the disparity between the two ballot-access paths most pronounced in the presidential context. On this record, the burden is severe and strict scrutiny applies, *see Storer*, 415 U.S. at 737; *Patriot Party*, 95 F.3d at 259, 262 — but the Court need not fix the label to enter judgment: as it explained before, "both standards are heightened and both require Defendants to put forward more weighty and specific

[11] *Accord Cromer v. South Carolina*, 917 F.2d 819, 827 (4th Cir. 1990) (holding that, under *Anderson*, the fact that a challenged law "is strictly limited to state elections" constitutes "a significant difference").

interests that are, as applied to this case, furthered by the restrictions." ECF No. 33 at 5. Under either formulation, the construct fails.

### C. The Secretary has identified no precise, weighty interest that the construct actually furthers, and the stipulated record forecloses each interest he has suggested.

The justification burden is the Secretary's, and the place to carry it was this record. *See Reform Party*, 174 F.3d at 315; *Edenfield*, 507 U.S. at 768. He has not. In the state-court mandamus action, the Commonwealth's entire constitutional justification, in a verified pleading, was one unelaborated sentence — the affidavit requirement "is a minimal but reasonable burden that is more than justified by the Commonwealth's interests." Stip. Ex. G ¶ 156. In this Court, the Secretary's evidentiary submissions concerned only the feasibility of 2024 election-eve relief, not any interest served by treating electors as "candidates", *see* ECF Nos. 20-4, 40-1 (JA Exs. 21–22); ECF No. 33 at 8–9 — and discovery closed without the Secretary identifying, by declaration, document, or otherwise, any factual predicate for an interest that the construct serves. ECF No. 83.

What remains are the four rationales urged in his 2024 briefs, ECF No. 20 at 21–25; ECF No. 40 at 7–9 — each of which this Court found insufficiently "weighty and logically connected or tailored" on the preliminary record, ECF No. 33 at 5–6 & n.6, and each of which the now-stipulated record forecloses outright. Plaintiffs have searched in vain for any plausible state interest — let alone a compelling one — that is served by treating a political body's presidential electors as "candidates for public office."

**1. *A "modicum of support" is fully served by the signature requirement and has nothing to do with elector affidavits.***

The Commonwealth "surely" has an interest "in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot — the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election." *Jenness v. Fortson*, 403 U.S. 431, 442 (1971). Requiring a political body's presidential ticket to gather at least 5,000 signatures is a sensible measure in service of that interest — and Justice for All exceeded the threshold more than two and a half times over, without challenge. Stip. ¶¶ 6, 36.

But requiring the ticket's presidential electors to be listed on those papers and to file affidavits does nothing to further that goal, since it is the presidential and vice-presidential candidates who appear on the ballot — not their electors, whose names appear on no ballot, in no candidate database, and in no election materials. Stip. ¶¶ 10, 35; ECF No. 60 ¶¶ 43–45. No voter signs a nomination paper out of enthusiasm for a presidential elector. The rejection here nullified — rather than verified — a demonstrated modicum of support. Stip. ¶¶ 26, 36.

**2. *The anti-fraud rationale attests to nothing: there are no facts "pertinent to the candidacy" of an office with no ballot presence, no filings, and no pre-December function.***

The Commonwealth likewise has a settled interest in "protect[ing] the integrity of its political processes from frivolous or fraudulent candidacies," *Bullock v. Carter*, 405 U.S. 134, 145 (1972), and the Secretary invokes the affidavit's traditional role of "insur[ing] the legitimacy of information crucial to the election

process." *Scroggin, 237 A.3d at 1018–19 (cleaned up)*; ECF No. 20 at 22. If all the Secretary required were that a political body's papers be accompanied by affidavits from nineteen individuals willing and eager to serve, reliance on these well-recognized interests would at least be understandable. But viewed in its combined effect, there is no sense in which the "integrity of the political process" is protected by denying ballot access merely because some of the individuals who originally agreed to serve as electors for an upstart body later became unwilling or unable to do so — and nothing about that ordinary human fact makes the candidacy of the ticket itself "frivolous or fraudulent." *Id.*

Nor is there anything for the affidavit to verify. For an actual office-seeker, the affidavit confirms facts the electorate and the ballot depend on. For a political body's presidential elector there are no comparable "facts pertinent to [the] candidacy": the elector's name appears on no ballot and in no election materials, Stip. ¶¶ 10, 35; the office carries no campaign-finance obligations, Stip. ¶ 12; and it involves no function whatsoever unless and until the ticket wins the Commonwealth, weeks after the election, Stip. ¶ 11. *Clymer*'s observation that the generic ballot label "Presidential Electors" signifies that voters are "really voting for" the electors collectively, 324 A.3d at 649–50, changes nothing: no voter can cast a ballot for or against any individual elector, and no elector's name, identity, or qualification is ever before the electorate.

