**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CORNEL WEST AND MELINA ABDULLAH, *et al.*, | |
| Plaintiffs, | CIVIL ACTION No. 24-1349 |
| v. | |
| PENNSYLVANIA DEPARTMENT OF STATE, *et al.*, | |
| Defendants. | |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendant Al Schmidt, in his official capacity ("Secretary Schmidt"), by counsel, respectfully submits this reply memorandum of law in further support of his Motion for Summary Judgment (ECF No. 101) and in opposition to Plaintiffs' Motion for Summary Judgment (ECF No. 97).[1]

## I. INTRODUCTION

This case comes down to a straightforward question: What exactly is the West/Abdullah 2028 campaign required to do with respect to identifying and maintaining presidential electors, and how burdensome, on balance, is that requirement for the campaign?

Secretary Schmidt's opening brief set forth the answer to this question: The campaign must find 19 electors, eligible under Pennsylvania law; those electors must either not be affiliated with a major party or disaffiliate from those parties before the 2028 primary election;

[1] Defendant's initial brief, ECF No. 102, will be referred to as "Def. Br." Plaintiffs' responsive brief, ECF No. 104, will be "Pl. Br." Terms defined in Defendant's previous brief are incorporated into this brief.

each elector must sign an affidavit attesting to their eligibility and willingness to serve; and those affidavits must be submitted with additional candidate paperwork by the August 1 deadline. That is all this case is about. This burden, for a candidate for President of the United States, is minimal. It does not require substantial effort on the part of a presidential campaign, it does not place an unreasonable barrier to the general election ballot, and it is far less than the administrative burden faced by candidates seeking access to the ballot via a major party's nomination. Plaintiffs offer no concrete facts demonstrating that they face any real burden or unfair discrimination.

Under the *Anderson-Burdick* framework, which the parties agree applies here, the affidavit requirement presents a minimal burden on presidential campaigns and serves a critical government interest. The affidavit requirement ensures that, for every candidate who appears on Pennsylvania's general election ballot, Pennsylvanians can be confident that the candidate can execute their constitutional function in the Electoral College if he or she is certified as the winner. The administrative burden on the campaigns from the affidavit requirement is small, but the potential chaos from an improperly administered process is large.

The affidavit requirement is a reasonable and necessary step to help the Department ensure proper execution of the Electoral College vote. The Court should grant summary judgment in favor of Secretary Schmidt.

## II. ARGUMENT

### A. Plaintiffs Have Not Shown that the Affidavit Requirement Demands Heightened Scrutiny

The parties agree that Plaintiffs' claim turns on the *Anderson-Burdick* balancing test, and that the first step in that test requires identifying the severity of the burden placed on Plaintiffs. But Plaintiffs fail to marshal the facts or law to show a substantial burden, either because the law

is difficult to follow or because it places an unfair barrier to the general election ballot vis-à-vis a major party candidate. At bottom, Plaintiffs provide insufficient facts for this Court to invoke heightened scrutiny under step 1 of *Anderson-Burdick*.

1. Plaintiffs Cannot Demonstrate Any Substantial Difficulty in Finding 19 Electors and Obtaining Affidavits from Each

Plaintiffs do not dispute that the affidavit requirement warrants only that they find 19 qualified presidential electors, submit an affidavit from each of the electors affirming that he or she is eligible and willing to act as an elector, and otherwise comply with Pennsylvania election law. *See* Def. Br. at 11-13. They do not attempt to support the argument that any of these obligations individually presents a substantial burden, because they cannot. Instead, Plaintiffs assert that the substantial burden comes from the "combined effect" of these rules. Pl. Br. at 5.

But Plaintiffs offer no analysis or support for the claim that these tasks present a substantial burden on a presidential campaign. They contend that, generally, multiple minor obligations ***can*** amount to a substantial burden, *see* Pl. Br. at 5-6, but they never explain why the tasks associated with the affidavit requirement ***actually do*** amount to a substantial burden.