The only elector-specific "qualification" the affidavit polices — disaffiliation — is a qualification only because the challenged construction makes electors

"candidates" in the first place; the rationale is circular. And the Commonwealth itself does not believe the attestation is crucial: it requires nothing — no affidavit, no attestation, no filing of any kind by the elector personally — from the major parties' electors who perform the identical December function and who, in every modern election, actually cast Pennsylvania's electoral votes. Stip. ¶¶ 32–33.

Despite its facial appeal, then, the anti-fraud rationale does not withstand scrutiny, for it offers no justification for treating the presidential electors of political bodies differently than those of political parties. An anti-fraud measure applied only to the entrants least capable of absorbing it, and dispensed with entirely for the participants who matter most, is not a tailored fraud protection; it is a barrier. *See Bullock*, 405 U.S. at 145; *Socialist Workers Party*, 440 U.S. at 185 (states must employ "the least drastic means" of achieving their ends).

#### 3. *The disaffiliation and "sore loser" rationale is, as this Court found, attenuated as applied to electors — and the major-party comparison destroys it.*

The disaffiliation requirement, in conjunction with the "sore loser" rule, exists to keep defeated primary candidates from "obtaining a second bite at the ballot." *De La Fuente v. Cortes*, 751 F. App'x 269, 273–74 (3d Cir. 2018); ECF No. 20 at 21–22. Such provisions are sensible as applied to other offices, where they mirror the Election Code's requirement that primary candidates be registered members of their respective parties. But disaffiliation makes no sense here, because a major party's presidential electors need not be affiliated with that party at all. *See* 25 P.S. § 2878; Stip. ¶ 33.

As this Court observed, there is no evidence that Dr. West or Dr. Abdullah is a sore primary loser, and "even if they were, that justification is attenuated when applying the disaffiliation requirement to presidential electors, as opposed to the actual candidates." ECF No. 33 at 6 n.6. The record has only hardened: in 2024 the requirement's demonstrated operation was to disqualify a willing volunteer over her party registration and to invalidate the affidavits of two of the named Plaintiffs — ordinary registered voters, not primary candidates of anyone — who struck the clause. Stip. ¶¶ 24, 54.

And the Secretary's remaining gloss — that disaffiliation matters because Pennsylvania does not punish "faithless electors," ECF No. 40 at 9 — proves the opposite: if electors of every stripe are legally free in December, a springtime registration attestation binds no one's electoral-college vote, and the Commonwealth accepts precisely that freedom, without any attestation, from the two parties whose electors have cast every Pennsylvania electoral vote in living memory. Stip. ¶¶ 32–33. An interest the State declines to protect where it is most implicated cannot justify a burden imposed only where it is least implicated. *See Anderson*, 460 U.S. at 793; *Williams v. Rhodes*, 393 U.S. 23, 30–31 (1968).

#### 4. *The "genuine, willing, full slate" rationale is defeated by the statute's own design and by what the construct did in application.*

The Secretary's most developed argument is that Pennsylvania must be assured of "a full slate of people who know that they are being nominated and are willing to serve," so that the Commonwealth casts its full nineteen electoral votes.

ECF No. 40 at 7–9. The interest is legitimate in the abstract; the construct is not tailored to it, in four independent ways, each now stipulated.

First, the Election Code itself refutes any claim that early, verified slate lock-in is necessary. For major parties, the slate need not even exist until thirty days after the convention — mid-summer of the election year — and a late slate costs the ticket nothing. 25 P.S. § 2878; Stip. ¶ 31. The Secretary has never articulated any interest in requiring a political body to have its electors identified, disaffiliated, and sworn before it may even begin circulating nomination papers, while allowing a major party thirty days (or more) after its nomination to supply bare names and addresses — and requiring new parties to commit months before established ones has "generally been viewed as constitutionally suspect." *See Patriot Party*, 95 F.3d at 262 (noting that *Anderson* invalidated a statute that "required independent candidates to file nominating petitions several months before candidates of political parties were required to file their documentation"); *Williams*, 393 U.S. at 31–32.