Because Plaintiffs seem to agree that it is proper for campaigns to be required to find 19 willing and eligible electors, *see* Pl. Br. at 2, the lynchpin of Plaintiffs' asserted burden appears instead to be that they are stuck with the 19 electors they have chosen from spring 2028 until December 2028. "Timing," they argue, "is the heart of the burden." Pl. Br. at 9. But reality belies their complaint.

To start, finding 19 people out of 13 million Pennsylvanians who can continuously support for less than one year is not a substantial burden for a campaign. On the list of presidential campaign administrative tasks, it is hardly imposing.

But more importantly, Plaintiffs are wrong to assume that they are stuck with the 19 electors they initially select. After the initial affidavits are submitted with the rest of the campaign's paperwork, new elector affidavits can be submitted to replace an existing elector affidavit after August 1. *See* Def. Br. at 15. It is simply not the case that an elector can hold a campaign "hostage," *see* Pl. Br. at 9, because any elector attempting to do so, intentionally or not, can be replaced after August 1. Plaintiffs seem to argue that an elector cannot be replaced after August 1 because, if the elector needs to be replaced, he or she was never actually eligible in the first place. *See* Pl. Br. at 9.

This argument does not make sense—electors submit affidavits based on their intent and eligibility ***at the time the affidavit is signed***. *See* 25 P.S. § 2911(e) (describing the candidate affidavit averments in the present tense). Plaintiffs can have their electors sign affidavits when they are initially recruited. There is no basis for Plaintiffs' belief that, for example, if an elector truthfully signs an affidavit in January but moves out of Pennsylvania in July, that somehow means that the presidential candidate was never "properly nominated" in the first place. *See* Pl. Br. at 9 (citing *Clymer*, 324 A.3d at 655). In that case, the campaign would present the original 19 affidavits on August 1, and then immediately submit a new affidavit with an eligible replacement elector on August 2. There is no basis to argue that the Department of State would reject that substitution. Third parties and political bodies routinely submit nomination papers with "placeholder" candidates with the intent to substitute candidates after submission of the nomination papers. *In re Const. Party*, 323 A.3d 238, 241 (Pa. Cmwlth. 2024); *In re Scroggin*, 237 A.3d 1006, 1019 (Pa. 2020) ("use of a placeholder candidate is a permissible feature of the nominating process").

In sum, Plaintiffs have presented no record evidence to show that it substantially burdens political bodies to obtain 19 elector affidavits by the nomination paper deadline, especially when those affidavits can be replaced after the paperwork has been submitted on August 1.

Beyond the lack of factual evidence, Plaintiffs offer no legal authority that advances their claim. To support their argument here that the "combined effect" of steps required to comply with the affidavit requirement impose a substantial burden, Plaintiff cite to three cases: *Storer v. Brown*, 415 U.S. 724 (1974), *Const. Party of Pa. v. Cortes*, 824 F.3d 386 (3d Cir. 2016), and *Eakin v. Adams County Board of Elections*, 149 F.4th 291 (3d Cir. 2025). Pl. Br. at 6-7. However, none of these cases support Plaintiffs' contention or are helpful to their cause.

In *Storer*, the Supreme Court ruled a disaffiliation requirement for independent political candidates was not unconstitutional, because it was "obvious . . . that the one-year disaffiliation provision furthers the State's interest in the stability of its political system." 415 U.S. at 736. The Court then addressed a signature requirement, imposed on top of the disaffiliation rule, requiring candidates to gather 325,000 signatures in 24 days to access the ballot. The Court held that this requirement "would not appear to be an impossible burden," but remanded to the district court to decide whether this imposed "too great a burden on the independent candidates for the offices of President and Vice President." *Id.* at 740. But if 325,000 signatures in 24 days, imposed on top of a disaffiliation requirement, was a close call, obtaining 19 affidavits over nearly 18 months, even with that same disaffiliation requirement, cannot possibly be a close call. Far from standing for the proposition that the disaffiliation and affidavit requirement rules together impose a substantial burden, *Storer* demands the opposite conclusion.

*Cortes* is simply inapposite. That appeal concerned narrow issues of justiciability and appropriateness of relief granted by the district court. 824 F.3d at 389. Plaintiffs cite this for the

proposition that a court should not conduct fragmented review of separate election rules. Pl. Br. at 6. As a general matter that may be true, but *Cortes* addressed this argument in the context of the Eleventh Amendment and the scope of *Ex parte Young*, not *Anderson-Burdick*. 824 F.3d at 388-89.