Second, willingness attested in the spring guarantees nothing in December; what actually secures a full slate is the ability to fill vacancies. The Code supplies that mechanism — substitute nomination before the election, 25 P.S. §§ 2940–2941, and vacancy-filling by the assembled electors themselves on the day the votes are cast, 25 P.S. § 3193 — for everyone. The challenged construct does not augment those protections; it forecloses them at the only moment they matter for a political body, because no substitution is possible until the papers are accepted, and the

papers will not be accepted without all nineteen affidavits. *See* ECF No. 33 at 4; *Scroggin*, 237 A.3d at 1022–23; Stip. ¶¶ 49–50 & Exs. J–K.

Third, the construct's demonstrated operation disserves the asserted interest. Applied in 2024, it did not produce a fuller, more reliable slate; it produced no slate, no ticket, and the nullification of 13,000 voters' signatures, over the gap between eighteen affidavits and nineteen. Stip. ¶¶ 20–26, 36. A rule that destroys the participation it purports to secure "is not a means narrowly drawn to serve" the asserted end. *Norman*, 502 U.S. at 289–90; *see Obama for Am. v. Husted*, 697 F.3d 423, 433–34 (6th Cir. 2012) (vague invocations of administrative interest do not carry the State's burden under heightened review).

Fourth, whatever force an advance-verification interest might have, the Commonwealth's administration of it in 2024 forfeits the tailoring claim: the FAQ announcing that electors "must file candidates' affidavits" was not posted until June 7, 2024 — nearly four months after circulation opened and six weeks after this campaign's slate was locked onto its sheets — and the only "cure" window the Department offered expired at the filing deadline itself. Stip. ¶¶ 40, 43–44. A genuinely administrative requirement announced after the point of no return, with no functioning cure, operates as a trap, not a safeguard.

#### 5. *Neither Jenness nor Clymer's constitutional holding — which does not bind this Court — can sustain the construct.*

Finally, the Secretary has argued that the political-body path is merely "different," and on balance gentler, than the major parties' primary route, ECF No. 20 at 23–25, echoing *Jenness*, 403 U.S. at 441 — and *Clymer* itself sustained the

affidavit requirement against First Amendment, equal-protection, and state-constitutional challenge, concluding the burden was "minor" and justified by sore-loser and election-administration-and-integrity interests. 324 A.3d at 655–58. *Clymer*'s statutory holdings bind this Court; its federal constitutional conclusion does not. *See Mitchell*, 508 U.S. at 483–84. And this Court has already — respectfully, and correctly — declined to follow that conclusion, because its premise fails: treating electors as "candidates" is not nondiscriminatory; it "triggers requirements that apply to minor political parties and political bodies and not to the two major parties," so the deferential review reserved for "reasonable, nondiscriminatory restrictions" never attaches. ECF No. 33 at 6 n.7; *Kim*, 99 F.4th at 155.

Nor could *Clymer*'s analysis survive this record. Deciding cross-applications for summary relief in the weeks before a general election, the *Clymer* court evaluated the affidavit requirement in isolation — a "single-page affidavit" with a six-month runway, 324 A.3d at 657 — without the combined-effect analysis that *Storer* and *Cortes* require and without confronting the office-specific comparison to 25 P.S. § 2878. It never weighed, as one scheme, the pre-circulation lock-in of the full slate, the disaffiliation disqualification, the absence of any functioning cure, and its own holdings that rejection is mandatory and substitution impossible before acceptance.

Those statutory holdings supply precisely the severity its constitutional discussion discounted: a six-month window is no answer when, twice in 2024 — on

*Clymer*'s facts and on this stipulated record — fifteen or eighteen affidavits of nineteen equaled total exclusion. *Id.* at 643–44, 655; Stip. ¶¶ 18–26, 36. *Jenness* sustains different paths of comparable seriousness; it does not license the Commonwealth to impose, on new parties alone, a nineteen-person unanimity requirement enforceable by total exclusion. And the two interests *Clymer* accepted on the Secretary's say-so are the same two interests the stipulated record here dismantles. *See supra* Sections IV.C.2–C.4.