Finally, *Eakin* does not support Plaintiffs' conclusion. While *Eakin* sets forth the various categories of burdens under Anderson-Burdick, *see* Def. Mem. at 11, it was a voting, not ballot access case, presenting a challenge to the requirement that voters must sign and date their mail-in ballots. On the first step of *Anderson-Burdick*, the Third Circuit held that the law imposed some burden on voters, but that the burden was minimal. 149 F.4th at 312. The Court then concluded that the state lacked an adequate interest to justify imposing that minimal burden. *Id.* at 317. Plaintiffs argue that *Eakin* controls because both the mail-ballot signature requirement and the affidavit requirement result in "a severe consequence," Pl. Br. at 7, but this ignores that, unlike in *Eakin*, the Commonwealth here has valid, specific, and important constitutional goals in imposing the affidavit requirement. *See* Def. Br. at 20-22. There was no similar justification for the signature and date requirement for mail ballots.

Plaintiffs' reliance on a footnote in *Eakin* to compare the affidavit requirement to "the presence of a typo in a petition" is puzzling. Pl. Br. at 7. This case is not about a typo in one elector affidavit causing a rejection of a candidate's paperwork; this case is about whether a candidate needs to find the electors and submit paperwork ***at all***. Further, if there is a typographical problem with the campaign's paperwork—an issue not presented by this case—the Department of State will work with the campaign to remedy it. In fact, that is exactly what happened in 2024, as the Department returned the West/Abdullah campaign's paperwork,

explained that it lacked presidential elector affidavits, and gave them the opportunity to resubmit. *See* SUF ¶ 19. This case is about substance, not form.

Plaintiffs have thus presented no facts or legal authority to support the conclusion that the affidavit requirement imposes on them a substantial administrative burden. There is no basis to apply heightened scrutiny.

2. The Different Rules for Political Body Candidates Is Warranted by the Primary and Convention Process that Major Party Candidates Face

Plaintiffs are largely correct that, when it comes to major party candidates and political body candidate, "the law treats them differently at every step." *See* Pl. Br. at 9. But there is no legal requirement that the law treat them equally—in order for heightened scrutiny to apply under *Anderson-Burdick*, differential treatment must unfairly burden political opportunity. *See* Def. Br. at 15-16. Here, taken as a whole, the combination of a signature requirement and elector affidavit requirement places a ***lower*** bar to political opportunity than the primary and convention process required for a major party candidate. *See* Def. Br. at 16-17. In other words, even with the affidavit requirement, it is still easier to get on the ballot as a political body candidate than as a major party candidate.

Here, Plaintiffs' argument relies on sleight of hand—it compares political body candidates to major party ***nominees***, not major party ***candidates***. By doing so, it compares candidates seeking to get on the general election ballot to candidates who have already won the right to be on the general election ballot. The more apt comparison is to a major party candidate seeking to win the nomination by competing in primary elections and securing delegate votes at the convention. By arguing that a nominee faces less of a burden after winning the nomination at the convention, *see* Pl. Br. at 9-10, Plaintiffs ignore everything that the candidate had to do in order to win the nomination at the party convention. And the measures a candidate needs to take

to win a major party nomination is precisely what ensures their ability to deliver in executing the Electoral College vote. *See* Def. Br. at 18-19.

Importantly, the differential treatment of major parties and political bodies relates directly to the state interest in ensuring that the election winner will supply 19 eligible electors at the Electoral College in December. Plaintiffs cite *Reform Party of Allegheny Cnty. v. Allegheny Cnty. Dep't of Elections*, 174 F.3d 305 (3d Cir. 1999), Pl. Br. at 10, but that case involved a rule forbidding minor parties from cross-nominating candidates while allowing major parties to cross-nominate. *Id.* at 316. The state offered various justifications for disallowing cross-nomination, but none of the justifications explained why major parties were permitted to be treated differently. *Id.* at 318. Here, by contrast, Secretary Schmidt has explained that the primary and convention process for major party candidates—which is part of Pennsylvania election law—ensures the nominee has the organization necessary to carry out the Electoral College function. *See* Def Br. at 18-19. Pennsylvania law requires political bodies to submit affidavits for electors because there is no similar guarantee.