### D. For the same reasons, the construct denies Plaintiffs the equal protection of the laws.

The equal-protection analysis "is similar in many respects to the balancing test" above, *Patriot Party*, 95 F.3d at 269, measuring "the totality of the burden" against the State's justifications, *id.*[12] — and largely for the same reasons that the unequal burdens placed on Plaintiffs violate the First Amendment, they also violate the Equal Protection Clause: they give "established parties a decided advantage over any new parties struggling for existence and thus place substantially unequal burdens on both the right to vote and the right to associate." *Williams*, 393 U.S. at 31.

The classification is explicit, and after *Clymer* it is statutory — electors are "candidates" only when a political body or minor party names them, Stip. ¶¶ 7, 31–33; *Clymer*, 324 A.3d at 649–51. And as evidenced by the fact that three political

[12]"[I]n order to determine whether election laws violate the Equal Protection Clause, [courts] must measure the totality of the burden that the laws place on the voting and associational rights of political parties and individual voters against the justifications that the State offers to support the law." *Patriot Party*, 95 F.3d at 269 (cleaned up).

bodies were denied 2024 ballot access exclusively because of defects associated with their presidential electors' affidavits, Stip. ¶¶ 20–26; ECF No. 77 at 8, the construct "help[s] to entrench the decided organizational advantage that the major parties hold over new parties struggling for existence." *Patriot Party*, 95 F.3d at 269. It violates the Fourteenth Amendment on its face and as applied, and judgment should enter on Count II as on Count I.

### E. Plaintiffs' claims remain justiciable, and the Court should enter declaratory and permanent injunctive relief now — the timing this Court itself commended.

#### 1. *Justiciability is settled, and the stipulated record confirms it.*

The Court held at ECF No. 77 that these claims are ripe, that they sit comfortably within the capable-of-repetition-yet-evading-review exception given the compressed election-litigation calendar, and that the Secretary is properly before the Court under *Ex parte Young*. ECF No. 77 at 5–15; *see Merle v. United States*, 351 F.3d 92, 95 (3d Cir. 2003) (two years between elections is too short for full litigation); *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 462–63 (2007) (requiring only a reasonable expectation of "materially similar" recurrence).

The summary judgment record supplies the evidentiary counterpart to the allegations the Court credited: Dr. West is keeping a 2028 candidacy open and would likely again run as Justice for All's candidate; Justice for All supporters have organized a national committee and a continuing Pennsylvania political body with elector identification as one of its anticipated functions; and the Secretary has never disavowed the challenged construction — his position remains that "the Election

Code considers presidential electors to be candidates and requires each candidate of a political body to submit an affidavit." Stip. ¶¶ 57–58; JA Ex. 28, Answers to Interrogatory Nos. 3–4; Stip. Ex. G ¶¶ 76–77, 80–81. The controversy is live, concrete, and — for the first time in this litigation — nowhere near an election.

*Clymer* removes whatever speculative quality the Secretary once attributed to 2028. At the pleading stage he suggested that the Department might "work with" political bodies to "devise sensible solutions," or that its approach could change — suggestions this Court noted were no disavowal. ECF No. 62 at 5–6; ECF No. 77 at 7 n.5. That door is now closed. The construction the Secretary urged, obtained, and successfully defended through the Supreme Court of Pennsylvania is binding precedent, and its application is ministerial: the Code "affords the Department … no discretion to accept a facially deficient nomination paper," and "without a full slate of properly nominated presidential electors … the Department is without the authority to accept" a political body's papers. *Clymer*, 324 A.3d at 652, 655. Enforcement in 2028 is not a prediction about administrative behavior; it is a legal certainty — which is precisely why pre-enforcement adjudication now, rather than another emergency posture in the summer of 2028, is the responsible course.

#### 2. ***Actual success on the merits and the equitable factors warrant a permanent injunction.***

A permanent injunction follows from actual success on the merits together with the familiar equitable factors: irreparable injury, the inadequacy of legal remedies, the balance of hardships, and the public interest. *See Shields v. Zuccarini*, 254 F.3d 476, 482 (3d Cir. 2001); *TD Bank N.A. v. Hill*, 928 F.3d 259, 278

(3d Cir. 2019). Success on the merits is established above. The injury is irreparable as a matter of law: “the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury,” *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *accord Kim*, 99 F.4th at 159, and no damages remedy exists — or could exist against this Defendant — for a ballot access lost or chilled.