Plaintiff attempts to distinguish *Jenness v. Fortson*, 403 U.S. 431 (1971), by pointing out that that case allowed differential paths to a ballot because the signature requirement at issue was meant to show that candidates had "a significant modicum of support." Pl. Br. at 10 (quoting *Jenness*). The affidavit requirement, Plaintiff assert, "measures nothing about support." *Id.* This misses the point. The signature requirement is about ensuring a modicum of support, but the affidavit requirement at issue here is about ensuring the smooth functioning of the Electoral College. It shows that a campaign has the sufficient organization to carry out its constitutional function in the Electoral College. The point of *Jenness* is that the state can achieve the same goal

by differently regulating major parties and political bodies without running afoul of *Anderson-Burdick*. That is the situation here.

Plaintiffs have not shown unconstitutional discrimination against political body candidates because they have not shown that the affidavit requirement unfairly harms their political opportunity. Thus, heightened scrutiny is not warranted.

**B. The Commonwealth Has Important Interests in Administering the Electoral College that are Advanced by the Affidavit Requirement**

Plaintiffs concede that the state has "legitimate interests in confirming that its electors are eligible and have consented to serve and in casting a full slate of electoral votes." Pl. Br. at 11. The only dispute in this case is whether the affidavit requirement sufficiently advances that interest. It does, and the experience of the West/Abdullah campaign in 2024 demonstrates why it is necessary.

Plaintiffs contend that the affidavit requirement "contains no undertaking to serve, to attend, or to vote." Pl. Br. at 11. But it does. Or, more specifically, it certifies a present intent and eligibility of the elector to serve, attend, and vote at the Electoral College. As described above, electors can be substituted later, but the affidavit requirement ensures that, at all relevant times, a political body candidate has a full roster of electors ready, willing, and able to serve.

Why not wait until after the election to allow a political body candidate to gather their electors? Look no further than the experience of the West/Abdullah campaign in 2024. Over the course of a month in July 2024, the campaign was unable to certify that it actually had 19 Pennsylvania electors ready, willing, and able to perform their function. *See* Def. Br. at 7. Some had disappeared, while others appeared to be surprised that the role of an elector would involve performing a governmental function and submitting official paperwork. *See id.* In another state,

it appears that the West/Abdullah campaign submitted an elector's name without actually obtaining that elector's consent. *See id.*

Plaintiffs argue that nothing in the record shows anything about the "organizational strength" of major parties as compared to political bodies. Pl. Br. at 12. But the record facts about the West/Abdullah campaign in 2024 precisely demonstrate the lack of organizational strength that a political body candidate might be more likely to have in comparison to an established political party. If this lawsuit were being brought by another candidate, the experience of the West/Abdullah campaign could be cited as the example supporting why Pennsylvania requires affidavits from the electors when it does.

If anything like the experience of the West/Abdullah campaign from July 2024 happens in November and December 2028, the result is likely to be chaos. The regulatory scheme which best ensures a smooth Electoral College vote, but also gives political bodies necessary flexibility over a long campaign season, is the status quo—political body candidates must submit complete affidavits with their paperwork on August 1, but those electors can be replaced after August 1 with the submission of a complete new affidavit.

Finally, Plaintiffs push the challenge to disaffiliation for presidential electors. *See* Pl. Br. at 12-13. Initially, Plaintiffs do not contest that an elector faces nearly no burden at all from disaffiliating today—there is a simple online form for changing party registration. *See* Def. Br. at 14. Thus, Plaintiffs effectively concede that disaffiliation should be subject to the lowest level of scrutiny.