“The election is a single event incapable of repetition, and it is of such paramount importance to both the candidate and his community, that denying a candidate his effective participation in it is … of great, immediate, and irreparable harm.” *Loftus v. Twp. of Lawrence Park*, 764 F. Supp. 354, 359 (W.D. Pa. 1991) (cleaned up); *see Council of Alternative Political Parties v. Hooks*, 121 F.3d 876, 883 (3d Cir. 1997) (an infringement on ballot access “cannot be alleviated after the election”).

The balance of hardships and the public interest merge where the government is the opposing party, *see* ECF No. 33 at 7 n.8 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)), and both favor judgment: the Secretary has no cognizable interest in enforcing an unconstitutional construct, while “[i]n the absence of legitimate, countervailing concerns, the public interest clearly favors the protection of constitutional rights, including the voting and associational rights of alternative political parties, their candidates, and their potential supporters.” *Council of Alternative Political Parties*, 121 F.3d at 883–84.[13] “It is to be expected that a voter

[13] *See also Madera v. Detzner*, 325 F. Supp. 3d 1269, 1283 (N.D. Fla. 2018) (“The public interest is always served by more equitable, easier access to the ballot.”); *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005) (“[C]autious protection of the Plaintiffs’ franchise-related rights is without question in the public interest.”).

hopes to find on the ballot a candidate who comes near to reflecting his policy preferences on contemporary issues," and "[t]he right to vote is heavily burdened if that vote may be cast only for major-party candidates at a time when other parties or other candidates are clamoring for a place on the ballot." *Anderson*, 460 U.S. at 787–88 (cleaned up).

The stakes are no smaller now than they were in 2024. The primary values protected by the First Amendment — "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open" — are "served when election campaigns are not monopolized by existing political parties[.]" *Anderson*, 460 U.S. at 794 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). And in the specific context of presidential elections, ballot-access restrictions must be examined with particular care, because they "implicate a uniquely important national interest" with "an impact beyond [the State's] own borders." *Id.* at 794–95. Upstart political movements remain crucial to advancing diversity of thought and ensuring competition in the marketplace of ideas; yet, absent judicial intervention, the same obstacles that kept three presidential tickets off Pennsylvania's 2024 ballot will stand as an unconstitutional barrier in 2028.

And the one consideration that defeated relief in October 2024 now supports it. *Purcell* counsels against judicial alteration of election rules on the eve of voting; its corollary is that constitutional adjudication should happen early, in the calm between cycles. *See* ECF No. 33 at 7–12. This Court said as much: had the case been brought earlier, "the result, at least on the present record, may have been different."

ECF No. 33 at 12. Judgment entered now — more than two years before the 2028 general election and well before any 2028 circulation period opens — gives the General Assembly and the Department ample time to conform their forms, instructions, and guidance, and gives every 2028 participant what *Purcell* values most: clear, settled rules of the road. Declaratory relief under 28 U.S.C. § 2201 and a permanent injunction in the form proposed with Plaintiffs' motion are the orderly path.

**V. CONCLUSION**

Minor political parties serve a crucial role in our elections: the values at the heart of the First Amendment are "served when election campaigns are not monopolized by existing political parties." *Anderson*, 460 U.S. at 794. For the reasons above, Plaintiffs respectfully request that the Court grant their motion, enter judgment in their favor on Counts I and II of the Amended Complaint, declare that Section 951 of the Election Code, as authoritatively construed and as enforced by the Secretary — requiring a political body's presidential electors to submit candidate's affidavits, including the disaffiliation attestation, as a condition of the body's presidential ticket's access to the ballot — violates the First and Fourteenth

Amendments, and permanently enjoin the Secretary from enforcing it. Plaintiffs stand ready to present oral argument if it would assist the Court.

Date: August 21, 2026

Respectfully submitted,

/s/ Shohin H. Vance
SHOHIN H. VANCE (No. 323551)
SAXTON & STUMP
100 Deerfield Lane, Suite 240
Malvern, PA 19355
Phone: 484.328.8512
svance@saxtonstump.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Shohin H. Vance, hereby certify that I have caused all parties to be served on this day with the foregoing Brief in Support of Plaintiffs' Motion for Summary Judgment via the Court's ECF system.

Date: August 21, 2026

By: /s/ Shohin H. Vance
SHOHIN H. VANCE