Further, as to the second step of *Anderson-Burdick*, Plaintiffs attempt to distinguish *Storer v. Brown*, 415 U.S. 724 (1974), by arguing that membership in the Electoral College has nothing to do with primary elections. They say that "[n]o one 'raids' a party through an elector

designation." Pl. Br. at 13. But the point is, in the event that a political body candidate wins Pennsylvania, a major party could. This would also be a world where it is likely that the Republican and Democratic nominee have both won a large number of states ***but neither has won Pennsylvania***. Thus, Plaintiffs are asking this Court to allow a political body to appoint a Republican or Democrat as a presidential elector after the people of Pennsylvania have expressly chosen not to support either the Republican or Democratic nominee. What Plaintiffs are asking for is the ability to appoint a Republican or Democratic party member—who voted in that year's primary election and maybe even served as a delegate to the party convention—as one or more of their electors. While Plaintiffs blindly conclude that no major party could raid a political body via elector designation, allowing major party members to serve as presidential electors of a political body would absolutely open that possibility.

*   *   *

For the reasons provided previously and explained above, this Court should uphold the affidavit requirement. It should find that heightened scrutiny is not required because the affidavit requirement does not place a substantial burden on ballot access, and it should find that, under any level of scrutiny, the affidavit requirement passes constitutional muster because it is narrowly tailored to the Commonwealth's interest in administering the Electoral College vote cleanly, efficiently, and without unnecessary problems.

### C. Plaintiffs Do Not Dispute That Specific Timing Issues They Faced in 2024 Cannot Repeat in 2028

In response to Secretary Schmidt's mootness argument, Plaintiffs repeat their position that the facts that the West/Abdullah campaign encountered in 2024 are likely to repeat in 2028. Pl. Br. at 16-17. But while the law remains the same, key facts will not, making all the difference.

Plaintiffs' problems in 2024 arose from their lack of diligence—for whatever reason, they found out about the affidavit requirement close to the August 1 deadline and after the disaffiliation deadline. *See* Def. Mem. at 6-7. This, Plaintiffs argue, placed a burden on the campaign it could not meet. But this timing problem has not, will not, and cannot repeat in 2028. Plaintiffs now have plenty of notice to identify their electors prior to circulating their nomination papers and prior to the disaffiliation deadline. To the extent they contend that they will not be allowed to replace an elector after August 1 or that some other problem might emerge before August 1 that they cannot fix, such speculation cannot be the basis of today's constitutional challenge.

Plaintiffs point out that there has been "no change in the law," Pl. Br. at 16, but that is not entirely true and beside the point. It is not entirely true because, as Plaintiffs admit, they were uncertain about what state law required until *Clymer*, which was decided during the 2024 campaign. *Id.* That uncertainty is now gone. And it is beside the point because the mootness argument here rests on different facts, not a change in the law. The burden Plaintiffs faced in 2024—which accounts for half of the scale under *Andeson-Burdick*—was at least partly due to uncertainty and specific facts related to timing. Those particular facts will not repeat, and thus they cannot be used as part of the balancing test.

## III. CONCLUSION

Wherefore, for the reasons stated above and in their previous Memorandum of Law, ECF No. 102, this Court should grant Defendant's motion for summary judgment, deny Plaintiffs' motion for summary judgment, and enter final judgment dismissing Plaintiffs' case.[2]

Date: October 27, 2026

Respectfully submitted,

JENNIFER C. SELBER
GENERAL COUNSEL

By: /s/ Stephen R. Kovatis
STEPHEN R. KOVATIS (ID No. 209495)*
Deputy General Counsel
JACOB BOYER (ID No. 324396)
Deputy General Counsel

GOVERNOR'S OFFICE OF GENERAL COUNSEL
30 North Third Street, Suite 200
Harrisburg, PA 17101
Phone: 717-602-0943
Email: skovatis@pa.gov

*Counsel for Defendants*

**Admitted pro hac vice* (*)

[2] As previously indicated, if the Court denies this motion and grants Plaintiff's motion for summary judgment, Defendants respectfully request the opportunity to brief the appropriate remedy.

**CERTIFICATE OF SERVICE**

I, Stephen R. Kovatis, hereby certify that I have caused all parties to be served on this day with the foregoing Memorandum of Law via the Court's ECF system.

Date: October 27, 2026

By: /s/ Stephen R. Kovatis______
STEPHEN R. KOVATIS